# UNITED STATES DISTRICT COURT

### for the

Eastern District of Wisconsin

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Phillip Daniels, Sr., a/k/a "Dr. Phil," et al. | ) Case No.22-1852M(NJ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____September 2020 - Present_____ in the county of _____Milwaukee_____ in the

_____Eastern_____ District of _____Wisconsin_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| See Attachment A. | See Attachment A. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

DEA TFO Donald Krenzien
_____
*Printed name and title*

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date: 11/23/2022
_____

_____
*Judge's signature*

City and state: _____Milwaukee, Wisconsin_____

Honorable Nancy Joseph, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND SEARCH AND SEIZURE WARRANTS

I, Donald Krenzien, being duly sworn, do depose and state as follows:

## I.     INTRODUCTION AND AGENT BACKGROUND

1.     I am a state certified law enforcement officer employed as a Police Officer with the Milwaukee Police Department (MPD) and have been a sworn officer in the State of Wisconsin for approximately 8 years.  I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) Milwaukee Metro Drug enforcement group.  I am also a federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA).  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.     In connection with my official Milwaukee Police Department and DEA duties, I investigate criminal violations relating to narcotics trafficking offenses, in violation of Title 21, United States Code, Sections 841, 843, 846; money laundering offenses, in violation of Title 18, United States Code, Sections 1956 and 1957; and federal firearms offenses, in violation of Title 18, United States Code, Sections 922(g), 924(a), and 924(c). I have received specialized training in the means and methods by which individuals and DTOs conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking.

1

3. As a DEA TFO and MPD police officer, I have participated in the investigation of narcotics-related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the narcotics traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone records, and the arrests of numerous drug traffickers. I have also been the affiant of search warrants. Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

    a.    I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

    b.    I am familiar with the coded language used over the telephone to discuss drug trafficking and know that the language is often limited,

guarded and coded. I also know the various code names used to describe controlled substances;

c.  I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own, use and exercise dominion and control over these assets;

d.  I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

e.  Drug traffickers frequently possess firearms and ammunition to protect their illegal product;

f.  I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, vehicles, or other locations over which they maintain dominion and control;

g.  I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

h.  It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time.  It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

3

i.  It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

j.  I know large-scale drug traffickers often use electronic equipment such as telephones, pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers use the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses that may generate large quantities of currency. To this end, I am also familiar with the analysis of financial documents;

l.  I know drug traffickers commonly maintain addresses or telephones numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

m.  I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's,

4

optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

n.    Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

4.    Case agents also include State of Wisconsin health care fraud investigators, and specifically a Special Agent for the Wisconsin Department of Justice, Division of Criminal Investigations, assigned to the Medicaid Fraud Control and Elder Abuse Unit (MFCEAU). Through speaking with health care fraud investigators, I know that they have received specializing training in Medicaid rules and regulations and have been involved in the investigation related to alleged fraud, abuse, and neglect committed by Medicaid providers against Medicaid recipients and the Medicaid program. Some of the offenses that MFCEAU investigates include: heath care fraud offenses, including by not

5

limited to violations of 18 U.S.C. § 1347, 1349, 1035, as well as the Anti-Kickback statute, contrary to 42 U.S.C. § 1320a-7b(b). Based on their training, experience, and involvement in health care fraud investigations, health care fraud investigators have conducted complex investigations and audits of Medicaid-funded programs and providers, home health agencies, hospitals, medical clinics, nursing homes, assisted living facilities, such as adult family homes, and pharmacies to identify fraud. Medicaid-funded programs may include fee for service, self-directed, health maintenance, or managed care. Their duties include conducting interviews of witnesses, complainants, and suspects to obtain information and evidence; reviewing medical records for indications of fraud; collecting, using, and interpreting information from computerized databases; collecting, protecting, and preserving evidence and maintaining its admissibility for court proceedings; and obtaining, reviewing, and maintaining financial records related to investigations.

5.     Pursuant to my official duties, I am submitting this Affidavit in support of an application for a criminal complaint, arrest warrants, and search warrants for property described in Attachment A, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies); Title 18, United States Code, Sections 1956(a), 1956(h), and 1957 (Money Laundering and Conspiracy to Commit Money Laundering); Title 18, United States Code, Section 1035 (False Statements Regarding Health Care Matters); Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, United

6

States Code, Section 1343 (Wire Fraud); and Title 18, United States Code, Section 2(a) (Aiding and Abetting the Aforementioned Offenses), collectively referred to as the Target Offenses.

6.    I am also submitting this Affidavit in support of the seizure of funds that were involved in, or are traceable to funds involved in, money laundering transactions.

7.    Throughout this Affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

8.    The facts set forth in the Affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint, search warrants, and seizure warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.

## II.    PURPOSE OF AFFIDAVIT

### A.    Individuals for Whom a Criminal Complaint are Sought

|   | Name | Date of Birth |
|---|------|---------------|
| 1 | Phillip DANIELS SR., a/k/a "Dr. Phil" | redacted/1976 |
| 2 | Roy HENTON, a/k/a Pops | redacted/1958 |
| 3 | Joelle MASSEY | redacted/1992 |
| 4 | Joathan COLULA | redacted/1992 |
| 5 | Julio BARRAZA | redacted/1974 |
| 6 | Deonte EDWARDS | redacted/1995 |

7

| 7 | Jimmy GONZALEZ MACIAS a/k/a Jimmy MACIAS | redacted/1997 |
| 8 | Jameel BRADLEY SR., a/k/a "Black" | redacted/1985 |
| 9 | Michael WILLIAMS | redacted/1981 |
| 10 | Kevin NELSON | redacted/1975 |
| 11 | Ramona FRYER | redacted/1994 |
| 12 | Carla SMITH | redacted/1976 |
| 13 | Itzel CRUZ-GONZALEZ | redacted/1996 |
| 14 | Betty DANIELS | redacted/1976 |
| 15 | Dominique M. LEWIS | redacted/1995 |
| 16 | Lenard MONROE | redacted/1973 |

**B. Properties for Which Search Warrants are Sought**

9. For the reasons discussed herein, there is probable cause to believe that located at and in the following properties, more fully described in Attachment A and collectively referred to as "SUBJECT PREMISES," are items that constitute evidence of the Target Offenses.

a. redacted W. Bradley Road, Apartment #203, Milwaukee, Wisconsin ("SUBJECT PREMISES 1");

b. redacted N. Teutonia Avenue, Apartment #4, Milwaukee, Wisconsin ("SUBJECT PREMISES 2");

c. redacted W. Fond Du Lac Avenue, Milwaukee, Wisconsin ("SUBJECT PREMISES 3");

d. redacted N. 37th Street, Milwaukee, Wisconsin ("SUBJECT PREMISES 4");

e. redacted W. Capitol Drive, Suite #119, Milwaukee, Wisconsin ("SUBJECT PREMISES 5);

f. redacted N. Sherman Avenue, Suite #305, Milwaukee, Wisconsin ("SUBJECT PREMISES 6");

g. redacted Linden Court, Lomira, Wisconsin ("SUBJECT PREMISES 7");

h.      <span>redacted</span> W. Townsend Avenue, Suite #104, Milwaukee, Wisconsin ("SUBJECT PREMISES 8"); and

i.      Storage Unit #3015E, located at East Bank Storage, <span>redacted</span> N. Doctor Martin Luther King Drive, Milwaukee, Wisconsin ("SUBJECT PREMISES 9").

**C.    Accounts for Which Seizure Warrants are Sought**

10.    This affidavit is in support of the seizure of all funds in the following Accounts:

a.      BMO Harris Bank Account <span>redacted</span>4242, in the name of First Response Supportive Care Agency ("BMO 1");

b.      BMO Harris Bank Account <span>redacted</span>6721, in the name of First Response Supportive Care Agency ("BMO 2");

c.      BMO Harris Bank Account <span>redacted</span>1119, in the name of Betty Daniels and Phillip Daniels ("BMO 3");

d.      BMO Harris Bank Account <span>redacted</span>277, in the name of Betty Daniels ("BMO 4");

e.      BMO Harris Bank Account <span>redacted</span>9173, in the name of Wellness Personal Care Service ("BMO 5");

f.      BMO Harris Bank Account <span>redacted</span>8472, in the name of Wellness Personal Care Service ("BMO 6");

g.      Chase Bank Account <span>redacted</span>8205, in the name of Intelligent Investments ("Chase 1");

h.      Chase Bank Account <span>redacted</span>9319, in the name of Tier One Records ("Chase 2");

i.      Educators Credit Union Account <span>redacted</span>13_08, in the name of A Touch of Love Supportive Care Agency/The Perfect Choice Supportive Care Agency ("ECU 1");

j.      Educators Credit Union Account <span>redacted</span>13_00, in the name of A Touch of Love Supportive Care Agency/The Perfect Choice Supportive Care

9

Agency ("ECU 2");

k.      Educators Credit Union Account redacted 71_08, in the name of Unconditional Love Supportive Home Care ("ECU 3");

l.      Educators Credit Union Account redacted 71_00, in the name of Unconditional Love Supportive Home Care ("ECU 4");

m.      Wells Fargo Bank Account ending in redacted 8255 in the name of Phillip Daniels ("WF 1");

n.      Wells Fargo Bank Account redacted 6511, in the name of Wellness Personal Care ("WF 2"); and

o.      Wells Fargo Bank Account redacted 7022, in the name of Lenard Monroe ("WF 3").

11.     For the reasons set forth below, I submit that the funds sought to be seized are funds that were involved in, or are traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. § 1956(a)(1), and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 984, and subject to criminal forfeiture under 18 U.S.C. § 982(a)(1).  The funds are subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

## III.    SUMMARY OF PROBABLE CAUSE

### A.     Background and Summary of Investigation

12.     In January 2022, members of the North Central High Intensity Drug Trafficking Area (HIDTA), the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and the Internal Revenue Service (IRS) initiated an investigation into individuals distributing large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law

enforcement officers identified the leader of the drug trafficking organization (DTO) as Phillip DANIELS SR., a/k/a "Dr. Phil" (DANIELS), who has established distribution locations in Milwaukee, Wisconsin; St. Paul/Minneapolis, Minnesota; and Chicago, Illinois. Based on their training, experience, and knowledge of this investigation, case agents believe that beginning by at least September 2020, the DANIELS DTO has distributed in excess of 400 grams of fentanyl, a Schedule II controlled substance, 500 grams of methamphetamine, a Schedule II controlled substances, 5 kilograms of cocaine, a Schedule II controlled substance, 1 kilogram of heroin, a Schedule I controlled substance, and marijuana, a Schedule I controlled substance.

13.    Court-authorized intercepted communications, video surveillance, phone records, postal records, and financial records reflect that the DANIELS DTO is sourced by numerous sources of supply operating in California. Beginning by at least October 2021, Joathan COLULA (COLULA) and Julio BARRAZA (BARRAZA), California residents, are supplying the DANIELS DTO with cocaine and methamphetamine. The investigation has further revealed that Jimmy GONZALEZ MACIAS (MACIAS) is supplying the DANIELS DTO with methamphetamine, cocaine, and fentanyl. Deonte EDWARDS (EDWARDS), who also resides in California, assists DANIELS in purchasing controlled substances from the California-based sources of supply, and obtains, packages, and sends controlled substances, including fentanyl, cocaine, and marijuana, to the DANIELS DTO.

14.    To date, court-authorized interceptions, physical and electronic surveillance, and postal records reflect that the DANIELS DTO has used United Postal

Service (UPS), FedEx, and/or the United States Postal Service (USPS) to ship and receive at least 45 parcels suspected to contain controlled substances, to include methamphetamine, fentanyl, cocaine, and marijuana. COLULA, BARRAZA, and EDWARDS send the suspected drug parcels to DTO-related addresses in Milwaukee, Wisconsin, and St. Paul, Minnesota, using aliases and/or fictious identifying information. In the case of MACIAS, intercepted communications and location information reflect that EDWARDS obtains controlled substances from MACIAS, which he packages and ships to the DTO. During the course of this investigation, two narcotics-laden parcels were lawfully searched, resulting in the seizure of approximately 3 kilograms of cocaine (March 2022) and 1 kilogram of fentanyl (November 2022).

15.     Based on confidential source information, the DTO has also used couriers to drive the controlled substances from California to the Midwest United States at the direction and control of DANIELS. In January 2022, approximately 7 kilograms were seized from a DTO courier while traveling from California to Milwaukee, Wisconsin, at the direction of DANIELS and Jameel BRADLEY SR. (BRADLEY SR.).

16.     The investigation has further revealed that DANIELS has used various methods to send drug proceeds to the California-based suppliers. DANIELS has used "ghost" bags by sending luggage, believed to contain drug proceeds, to Los Angeles, California, on flights that he did not board. On one occasion, COLULA was observed picking up a "ghost" bag. On another occasion, a "ghost" bag was lawfully searched, revealing $105,000 in bulk currency.

17.     Throughout the course of this investigation, various DTO members have used various business bank accounts to conceal and disguise the nature of source of their drug proceeds. The investigation has revealed that DTO members, including DANIELS, Roy HENTON (HENTON), Joelle MASSEY (MASSEY), and Ramona FRYER (FRYER), have deposited drug proceeds—in the form of cash and cashiers' checks—into (1) DANIELS' and Betty DANIELS' (B. DANIELS) business account, (2) COLULA's business account, and (3) EDWARDS' business account. DANIELS has withdrawn from his business accounts U.S. currency in the form of cashier's checks, which he then electronically transferred to EDWARDS' business account in the name of Tier One Records. EDWARDS then uses his Tier One Records account as a "funnel" account, as illustrated by his subsequent cash withdrawals. It is believed that EDWARDS then provides the cash proceeds to the DTO's California-based suppliers, to include COLULA and MACIAS.

18.     As previously stated, DANIELS operates distribution locations in Milwaukee, Wisconsin; St. Paul and Minneapolis, Minnesota; and the greater Chicago, Illinois area. DANIELS is based in Milwaukee, where he operates at least one stash location at [redacted] N. Teutonia Avenue Apartment #4. HENTON, a Milwaukee-based conspirator, has been identified as DANIELS' partner in DTO operations. HENTON manufactures and distributes controlled substances, frequents the Milwaukee DTO stash location, and retrieves parcels suspected to contain controlled substances. Kevin NELSON (NELSON) and Domonique LEWIS (LEWIS) have been identified as Milwaukee-based DTO distributors. MASSEY, DANIELS' long-term girlfriend based in

13

Milwaukee, has received narcotics-laden parcels, distributes controlled substances, and launders and facilitates the movement of DTO proceeds. MASSEY also travels to Chicago, and has traveled to California, on behalf of the DTO.

19.     The DTO is known to distribute methamphetamine, fentanyl, heroin, and cocaine in Minnesota. DANIELS and Michael WILLIAMS (WILLIAMS) work in tandem, i.e. partnership, to manufacture and distribute controlled substances in the St. Paul/Minneapolis metropolitan area. WILLIAMS and DANIELS operate a stash location in Minneapolis, Minnesota. Ramona FRYER (FRYER) has been identified as a Minnesota-based DTO distributor who also receives narcotics-laden parcels, frequents the Minnesota stash house, and launders and facilitates the movement of DTO proceeds. FRYER and DANIELS are believed to be in a romantic relationship and share a residence in Eagan, Minnesota. Carla SMITH (SMITH), FRYER's mother, has also been identified as a Minnesota-based DTO distributor.

20.     Furthermore, DANIELS and BRADLEY SR. work in tandem, i.e. partnership, to procure controlled substances, to include methamphetamine and cocaine, for the DTO. BRADLEY SR. has traveled with DANIELS to California and Memphis, Tennessee, to facilitate and supply narcotics to the DTO. DANIELS and BRADLEY SR. also work together to distribute controlled substances through the greater Chicago, Illinois, area. Itzel CRUZ-GONZALEZ (CRUZ-GONZALEZ) also works with BRADLEY SR. and DANIELS to procure controlled substances, including methamphetamine, from MACIAS. CRUZ-GONZALEZ is further believed to facilitate the DTO by packaging controlled substances, to include cocaine, and by accounting for DTO proceeds.

14

21.     The investigation has further revealed that DTO members, including but not limited to, DANIELS, COLULA, BARRAZA, EDWARDS, MASSEY, FRYER, and NELSON, use the third-party end-to-end encrypted application WhatsApp to communicate drug-related business in addition to communicating over the Target Telephones.

22.     Additionally, the investigation has revealed, through the assistance of the Wisconsin Department of Justice, Division of Criminal Investigations (DCI), that DANIELS, HENTON, B. DANIELS, Lenard MONROE (MONROE), and others operate various personal and/or supportive care agencies that purport to offer supportive and personal care services. The investigation reveals, however, that the various agencies have billed the State of Wisconsin Medicaid program for personal and/or supportive care services that were not actually rendered. Various individuals for whom these agencies have received Medicaid payments were interviewed and stated that DANIELS, HENTON, B. DANIELS, and MONROE received Medicaid payments for services never provided to them.

23.     Bank accounts held in the name of agencies operated by DANIELS, B. DANIELS, and HENTON have received well over $1,500,000 in Medicaid payments from January 2018 to May 2022, despite these accounts reflecting minimal legitimate business expenses and no payroll services. During the same time period, their accounts have received approximately $2 million dollars in unexplained cash, and the accounts reflect withdrawals totaling over $2,700,000.

15

24.     MONROE is the owner of a separate but related agency that purports to offer supportive and personal care services to individuals qualifying for the Wisconsin Medicaid program. Since January 2019, MONROE's agency has received at least $5,000,000 in Medicaid payments. Bank records reflect a significant amount of funds were withdrawn as cash, as payments to himself, and as payments to DANIELS' and B. DANIELS' healthcare agency. MONROE's bank accounts also reflect significant unexplained cash deposits. MONROE has also engaged in loan fraud by making false representations regarding his healthcare business to obtain approximately $592,000 in COVID-19-related loan relief. MONROE directed his fraudulently obtained loan proceeds to be deposited directly into bank accounts receiving what is believed to be fraudulently obtained Medicaid payments.

IV.     **PROBABLE CAUSE**

25.     This investigation used numerous investigative techniques, including but not limited to the following: interviews with confidential sources and sources of information; information from other law enforcement officers; documentary evidence; pen register, trap, and trace devices; telephone toll data; physical surveillance; electronic surveillance; mail carrier records; and Title III court authorized intercepted communications. Through this information, I have learned the following:

A.     **Court Authorized Interceptions**

26.     In the course of this investigation, the United States District Court for the Eastern District of Wisconsin authorized the following interceptions pursuant to 18 U.S.C. § 2518:

a.  On August 24, 2022, the Honorable J.P. Stadtmueller issued an Order authorizing the initial interception of wire communications over phone number (262) 599-[redacted] (Target Telephone 1), used by HENTON, and phone number (213) 444-[redacted] (Target Telephone 2), used by DANIELS. Interceptions pursuant to this Order began on August 24, 2022 and ended on September 22, 2022.

b.  On September 30, 2022, the Honorable Pamela Pepper issued an Order authorizing the continued interception of wire communications over Target Telephone 1, used by HENTON; the continued interception of wire communications and the initial interception of electronic communications over Target Telephone 2, used by DANIELS, the initial interception of wire communications over phone number (773) 934-[redacted] (Target Telephone 3), used by BRADLEY SR.; and the initial interception of wire and electronic communications over phone number (773) 948-[redacted] (Target Telephone 4), used by DANIELS. Interceptions pursuant to this Order began on September 30, 2022 and ended on October 29, 2022. However, interceptions over Target Telephone 3 ended on October 20, 2022 due to inactivity.

c.  On November 3, 2022, the Honorable J.P. Stadtmueller issued an Order authorizing the continued interception of wire and electronic communications over Target Telephone 2, used by DANIELS; the continued interception of wire communications over phone number (773) 948-[redacted] (Target Telephone 4), used by DANIELS; and the initial interception of wire and electronic communications over phone number (708) 635-[redacted] (Target Telephone 5), used by BRADLEY SR. Interceptions pursuant to this Order began on November 4, 2022 and are scheduled to end at 11:59 p.m. on December 2, 2022.

27.  Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means discussed above, including many conversations of intercepted communications over several months, phone records, information from confidential sources, public records searches, and electronic and personal surveillance. The intercepted calls detailed below are provided solely as a sample of what case agents believe are numerous

17

inculpatory interceptions with the identified below targets. Furthermore, the significance and meaning attributed to the intercepted communications are based on case agents' training, experience, and knowledge thus far derived from this investigation.

28.    For reference, evidence as it relates to drug trafficking will be presented first, then evidence as it relates to Medicaid fraud will be presented next, to be followed by the results of the DANIELS DTO financial investigation.

### B.    DANIELS Orchestrates a Multi-State DTO, launders DTO proceeds, and uses SUBJECT PREMISES 1 and 2 to facilitate his drug trafficking.

29.    The investigation has revealed that DANIELS is the leader of a DTO operating in Milwaukee, Wisconsin; St. Paul and Minneapolis, Minnesota; and Chicago, Illinois. Since at least September 2020, DANIELS and his DTO has been distributing large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana, at least some of which he has been sourcing through suppliers operating in California. DANIELS has used the mail to receive parcels that are suspected to have contained controlled substances. DANIELS has also used couriers to drive controlled substances from California to Milwaukee.

30.    During the course of this investigation, case agents determined that DANIELS has used Target Telephone 2 and Target Telephone 4 to further DTO activities. Between August 24, 2022 and November 12, 2022, approximately 901 intercepted calls and/or text messages between DANIELS and others were deemed criminal and pertinent in nature.

18

31.     According to airline records, DANIELS and other DTO members, including HENTON, BRADLEY SR., and MASSEY have traveled between the Midwest United States and California multiple times in the past. DANIELS' primary residence is in Milwaukee, SUBJECT PREMISES 1. However, DANIELS spends a significant amount of time traveling to St. Paul/Minneapolis, Minnesota, and to Chicago, Illinois. Intercepted communications and surveillance reveal that the purpose of DANIELS' travels is to facilitate the DTO and expand its operations. Intercepted communications and surveillance—both physical and electronic—establish that DANIELS travels to each DTO hub on a frequent basis to re-supply DTO distributors, collect drug proceeds, and monitor drug trafficking operations. He often travels in his black GMC Yukon bearing Wisconsin registration plates "M0NEY23." The registered owner of this vehicle is Christopher DANIELS of ██████ West North Avenue #146, Brookfield, Wisconsin.

32.     Christopher DANIELS (C. DANIELS), believed to be DANIELS' son or nephew, was shot and killed in October 2022 in his home. Previous to his death, C. DANIELS was believed to have accepted parcels that contain suspected controlled substances and to distribute controlled substances. At the time of his death, his residence at ██████ W. Fond Du Lac Avenue, Milwaukee was searched, which search yielded twelve 9mm casings and three bullets in the bedroom, and approximately 1,612 grams of marijuana and $52,042 U.S. currency in the residence. A blue 2008 Audi Q7 (WI plate# ARC-7252) was located, parked in the parking lot next to the residence. A dark blue Dodge Durango (WI plate# BIGGW0P), listing to New Generations Investments LLC (C. DANIELS' business) was located in the garage. These vehicles were searched and a Ruger

19

5.57mm handgun, bearing serial number 642-21930, was located on the driver's side floorboard of the Dodge Durango. Both vehicles, the blue Audi and the blue Dodge Durango, have now regularly been parked in front of SUBJECT PREMISES 1.

33.     DANIELS is also engaged in laundering the money generated from the sale of the controlled substances that he supplies to the DTO. First, DANIELS, by depositing and/or sending bulk currency as payment for controlled substances, is involved in transactions that are designed to conceal or disguise the source, origin, nature, ownership, or control of the proceeds and/or to promote the drug trafficking activities. Examples of DANIELS' money laundering activities will be more thoroughly addressed where connected to other DTO members.

      **1.    A confidential source indicates DANIELS supplied narcotics to the source, directed the source to deposit drug proceeds into a business bank account, and directed the source to provide narcotics to FRYER.**

34.     In early 2021, DEA and the Bureau of Criminal Apprehension in Minneapolis/St. Paul, Minnesota, were conducting a drug trafficking investigation in which approximately five pounds of methamphetamine, paraphernalia consistent with kilogram level distribution, and U.S. currency were seized from an individual later identified as confidential source (CS) 1. [1]

---

[1] Beginning in November 2021, a confidential source, CS 1, made statements against CS 1's penal interest. CS 1 has an armed robbery conviction, two firearm convictions, and one federal narcotics trafficking conviction. CS 1 is cooperating in exchange for consideration on the federal narcotics trafficking conviction. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by seizures of

35.     Beginning in November 2021, law enforcement conducted an interview of CS 1. CS 1 stated that CS 1 has known "Dr. Phil" since approximately September 2020. CS 1 identified DANIELS by photograph as "Dr. Phil." CS 1 stated that CS 1 sold multiple kilograms of cocaine, heroin, and methamphetamine for DANIELS and HENTON from approximately September 2020 to January 2021, in the Saint Paul/Minneapolis area. According to CS 1, the narcotics were shipped to Minnesota, and a typical shipment would contain six kilograms of cocaine, six kilograms of heroin, and approximately thirty pounds of methamphetamine.

36.     CS 1 indicated that DANIELS traveled via a commercial airline multiple times a month to see if people were ready for more controlled substances, i.e., resupply and/or collect money from his various runners who assisted the DTO. CS 1 stated that DANIELS took these flights with U.S. currency inside of his luggage. CS 1 also called DANIELS when more product was needed or when money was ready for pickup.   CS 1 stated that DANIELS also set up numerous LLCs, which DANIELS used to get loans to move money.   CS 1 indicated that DANIELS directed CS 1 to sell the narcotics, and DANIELS picked up the money at a later date. CS 1 indicated that if DANIELS did not pick up the money, CS 1 deposited drug proceeds into a Chase bank account under one

---

physical evidence, documentary evidence, and lawfully obtained device extractions. CS 1's information has also been corroborated by digital evidence contained on CS 1's cell phone, such as text messages, photographs, and geolocation information. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

of DANIELS' LLCs associated with a health care business, possibly "First Responsive Supportive Care."

37.     CS 1 stated that in December of 2020, a Minnesota-based DTO member stole four kilograms of cocaine from DANIELS. Immediately thereafter, DANIELS and "Pops" (identified as HENTON) flew into Minneapolis to address the theft. CS 1 believed that HENTON was DANIELS' father (although the investigation reveals that HENTON is not DANIELS' father).   According to CS 1, at this time, CS 1 met with DANIELS and HENTON regarding the price for cocaine.  During the meeting, HENTON agreed to drop the price of a kilogram of cocaine sold to CS 1 from $45,000 to $40,000 and advised CS 1 not to disclose the price with any other individual.

38.     CS 1 stated the organization was run by DANIELS. However, CS 1 believed HENTON had the final say and ultimately was the "shot caller" based upon HENTON's ability to set pricing for cocaine. CS 1 identified additional DTO subjects, to include BRADLEY SR., Leroy HENTON, C. DANIELS, and FRYER. CS 1 further stated that B. DANIELS handled the marijuana aspect of the DTO.

39.     CS 1 further stated that CS 1 delivered narcotics to FRYER's residence located at ███ E. Bates Avenue, St. Paul, Minnesota. According to CS 1, DANIELS instructed CS 1 to provide FRYER with pills and cocaine, which FRYER then distributed.

        **2.      DANIELS' DTO receives drugs through mailed parcels.**

40.     Between approximately October 7, 2021, through November 11, 2022, at least forty-five parcels suspected to contain controlled substances have been delivered from California to addresses associated with the DTO. These parcels have been identified

22

as being associated with the DTO because the parcels have been traced to the same group of senders, and the listed recipients are often identified DTO members, to include DANIELS, MASSEY, C. DANIELS, HAUCK, or a few select other names believed to be nominee names. The receiving addresses include, but are not limited to, the following:

a. [redacted] N. Deerwood Drive, Brown Deer, Wisconsin: a former residence shared by DANIELS and MASSEY. In January 2022, law enforcement located a parcel at this residence that agents believe was used to mail approximately 4 pounds of methamphetamine, which was seized at the time of the execution of a search warrant.

b. [redacted] Bates Avenue, Saint Paul, Minnesota: is a former residence shared by DANIELS and FRYER. A parcel destined for this address was searched in March 2022 pursuant to a federal warrant. Located within the parcel was approximately 3 kilograms of cocaine.

c. [redacted] W. Fond Du Lac Avenue, Milwaukee, Wisconsin: the residence of D.B. and K.B. D.B. and K.B.'s Medicaid information has been used by a home health care company, A Touch of Love Supportive Care Agency (ATOL), operated by HENTON. A parcel destined for this address was searched in November 2022 pursuant to a warrant. Located within the parcel was approximately 1 kilogram of fentanyl.

d. [redacted] N. Teutonia Avenue, Milwaukee, Wisconsin, SUBJECT PREMISES 2: a stash location frequented by DANIELS and other DTO members.

e. [redacted] N 48th Street, Milwaukee, Wisconsin: a vacant residence.

f. [redacted] N 103rd Street, Milwaukee, Wisconsin: a vacant residence.

g. [redacted] W. Fond Du Lac Avenue, Milwaukee, Wisconsin: a residence directly next to DANIELS' former residence [redacted] W. Fond Du Lac Avenue). DANIELS has been observed obtaining from this address parcels suspected of containing controlled substances on two occasions.

h. [redacted] N. 37th Street, Milwaukee, Wisconsin, SUBJECT PREMISES 4: NELSON's residence.

23

41.     Based on their training and experience, case agents know that drug traffickers often use mail carriers to ship and receive controlled substances using alias names, fake names, or relatives/other people's names to distance themselves from the drugs contained therein and to avoid law enforcement detection.  Case agents further know that even when the drug parcels are not in the drug trafficker's name, the drug traffickers exercise dominion and control over the drug parcel.  Case agents knows it is common for controlled substances to come from drug source states, including California.

### 2.1    DANIELS and MASSEY received DTO parcels and stored drugs and proceeds at former Deerwood Drive residence and search uncovered DTO payments to COLULA.

42.     On January 5, 2022, the residence located at ███ N. Deerwood Drive, Brown Deer, Wisconsin, which was later determined to be associated with DANIELS, was searched pursuant to a federal search warrant after the U.S. Marshal Service arrived to execute a fugitive arrest warrant for someone wanted on state cocaine distribution charges and saw contraband in plain view. MASSEY was home at the time. MASSEY was permitted to call DANIELS, during which call they discussed whether officers would take the money in the residence. MASSEY was later arrested.

43.     Evidence seized during the search of this residence included the following:

    a.    Approximately 1,910 grams of methamphetamine in the kitchen/dining area, comprised of 1,885 grams, which was divided into 4 individual plastic bags, in one of several white plastic screw-on top containers, and approximately 25 grams packaged in 64 individual gem pack bags. Next to the white plastic containers was a shipping box with a circular imprint similar to the top of one of the white plastic containers. The shipping label was addressed to MASSEY with the address for the residence at ███ N. Deerwood Drive, Brown Deer, Wisconsin, and the label indicated it was

24

shipped by Michael Herrera, from an address in Los Angeles, California;

b.    Approximately 2,767 grams of marijuana packaged in 10 individual vacuum sealed bags, a stun gun, and two medication bottles belonging to MASSEY in the bedroom;

c.    A plastic firearm box for a Glock, model 27, pistol in a kitchen cabinet;

d.    Three digital scales and empty gem pack bags in a kitchen drawer;

e.    $45,448 in U.S. currency believed to be drug proceeds;

f.    Personal identifying information for DANIELS throughout the residence, including DANIELS' social security card and his driver's license, which lists his address as ⬛ W. North Avenue, 146, Brookfield, Wisconsin, a UPS store with numbered boxes for mail;

g.    Documents reflecting (1) DANIELS held a Wells Fargo bank account and safety deposit box in St. Paul, Minnesota (which DANIELS and FRYER emptied on January 5, 2022) (2) two cashier's checks ($7,850 and $15,300) dated December 2021, drawn from DANIELS' Wells Fargo account to COLULA; (3) a deposit receipt dated December 15, 2021, reflecting a $9,010 deposit into DANIELS' Wells Fargo account (approximately $3,900 of the total deposit consisted of $20.00 bills, which case agents believe to be indicative of drug trafficking based upon their training and experience); (4) a $5,500 MoneyGram transfer receipt dated June 2021, wherein MASSEY sent U.S. currency from Minneapolis, Minnesota, to a liquor store in Los Angeles, California; and (5) rental agreements for various storage units held by DANIELS in Milwaukee, Wisconsin; and

h.    Hand-written drug ledgers wherein quantities of controlled substances, prices, and amounts paid were memorialized. Based on their training and experience, case agents believe that the controlled substances referred to include methamphetamine, cocaine, and different strains of marijuana.

44.    Pursuant to the search warrant, agents forensically extracted various devices seized from the residence. Located on an iPad were numerous pictures of

DANIELS holding large quantities of U.S. currency. Located on MASSEY's phone were communications between DANIELS and MASSEY related to their involvement in drug trafficking and healthcare-related matters.

### 3. DANIELS' DTO received drugs through couriers.

45. On or about January 16, 2022, a traffic stop was conducted on a black Nissan Altima (WA BYG7898) driven by an individual on I-15 near mile marker 71 in Summer, Utah. The individual was later identified as a confidential source, CS 2. [2] During the traffic stop, CS 2's vehicle was subsequently searched after a drug detection dog alerted to the presence of the scent of narcotics coming from the trunk of the car. The search revealed a white plastic container with a screw off lid containing seven brick-shaped objects, which field tested positive for seven kilograms of cocaine.

46. Upon arrest, CS 2 stated that the car was rented by BRADLEY SR. (confirmed by case agents), and that CS 2 did not know any controlled substance were inside the vehicle. CS 2 knows that BRADLEY SR. also goes by the nicknames of "Chris" or "Black." CS 2 stated CS 2 was driving the black Nissan first to Chicago, and then to Milwaukee, where CS 2 would be staying with MASSEY and meeting with friends.

---

[2] Beginning in January 2022, CS 2 made statements against CS 2's penal interest. CS 2 has one federal narcotics trafficking conviction. CS 2 is cooperating in exchange for consideration on the federal narcotics trafficking conviction. Thus far, the information provided by CS 2 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 2's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 2 is credible and CS 2's information reliable.

26

47.     CS 2's phone was searched pursuant to CS 2's consent. Located in CS 2's phone extraction was a text message dated January 12, 2022, from (213) 444█████, Target Telephone 2, which stated " . . .  this Dr. Phil Please give me a call." Case agents know, based upon their training and experience, that it is common for drug traffickers to obtain new cellular telephone numbers to avoid detection by law enforcement officers, particularly after a co-conspirator is arrested. In this case, case agents believe that DANIELS changed his phone number to Target Telephone 2 and informed CS 2 of such after controlled substances, drug trafficking paraphernalia, and a large amount of U.S. currency was seized from his residence on January 5, 2022.

48.     CS 2 later provided additional statements to law enforcement. CS 2 stated that CS 2 transported drugs from California to Wisconsin approximately four or five times at the direction of DANIELS and BRADLEY SR. CS 2 further stated that DANIELS and/or BRADLEY SR. hid the drugs within items such as a washing machine and furniture. According to CS 2, CS 2 was present at hotels in California with DANIELS and/or BRADLEY SR. when CS 2 observed rectangular-shaped objects wrapped in aluminum and/or brown tape. CS 2 stated that DANIELS and/or BRADLEY tampered with whatever item was used to transport the rectangular shaped objects, before loading the objects for transport. CS 2 further stated that DANIELS directed CS 2 to obtain items such as cleaning supplies, wipes, hand sanitizer, glue, and expandable foam. Based on their training, experience, and knowledge of this investigation, case agents believe that the rectangular-shaped items that CS 2 observed were kilogram quantities of controlled substances. Agents further know that kilogram quantities of narcotics are commonly

wrapped in multiple layers of plastic along with multiple layers of tape, which is often done to conceal the controlled substance from a drug sniffing canine or from x-ray machines. Based on my training and experience, I also know that traffickers will commonly wipe the outside of the kilogram packages with items such as cleaning supplies to conceal the odor from a drug canine and/or to remove fingerprints from the packaging.

49.     CS 2 described being present in Milwaukee with DANIELS, C. DANIELS, and HENTON. CS 2 observed HENTON directing others what to do. As an example, on one occasion, CS 2 stated that HENTON told C. DANIELS to go to the "office," which C. DANIELS did. Upon his return, CS 2 observed C. DANIELS with white powder which he started cooking. I know, based on my training and experience, that it is common for drug traffickers to cook powder cocaine into "crack" cocaine.

### 4.     DANIELS uses SUBJECT PREMISES 2 as a DTO stash location.

50.     According to a WE Energies representatives, D.B. is the subscriber of utilities at SUBJECT PREMISES 2 since November 3, 2022.

51.     The investigation has revealed that DANIELS uses SUBJECT PREMISES 2 as a DTO Milwaukee stash location. The DANIELS DTO has sent DTO parcels to SUBJECT PREMISES 2. Additionally, DANIELS has been observed via both physical and electronic surveillance traveling to SUBJECT PREMISES 2 after picking up parcels suspected to contain controlled substances on numerous occasions. Further, DANIELS and HENTON have also been surveilled visiting SUBJECT PREMISES 2 on several occasions during controlled buys.

52.     As an example, on January 26, 2022, UPS attempted to deliver a parcel addressed to C. DANIELS at SUBJECT PREMISES 2. No one from the residence responded, so the parcel was subsequently delivered to CVS Pharmacy located at 3030 W. Villard Avenue, Milwaukee.

53.     Case agents are aware that UPS contracts with CVS Pharmacy, allowing customers to divert parcels to CVS locations for pickup at a later time. Through their experience, training, and knowledge of the investigation, case agents are aware that drug traffickers will use CVS drop off locations to obtain narcotics-laden-parcels in attempts to deter law enforcement, allowing for the safe delivery of the parcels at CVS locations, giving it an appearance that the parcel is unaffiliated with the DTO.

54.     Case agents obtained security surveillance footage from the CVS Pharmacy located at 3030 W. Villard Avenue, Milwaukee. Examination of the video revealed that on the evening of January 27, 2022, C. DANIELS entered the CVS Pharmacy and exited a short time later with the UPS parcel.

55.     On March 7, 2022, case agents conducted surveillance at ▉ W. Fond Du Lac Avenue in Milwaukee, to monitor the delivery of a UPS package destined to this address. The sender of the package was DXG Technology, Michael Herrera, 1001 S. Lawson Street, City of Industry, California. The listed receiver of the package was Diane Ellis.  Case agents observed the delivery truck arrive, and then observed the driver exit the truck holding a medium sized brown box. The UPS employee delivered the parcel at the side door of ▉ W. Fond Du Lac Avenue. D.B. was observed opening the door and accepting the package.

29

56.     According to pen register data, a few minutes after the package was delivered, DANIELS received a phone call from Michelle HAUCK and C. DANIELS. Approximately thirteen minutes after the package was delivered, location data DANIELS' cell phone showed the cell phone was in the vicinity of [redacted] W. Fond Du Lac Avenue. Case agents conducted surveillance and observed DANIELS parked in front of [redacted] W. Fond Du Lac Avenue. Case agents observed DANIELS exit the driver seat of the black GMC Yukon (M0NEY23) and walk to the residence carrying a black duffle bag. A few moments later, DANIELS exited the residence, entered the driver seat of the GMC Yukon, and drove to [redacted] W. Fond Du Lac Avenue, where case agents observed him enter the main door of the apartment building.  Surveillance video from March 7, 2022 was obtained, capturing the interior common hallway of [redacted] W. Fond Du Lac Avenue. Examination of the video showed D.B. collecting the parcel as described above. D.B. was observed opening the door to Apartment #1, and then entering Apartment #1 with the parcel.  Approximately thirty-five minutes after D.B. collected the package, DANIELS arrived at [redacted] W. Fond Du Lac Avenue. D.B. was observed escorting DANIELS into Apartment #1. DANIELS remained within Apartment #1 for approximately eight minutes, and then exited the apartment with a white plastic grocery-style bag.

57.     After departing from [redacted] W. Fond Du Lac Avenue, location data for Target Telephone 2 reflected that the device traveled to SUBJECT PREMISES 2. Case agents responded to that area and observed DANIELS meet with C. DANIELS as DANIELS carried the white grocery style bag inside of the apartment building. After DANIELS left

SUBJECT PREMISES 2, location data for Target Telephone 2 showed DANIELS's cellular device traveled to ███ Bates Avenue, Saint Paul, Minnesota.

58. Similar observations related to SUBJECT PREMISES 2 occurred on April 15, 2022. During that time, DANIELS again obtained a suspicious parcel from Brody's residence at ███ W. Fond Du Lac Avenue. DANIELS later traveled to NELSON's residence (drug distributor for the DANIELS DTO). After meeting with NELSON, DANIELS drove to SUBJECT PREMISES 2. DANIELS subsequently left SUBJECT PREMISES 2, carrying a bag, and traveled to his (DANIELS') previous residence located at ███ Fond Du Lac Avenue, Milwaukee.

59. On approximately four occasions, case agents have conducted controlled purchases of narcotics from both DANIELS and HENTON. These controlled purchases have further identified SUBJECT PREMISES 2 as the DANIELS DTO's "stash" location. For example, during the controlled purchase on July 26, 2022, CS 3 had a series of recorded telephone calls with HENTON regarding the purchase of both cocaine and fentanyl. During the call, HENTON advised CS 3 that DANIELS had been stopped by law enforcement on the freeway and that the transaction would not occur until 3:30 p.m. or 4:00 p.m. because of the traffic stop. After telling CS 3 about the traffic stop, HENTON, using Target Telephone 1, immediately called DANIELS on Target Telephone 2.

60. According to court-authorized location data, Target Telephone 2 traveled to the area of North Teutonia Avenue and West Villard Avenue and arrived in the black GMC Yukon at SUBJECT PREMISES 2. DANIELS, using Target Telephone 2, called HENTON on Target Telephone 1. Immediately after this phone call, at 4:12 p.m.,

HENTON using Target Telephone 1, called CS 3. This phone call was recorded and verified by phone records. During the call, HENTON stated, "He's on 26th, headed towards my house and he will be there waiting on me." CS 3 acknowledged by stating "Okay." HENTON then continued, "Okay, I'm on 27th, I'm on my way down to grab him from my house then I'm coming straight to you."

61.     During that approximate time, case agents observed DANIELS exit the GMC Yukon and obtain two bags that appeared to be heavy from the rear of the vehicle. DANIELS used keys to enter SUBJECT PREMISES 2. While DANIELS was in the apartment, at approximately 4:16 p.m., DANIELS, using Target Telephone 2, called HENTON on Target Telephone 1, which call lasted approximately thirty minutes. Case agents later observed DANIELS exit SUBJECT PREMISES 2. DANIELS wore blue latex gloves on his hands and was carrying a black duffel bag. DANIELS placed this bag in the rear of his GMC Yukon, entered the vehicle, and drove away.

62.     At approximately 5:17 p.m., DANIELS and HENTON arrived to the meet location in the GMC Yukon. At approximately 5:31 p.m., DANIELS, still wearing latex gloves, exited the black GMC Yukon, and CS 3 approached the vehicle. CS 3 was on the phone and DANIELS told CS 3 to finish the call.  At 5:49 p.m., DANIELS, still wearing latex gloves, exited the black GMC Yukon and walked to meet CS 3.  CS 3 and DANIELS walked to the garage and out of sight. HENTON later joined them. At this time, DANIELS asked CS 3 what he wanted. CS 3 responded, "I called Pops and text him. I said, I need a half of the soft and an ounce of the barney." DANIELS replied, "Okay, so um me, you,

we did sixty a gram across the board for the barney, and then we did um, twelve for the full ounce of the soft. So that would be six for the half."

63.    Based on their training, experience, and knowledge of this investigation, case agents know that during this call, CS 3 told DANIELS he asked HENTON ("Pops") to purchase one-half ounce of cocaine ("soft") and one ounce of fentanyl ("barney"). Agents further believe that DANIELS told CS 3 the cost would be $60 per gram of fentanyl ("sixty a gram across the board for the barney") and $600 for the cocaine ("six for the half"), for a total of $2,100.

64.    DANIELS then said to HENTON, "So, what you thought he wanted, it wasn't really what he wanted. He wanted something else." Based upon their training, experience, and knowledge of this investigation, case agents believe that there was a miscommunication between DANIELS and HENTON regarding what controlled substances CS 3 had ordered from HENTON. DANIELS then told CS, "Give me and Pops fifteen minutes and we'll be right back." As stated above, agents believe that DANIELS and HENTON had to leave to obtain both types of controlled substances CS 3 ordered.

65.    Shortly thereafter, DANIELS and HENTON entered the black GMC Yukon and traveled to SUBJECT PREMISES 2. Upon arrival, a case agent observed DANIELS use keys to open the front door, which DANIELS and HENTON entered at approximately 6:30 p.m. At 7:17 p.m., the case agent observed DANIELS and HENTON exit the apartment, re-enter the black GMC Yukon, and leave the area. DANIELS and HENTON later returned to CS 3's location. During this meeting, CS 3 engaged in a

33

controlled purchase of 13.77 grams of cocaine and 26.4 grams of a heroin/fentanyl mix in exchange for $2,300 of U.S. currency.

66.     Based on their knowledge of the investigation, SUBJECT PREMISES 2 is used as a DTO "stash" location, as illustrated during the events of the controlled buy. DANIELS returned to the stash location two separate times, to obtain the correct controlled substances, as requested by CS 3.

67.     On October 13, 2022, at approximately 3:34 p.m., digital video surveillance at SUBJECT PREMISES 2 reflected that DANIELS' black GMC Yukon arrived at the location and parked in the rear parking lot. Case agents observed DANIELS and BRADLEY SR. exit the vehicle and enter the building through the front door. At 3:58 p.m., DANIELS and BRADLEY SR. exited the apartment building. Upon exiting, DANIELS was observed wearing latex gloves. Case agents further noticed that the front jacket pockets of both DANIELS and BRADLEY SR. appeared to be full, based on their bulging appearance. While DANIELS was walking, it appeared that he kept his left arm over a heavy object in his left jacket pocket. Case agents know subjects will commonly keep their hand over illegal contraband in their pockets to secure them in the pocket and block the view of the object from other individuals or law enforcement. Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS and BRADLEY SR. went to the location to procure controlled substances.

68.     At approximately 4:12 p.m., the black GMC Yukon arrived in the ███-block of North 24th Street. Case agents observed that the Yukon was unoccupied, and also observed an unknown male exit a red Maserati (parked in the ███-block of North 24th)

and subsequently enter █████ North 24th Street, Milwaukee. The same unknown male exited the residence a short time later, entered the red Maserati, and left the area. Case agents believe, based upon their training, experience, and knowledge of this investigation, that a drug transaction occurred. At approximately 5:04 p.m., DANIELS and BRADLEY SR. exited █████ North 24th Street and re-entered the black GMC Yukon. The black Yukon left the area and arrived at SUBJECT PREMISES 2. Case agents observed DANIELS exit the black Yukon and entered the front door for SUBJECT PREMISES 2.

69.     Based upon their training, experience, and familiarity with this investigation, case agents believe that the DANIELS DTO uses SUBJECT PREMISES 2 as a "stash" location. Furthermore, case agents' review of remote surveillance and positional cell phone data revealed that when in Milwaukee, DANIELS frequents SUBJECT PREMISES 2. Remote surveillance and interceptions over Target Telephones 2 and 4 further reflect that DANIELS has control of SUBJECT PREMISES 2, as DANIELS has been observed entering SUBJECT PREMISES 2 via key. Other members of the DANIELS DTO have been observed, on multiple occasions, visiting SUBJECT PREMISES 2, including but not limited to BRADLEY SR., HENTON, and C. DANIELS.  On numerous occasions, DANIELS has been observed carrying boxes, parcels, and bags both into, and out of the SUBJECT PREMISES 2. During observations of DANIELS, he (DANIELS) is often times observed wearing latex gloves. Based on their training, experience, and knowledge of the investigation, case agents believe DANIELS wears latex gloves to limit detection by law enforcement, via fingerprint identification. The use of latex gloves further protects DANIELS from exposure to dangerous controlled substances, such as fentanyl.

70.    On October 24, 2022, electronic surveillance depicted DANIELS bringing two large black garbage bags that appeared to be full into SUBJECT PREMISES 2. He was observed leaving with only one black garbage bag.

71.    During the course investigation, electronic surveillance places DANIELS at SUBJECT PREMISES 2 in excess of 100 times. Furthermore, electronic surveillance reflects that SUBJECT PREMISES 2 is one of the more frequently visited locations visited by DANIELS while in the State of Wisconsin. Electronic surveillance last placed DANIELS and MASSEY at SUBJECT PREMISES 2 on November 20, 2022, at which time they entered with a box. HENTON also arrived to SUBJECT PREMISES 2 and was let in by MASSEY.

## C.    Roy HENTON facilitates the DTO in distribution, retrieval, and manufacturing of controlled substances. HENTON stores firearms at SUBJECT PREMISES 3.

72.    The investigation to date has revealed that HENTON assists DANIELS in day-to-day drug trafficking activities. HENTON distributes and arranges for the distribution of controlled substances, including heroin, fentanyl, methamphetamine, and cocaine, assists in manufacturing or "cooking" controlled substances, and helps retrieve parcels containing suspected controlled substances. HENTON assists DANIELS in making upper-level decisions regarding the DANIELS DTO and has traveled to California and Minnesota to further DTO activities. According to confidential source information, HENTON set pricing for kilogram quantities of cocaine for CS 3 and directed other DTO members to carry out DTO functions.

73.    During the course of this investigation, case agents determined that HENTON has used phone number (262) 599████, Target Telephone 1, to further DTO

36

activities. Between August 24, 2022 and October 27, 2022, approximately 293 intercepted calls and/or text messages between HENTON and others were deemed criminal and pertinent in nature.

74.     Case agents have observed HENTON with DANIELS on various occasions involved in drug trafficking activities. As an example, through intercepted calls, case agents were aware that on August 31, 2022, NELSON complained about the quality of controlled substances he previously received from DANIELS. Through physical observation and electronic surveillance, case agents surveilled a subsequent meeting in which DANIELS and HENTON were observed traveling from SUBJECT PREMISES 2 (stash house) to NELSON's residence, SUBJECT PREMISES 4, and returned to the stash location. Additionally, in February 2022, case agents observed HENTON arrive at the airport with DANIELS, at which time both flew from Milwaukee, Wisconsin, to Los Angeles, California. Because agents know that (1) the DANIELS DTO is sourcing at least some controlled substances from California, (2) DANIELS had contact with COLULA, a DTO source of supply, during/while in California, (3) DANIELS has previously readied controlled substances for transport to Milwaukee; and (4) HENTON has traveled with DANIELS for DTO purposes in the past,[3] case agents believe that the purpose of their travels to California was to further the DTO operations.

---

[3] Airline records reflect that DANIELS, HENTON, and BRADLEY SR. have taken multiple flights together from Milwaukee, Wisconsin, or Chicago, Illinois, to California from 2020 through various dates in 2021.

75.     Additionally, the investigation revealed that HENTON is known to drive rental vehicles. Based on their training and experience, case agents know drug traffickers may use rental vehicles to avoid detection by law enforcement. However, since September 2022, HENTON has been observed driving a white Ford Escape, bearing Florida registration 23BSHH. Intercepted communications and recorded conversations between CS 3, HENTON, and DANIELS, reflect that HENTON and DANIELS take precautions to avoid being stopped by law enforcement and to avoid being found in possession of contraband if they were to be stopped by officers. For example, in a recorded conversation with DANIELS, HENTON, and CS 3, wherein DANIELS recounts details of a July 26, 2022, traffic stop, DANIELS told CS 3 that an officer "comes up to the side of the car, right, looks in the back and sees a plastic bag on my back seat, called in to headquarters." Immediately after, HENTON responded, "Now you know to check your vehicles before you leave." Based on their training, experience, and knowledge of this investigation, case agents believe HENTON told DANIELS to check his vehicle so that no signs of criminal activity are evident to officers' observations and/or to check his vehicle for any tracking devices.

**1.     Intercepted calls establish HENTON's DTO involvement.**

76.     On August 25, 2022, at approximately 12:39 p.m., an unidentified male (UM), using (414) 399-█████, UM█████, called HENTON at Target Telephone 1.[4] HENTON stated, "It's Pops. . . . You want to get together and do some cooking, man?" UM█████

_____

[4] All time stamps are reported in Central Standard Time unless otherwise noted.

responded, "Uh, I'm finna, I ain't even finna be here today." HENTON then stated, "When you wanna . . get together and do some cooking?" UM[redacted] replied, "Man we can do it, uh, maybe like this weekend or something, let me see what my girl doing." HENTON replied, "Well, just let me know, let me know, [U/I], so we can get together."

77. Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, HENTON asked UM[redacted] whether he wanted to meet to cook powder cocaine into crack cocaine ("You want to get together and do some cooking, man?"). UM[redacted]0 responded that he was not going to be available that day, and that he would check to see whether he would be available to assist HENTON over the weekend. Case agents know it is common for traffickers to cook powder cocaine into crack cocaine for various reasons, including marketing to a desired user experience, and mixing adulterants into powder cocaine to increase product amount and therefore maximize profits. Case agents further know that on the day of this call the DTO received a parcel suspected to contain controlled substances.

78. On August 30, 2022, at approximately 6:03 p.m., UM4722, using (269) 547-[redacted], called HENTON at Target Telephone 1. UM[redacted] stated, "I'm getting in motion right now." "…I finna start moving around." HENTON asked, "What are you working on?" UM[redacted] replied, "Uh…shit, anything, whatever it don't matter any lane."

79. Based on their training, experience, and knowledge of this investigation, case agents believe that UM[redacted] called HENTON to purchase controlled substances. HENTON asked UM[redacted] what he wanted to purchase, and UM[redacted] wished to purchase whatever HENTON had to sell ("anything, whatever it don't matter any lane").

39

80.    On September 8, 2022, a parcel containing suspected controlled substances was delivered to [redacted] W. Fond Du Lac Avenue in Milwaukee. The parcel was addressed to "Andre Garner" and sent from "Michael Herrera" from an address in California. Interceptions and relevant surveillance related to this parcel delivery are as follows:

81.    At approximately 2:51 p.m., case agents conducting physical surveillance observed DANIELS arrive at [redacted] West Fond Du Lac Avenue in his black GMC Yukon. At approximately 2:55 p.m., the private parcel delivery truck arrived, and the delivery driver obtained a large square shaped cardboard box from the truck. Agents observed DANIELS meet with the delivery driver, at which point they both walked towards [redacted] West Fond Du Lac Avenue and out of view. Moments later, the delivery driver re-appeared, but was no longer holding the box.

82.    At 3:11 p.m., DANIELS, using Target Telephone 2, called HENTON at Target Telephone 1. During this call, HENTON was sitting inside the front passenger seat of the black GMC Yukon. HENTON stated, "I got Mary at the door, I got to run to the bank." DANIELS replied, "What you got to run to the bank for? I mean…" HENTON stated, I got to see what happened to two thousand dollars was out my account, they won't tell me." DANIELS then stated, "Okay, Pops, but that's not gonna go nowhere right now. Me and you need to finish our business." While on the phone with DANIELS, case agents observed Angel MCLAURIN, believed to be in a dating relationship with HENTON, enter [redacted] West Fond Du Lac Avenue. Through DANIELS' phone, case agents heard MCLAURIN tell an unknown child, "Go outside!" and "He's doing something, go!" MCLAURIN later walked over to the black GMC Yukon and spoke with

40

HENTON, who asked, "Babe, what did Phil say?" MCLAURIN replied, "I told her [U/I] 'cause Phil was cutting some stuff in the kitchen, and I didn't want her, um…"

83.     Based on their training, experience, and knowledge of this investigation, case agents believe that during this call DANIELS told HENTON that they received a parcel containing controlled substances that they needed to get ready for distribution. ("Me and you need to finish our business.") Agents further believe that DANIELS was mixing and/or adding cutting agents to the recently obtained controlled substances in the kitchen of ▆▆▆ West Fond Du Lac Avenue, and that MCLAURIN advised HENTON of the same and also did not want the child to observe.

84.     On October 3, 2022, at approximately 2:41 p.m., DANIELS, using Target Telephone 2, called HENTON, using Target Telephone 1. During the conversation, DANIELS asked, "Get a hold of Andre?" HENTON replied, "Yeah. What you need?" DANIELS then stated, "… Him, and take care of something for me. . . . Can you get a hold of him first? And get . . . you still got his ID card." The parties discussed the "ID card," and DANIELS later stated, "I brought it to you right there in the . . . I said, 'Pop, this Andre ID card, can you give it back to him.'" HENTON continued to state that he could not locate "Andre's" ID card, but he could not recall if he gave it back to "Andre." Near the end of the conversation, HENTON asked, "Where you want me to take Andre?" DANIELS replied, "I'm going to send you the address, it's in Menomonee Falls, it's not too far from the house." Later, HENTON asked, "So why do I gotta take. . . what's going on? Why do you want me to take him over there for?" DANIELS then stated, "Cause I got something that's waiting there."

41

85. Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS told HENTON to pick up "Andre" and to take him to get a parcel from the UPS Store in Menomonee Falls. Because prior parcels seized contained controlled substances, and because a parcel addressed to "Andre Garner" contained controlled substances, case agents suspect that the parcel discussed in the above intercepted calls contained controlled substances.

86. Case agents then conducted surveillance at the UPS Store located on Appleton Avenue in Menomonee Falls. Surveillance officers obtained video of the arrival of HENTON at the UPS store. HENTON was driving his white Ford Escape bearing FL plates of 23B-SHH. HENTON had two passengers with him, a female subject, who was believed to be MCLAURIN and a male black subject, who was believed to be Andre GARNER. Surveillance officers observed GARNER exit out of the rear passenger side and walk into the UPS store. GARNER returned to the vehicle without any parcel. A federal search warrant was obtained for this parcel and located in the parcel was approximately five pounds of marijuana.

## 2. HENTON and DANIELS sell Narcotics to CS 3

87. Case agents interviewed CS 3 during this course of this investigation. CS 3, a client of ATOL, reported that HENTON and Leroy HENTON have informed CS 3 that they have methamphetamine, cocaine, and heroin for sale. [5] During this course of this

---

[5] Beginning in April 2022, CS 3 made statements against CS 3's penal interest. According to law enforcement databases, CS 3 has one felony conviction for battery to a law enforcement officer and one misdemeanor battery conviction. CS 3 has open state cases for felony narcotic distribution charges and a Vehicle Operator Flee/Elude an

investigation, CS 3, at the direction and control of case agents, purchased controlled substances from HENTON and DANIELS.[6]

88.    On July 14, 2022, CS 3 purchased approximately 7 grams of cocaine, which appeared to be in "brick form," from DANIELS and HENTON in exchange for $460. CS 3 was debriefed after this controlled purchase and stated that DANIELS produced a bag from his pocket that contained a larger amount of cocaine and that DANIELS broke off CS 3's amount from that larger amount.

89.    On the following day, July 15, 2022, at approximately 11:35 p.m., DANIELS and HENTON arrived to CS 3's residence unexpectedly to provide "samples" of various controlled substances (small test quantities). CS 3 stated that at this time, DANIELS produced three small corner cut baggies. The first bag contained five blue circle pills with the inscription "M 30," which DANIELS referred to as "blue cheese." The second corner cut bag contained a clear shard, which DANIELS referred to as "sunglasses." The third

---

Officer charge. CS 3 is cooperating in exchange for consideration on the open state charges and for monetary compensation. Thus far, the information provided by CS 3 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 3's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. Moreover, CS 3's information has been corroborated by recorded phone calls. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 3 is credible and CS 3's information reliable.

[6] Standard controlled buy protocols were followed during all controlled buys. Protocols included searching the CS for U.S. currency and contraband before and after the controlled purchase, providing the CS with pre-recorded U.S. currency for the purchase, and providing the CS with an audio and visual recording device. Additionally, the narcotics received through CS 3 were subject to field testing and have been sent to the crime laboratory for further testing.

corner cut bag contained a gray/purple rock like substance, which DANIELS referred to as "barney." DANIELS then produced a sandwich bag that contained a brown powdery substance, which DANIELS referred to as "H-Town." CS 3 reported that DANIELS possessed a golf-ball size quantity of the brown powdery substance from which DANIELS broke off a smaller quantity and placed in a corner cut bag for CS 3. CS 3 further reported that DANIELS instructed CS 3 how much CS 3 could profit from the different types of narcotics if CS 3 were to find buyers for them. According to CS 3, DANIELS wrote down the prices of each of the drugs for CS 3. *See Figure 1.*



*Figure 1*

90. Based on their training, experience, knowledge of this investigation, information obtained from CS 3, and field testing of the substances as described below, case agents believe that the "Blue Cheese" refers to counterfeit Oxycodone Hydrochloride pills possibly containing methamphetamine or fentanyl; "H-Town" refers to heroin as "H" is a common abbreviation for heroin; "Barney" refers to fentanyl because the fentanyl received was purple in color; "Sunglasses" refers to methamphetamine because

44

of its glassy or shiny appearance; and "White Bitch" refers to cocaine because it is generally white in color.

91.     Field testing reflected that DANIELS and HENTON provided CS 3 samples of approximately 2.97 grams of a substance containing heroin and fentanyl, approximately 1.14 grams of methamphetamine, approximately 2.8 grams of fentanyl, and 0.55 grams of methamphetamine in pill form. Based on their training and experience, case agents know that controlled substance traffickers sell counterfeit Xxycodone Hydrochloride pills that contain controlled substances such as fentanyl or methamphetamine.

92.     On July 26, 2022, CS 3 purchased 13.77 grams of cocaine and 26.4 grams of a heroin/fentanyl mix from DANIELS and HENTON in exchange for $2,300.

93.     On August 31, 2022, CS 3 called HENTON at Target Telephone 1 and asked said, "I need uh, an ounce of that H-Town." HENTON replied, "Just text it to me" and "I'll get on top of it right, uh, right away." HENTON further stated, "Text me all the—all, all, all the sugar cookies [P/H] you want. Subsequently, CS 3 purchased 25 grams of heroin, which appeared to be in "brick form," from DANIELS and HENTON in exchange for $1,500. CS 3 was debriefed after this controlled purchase and stated that DANIELS produced a bag from his pocket that contained the suspected heroin. CS 3 gave DANIELS the U.S. currency, and DANIELS gave CS 3 the heroin.

94.     On September 20, 2022, CS 3 purchased 66.47 grams of fentanyl, which appeared to be in "brick form," from DANIELS in exchange for $3,880. An audio recording of this meeting reflects that during this controlled purchase, DANIELS said,

"It's hard to keep around… you follow me?" DANIELS further stated, "That real, authentic fentanyl [U/I]." Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS told CS 3 that he provided "real" fentanyl and that he has difficult keeping fentanyl around because it sells fast.

### 3. HENTON uses SUBJECT PREMISES 3 to store firearms, which he uses as protection.

95. HENTON's primary residence is SUBJECT PREMISES 3. According to a WE Energies representative, MCLAURIN is listed as the subscriber of utilities for SUBJECT PREMISES 3 since March 2, 2022.

96. Court-authorized location data on HENTON's phone has shown HENTON in the vicinity of SUBJECT PREMISES 3 on a regular basis, including the overnight hours during the approximate time period of July 11, 2022 to October 29, 2022, when the authorization expired. HENTON was observed via digital surveillance at SUBJECT PREMISES 3 as recently as November 20, 2022.

97. On September 18, 2022, at approximately 10:36 a.m., HENTON called MASSEY from Target Telephone 1 looking for his "son" (DANIELS). During the call, HENTON began to talk about a woman whom they discussed was recently causing trouble and had pulled a gun out on another woman. HENTON told MASSEY, "Yeah, she pulled a gun on that girl. She grabbed a gun in, which, I keep my guns—now I know she grabbed my gun and pulled it in the girl's face." MASSEY replied, "Out of control. No shame whatsoever." HENTON stated, "Joelle, she coulda shot that girl and I would had to explain why she had shot that girl in my house." MASSEY echoed him, "In my

46

house. With your gun." HENTON continued, "With my gun. And that bitch would have start lying right then." MASSEY agreed, "Right there and then, oh yeah. What? You better believe it." MASSEY talked about how the gun could have accidentally gone off and added, "That woman got a loaded gun." HENTON clarified, "But I never have no clips in it, and when I had it sitting out, I had not one clip in it—one bullet in it." MASSEY asked, "There was none in the chamber?" HENTON replied, "Nope; I had nothing. And when she pull it, I didn't tell her. I just wasn't gonna be having it in my house. I thought, 'This bitch is gone, period.'"

98.     Based on their training, experience, and knowledge of this investigation, case agents believe HENTON and MASSEY were discussing an incident during which one woman pulled a gun on another woman. According to HENTON, the gun involved belonged to him.

99.     On September 18, 2022, at approximately 12:38 p.m., MCLAURIN (who is in a long-term dating relationship with HENTON), using (262) 466-[redacted], called HENTON at Target Telephone 1. MCLAURIN stated, "You forgot your pistol . . . Is on top the 'frigerator." HENTON responded, "Ok." MCLAURIN replied, "Can you swing back?" HENTON then said, "No, it's okay; I'm good." MCLAURIN said, "Are you gonna be safe?" HENTON replied, "I'm good, Mia."

100.     Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, MCLAURIN told HENTON that he forgot his pistol at their house and asked him to come back and get it. When HENTON said he was not going to come get it, MCLAURIN then asked if he (HENTON) would be safe, to which

47

HENTON responded "I'm good." Case agents further know, based upon intercepted communications, that MCLAURIN knows about HENTON's involvement in the DTO, which is why she asked him to come get his pistol so that he would be safe. Case agents know that drug traffickers commonly possess firearms to protect themselves, their illegal product, and their drug proceeds.

101.    It appears HENTON also owns some much larger firearms that he keeps at SUBJECT PREMISES 3. On October 20, 2022, at approximately 7:39 p.m., HENTON, using Target Telephone 1, called Tamara, believed to be his daughter. He told her, "Hey, listen, get—get off—get off the house—I don't want anybody to hear." He then instructed her, "Ok, now when you go in my room, take a look—look where the mirror at." HENTON also told her, "There's a key that's gonna open up my closet door. Take my pump and my, uh, my R8 X15, uh, machine gun. Put that—put that stuff in my closet and then lock my door." Tamara said, "Okay." HENTON stated, "Make sure you do that 'cause I don't want nothing to happen." Tamara said, "Right, right. I got you." HENTON explained, "'Cause it's on the wall. Both—both my guns—guns are on the wall, sitting—that's sitting up, uh, by the other [U/I]. But I want you to put them in the closet." HENTON insisted that Tamara take care of this "first thing" and told her he was on his way.

102.    Their conversation continued in another call that evening at approximately 8:07 p.m. Tamara called HENTON back and HENTON asked Tamara, "Did you see the key?" When she confirmed she had it, HENTON told her, "Okay. And then close the door." Tamara answered, "Right." HENTON continued, "And open my closet door, and put those guns—you see them big guns." Tamara answered, "Yes. Yes, daddy." She told

48

HENTON, however, "Well, I'm scared to pick these up. You sure the safety on?" HENTON reassured her, "You're okay. You're okay. They ain't gonna hurt you. People hurt you. They won't—guns won't hurt you. People hurt you." Tamara laughed and stated, "Dang, I've never carried one of these before." HENTON replied, "Yeah, that's some—that's some heavy shit there. That's some stuff we fightin' in wars with."

103.    Based on their training, experience, and familiarity with this investigation, case agents believe that these calls concern HENTON asking his daughter to move a machine gun and another large firearm into a closet and to lock them in for him. Based on Tamara's second call with HENTON, it appears she located the guns and that they were substantial in size and weight.

### 4.    HENTON uses SUBJECT PREMISES 9 to facilitate the DTO.

104.    On November 17, 2022, the Honorable United States Magistrate Judge Nancy Joseph granted a search warrant authorizing a trained law enforcement-controlled substance detection canine to sniff the exterior of a storage locker that is SUBJECT PREMISES 9. HENTON is the current lease holder of SUBJECT PREMISES 9. Also on November 17, 2022, DEA Task Force Officer Joseph Scheuring deployed Titus around the exterior door of SUJBECT PREMISES 9. According to TFO Scheuring, Titus indicated to the odor of controlled substances on the outer exterior door of SUJBECT PREMISES 9.

### D.    Joelle MASSEY facilitates movement of drug proceeds and controlled substances.

105.    The investigation has revealed that MASSEY facilitates exchanges of drugs and currency. MASSEY has been in regular communication with DANIELS and is aware

of the breadth and scope of the distribution activities of the DANIELS DTO. As detailed above, MASSEY was present at her previous residence located on Deerwood Drive when law enforcement searched it pursuant to a warrant and located, among other items, approximately 4 pounds of methamphetamine, most of which was in one of several white plastic screw-on top containers. The container is believed to have been shipped from California to MASSEY on December 22, 2021.[7] As detailed later in this Affidavit, further examination of UPS records reflected that MASSEY received at least seven similar parcels from the same sender between October 2021 and her arrest in early January 2022. Further, intercepted calls reflect that MASSEY's involvement in shipping parcels is even more extensive, in that DANIELS advises other DTO member(s) how he and "Joelle" successfully shipped significant numbers of parcels, presumably containing controlled substances, by packaging the substances in a certain way and shipping via different mailing facilities.

106.    A subsequent search of MASSEY's phone conducted pursuant to a federal search warrant confirmed that MASSEY has been assisting DANIELS in trafficking controlled substances. Text message conversations between MASSEY and DANIELS concerned such topics as MASSEY carelessly allowing an unnamed male to "scam the pot" (meaning steal drugs) while she was supposed to be supervising this individual cooking crack cocaine, MASSEY growing the marijuana distribution side of the DTO by

---

[7] On January 25, 2022, MASSEY was charged by a grand jury with possession with intent to distribute 500 grams or more of methamphetamine and marijuana, as well as with maintaining a drug involved premises. See 22-CR-26. Her case is currently still pending.

investing in new strains and expanding their customer base, DANIELS asking MASSEY to sell "hard" or crack cocaine to an individual called "Domo" for redistribution, and DANIELS coaching MASSEY on cooking crack cocaine for the first time. Texts, emails, and photos in the phone reflect that MASSEY frequently traveled to Los Angeles and Chicago, places where the DTO is known to buy and sell drugs. They also demonstrated that MASSEY sent, tracked, and received packages on behalf of the DTO.

107. MASSEY's primary residence, which she shares with DANIELS, is SUBJECT PREMISES 1. According to a WE Energies representative, MASSEY is listed as the subscriber of utilities for SUBJECT PREMISES 1 since November 1, 2022. MASSEY and DANIELS are regularly located at this premises, with DANIELS' location information for Target Telephone 2 and the GMC Yukon reflecting he was at SUBJECT PREMISES 1 as recently as November 18, 2022. MASSEY is known to operate a red Chevrolet Camero, bearing Wisconsin registration ABK-9018. This vehicle lists MASSEY as the registered owner at the address of a UPS store in Brookfield, Wisconsin.

108. During the course of this investigation, case agents determined that MASSEY has used phone number (414) 336 redacted to further DTO activities. They noted numerous instances of her calling and texting other members of the DTO, including FRYER, EDWARDS, and HENTON. Between August 24, 2022 and November 12, 2022, agents intercepted approximately 112 calls and/or text messages between MASSEY and DANIELS and/or HENTON that were pertinent to this investigation. MASSEY's role in the DTO is illustrated in several of these calls, intercepted via monitoring of Target Telephone 2, a few of which are summarized below.

109.     On August 24, 2022, at approximately 9:24 p.m., DANIELS called MASSEY at (414) 336[redacted]. During the intercepted call, DANIELS told MASSEY he was on his way back to their house and asked MASSEY to come outside with "Jay." DANIELS instructed MASSEY, "Jay and [U/I] the shit in his car. Take the purple shit out and get in his car." MASSEY confirmed that they would do so and told DANIELS that they may head to Jay's house. Case agents believe that in this call, DANIELS instructed MASSEY to remove a controlled substance and transport it in "Jay's" vehicle. Based on their training, experience, and knowledge of this investigation, case agents believe that "purple" refers specifically to fentanyl because the fentanyl DANIELS and HENTON sold CS 3 was purple in color, and DANIELS called fentanyl "Barney" due to its color. Case agents also know that "Jay" is Jameel BRADLEY JR., another member of the DTO who is believed to have knowledge of the DTO's illegal substance manufacturing and trafficking activities.

110.     DANIELS has also been intercepted talking about DTO parcels with MASSEY, and MASSEY has accompanied DANIELS on at least one occasion when he has taken a parcel to the DTO's stash house. On August 25, 2022, a parcel containing suspected controlled substances was to be delivered to [redacted] W. Fond Du Lac Avenue in Milwaukee, an address next to [redacted] W. Fond Du Lac Avenue, which is where DANIELS, MASSEY, and DANIELS' son, C. DANIELS resided. The parcel was addressed to "Andre Garner" and sent from "Michael Herrera" from an address in California. Location information from DANIELS' vehicle and a ping on his phone reflected that DANIELS was in Chicago, Illinois during the early morning hours of August 25, 2022 before returning to Milwaukee on this date.

52

111.    At 9:46 a.m. that day, DANIELS spoke to an unknown female (UF) who was using phone number (414) 446▮▮▮▮2 (hereinafter "UF▮▮▮▮"). DANIELS told UF▮▮▮▮ that "the UPS man" was going to be arriving at his house shortly "for Andre Garner." DANIELS further told her, "All right, you can look over there now to see if it's there or not, but I need you, like, to be checking, like, [U/I] whatever. He had a box with medical supply that I don't want to miss it, 'cause they don't leave a note [U/I] in the box." Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS was asking UF▮▮▮▮ to retrieve the parcel addressed to Andre Garner for him. Agents therefore surmised that DANIELS was not, in fact, receiving "medical supplies" but rather was using that term to disguise the parcel's true contents: controlled substances.

112.    At 11:10 a.m., DANIELS connected with C. DANIELS by phone and asked, "Are you unable to take care of that?" C. DANIELS responded, "Um… Is it there already?" DANIELS then stated, "Is out for, is out for, uh… the flight is set to land. You see it? Look on the thing, that's why I was showing it to you." C. DANIELS later asked, "Where is it going to?" DANIELS replied, "You already know where's goin'… to the Hyatt. He wants to go—he wants to stay at the Hyatt." Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS told C. DANIELS that a parcel was out for delivery ("Is out for, is out for, uh… the flight is set to land."). Agents further believe DANIELS told C. DANIELS that the parcel would go the DTO's stash house, SUBJECT PREMISES 2 ("the Hyatt").

113.    At approximately 1:10 p.m., DANIELS arrived at [redacted] W. Fond Du Lac Avenue in his black GMC Yukon. At 3:32 p.m., case agents observed a UPS delivery truck arrive in front of [redacted] W. Fond Du Lac Avenue. DANIELS walked up to the delivery driver and accepted a large brown box. DANIELS placed the parcel in the rear of his black Yukon and then entered [redacted] Fond Du Lac Avenue.

114.    A 4:20 p.m., DANIELS called MASSEY and told her she needed to be ready in two hours. MASSEY asked DANIELS, "Okay, did, umm, your plane land?" DANIELS replied, "Yeah, it landed." MASSEY replied, "Okay, you already got it." DANIELS confirmed: "Yeah, I just picked the passenger up and fixing to take him to the hotel." MASSEY said she would be ready. During this call, case agents believe that MASSEY asked DANIELS whether the parcel containing suspected controlled substances was delivered, and DANIELS told MASSEY he had just picked up the parcel.

115.    At 6:22 p.m., law enforcement surveillance saw DANIELS park his black GMC Yukon in front of the stash house, SUBJECT PREMISES 2. MASSEY was seated in the front passenger seat. DANIELS opened the rear hatch of the vehicle and retrieved the same brown cardboard box that UPS had delivered to DANIELS near [redacted] W. Fond Du Lac Avenue earlier that day. DANIELS used keys to open the front door to the apartment building and went inside with the parcel. Based on their training, experience, and knowledge of this investigation, case agents believe that MASSEY had full knowledge of the suspected package of controlled substances being delivered and picked up by DANIELS. Case agents believe that MASSEY has full knowledge of and access to the stash house. In addition to this interception, she has been observed with DANIELS

54

outside of the apartment on multiple occasions. Case agents also intercepted calls on the evening of September 17, 2022 in which DANIELS asked MASSEY to go "to Teutonia" to oversee the delivery of appliances to that location—at the same time at which physical surveillance observed a U-Haul truck in front of the premises.

116.     Other intercepted calls show DANIELS and MASSEY checking up on one another around the time of planned narcotics transactions. For instance, on August 27, 2022, at approximately 8:41 p.m., DANIELS called MASSEY to find out whether she was okay. Based on digital surveillance and intercepted calls, it was determined that DANIELS and MASSEY were staying at a hotel in Chicago at this time. Based on intercepted calls, it appeared that MASSEY was driving DANIELS' vehicle which, at the time, was monitored by case agents via GPS tracking. Once MASSEY confirmed that everything was all right, DANIELS stated, "A'right, okay. 'Cause I don't like when you go off the reservation. You was supposed to go to a gas station and get something in there. I know you riding with that stuff. You don't wanna be just going off the reservation, okay? You got to keep that in mind." MASSEY replied, "I came to the, uh, the car wash right here, by the hotel. But I'm coming to the hotel now though." Based on their training, experience, and knowledge of this investigation, case agents believe that MASSEY was driving a vehicle containing contraband or a large amount of U.S. currency and DANIELS was worried that MASSEY came in contact with law enforcement because she did not return promptly.

117.     On August 28, 2022, DANIELS called WILLIAMS. During this call, DANIELS stated, "You know what I'mma do today? I'mma be on my way to see you."

WILLIAMS responded, "You are not [U/I]. DANIELS replied, "You know what I'm sayin? I'mma be on my way to see you. I need, uhh… I need a substitute." Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS told WILLIAMS he intended to meet with him to exchange U.S. currency for higher quality controlled substances. At approximately 4:22 p.m. on August 28, 2022, location data from the vehicle GPS tracker and DANIELS' phone location data both reflected that DANIELS traveled to ███ Thomas Avenue in Minneapolis, Minnesota, an address known to case agents to be used by DANIELS and WILLIAMS as a stash location.

118.    While DANIELS was waiting for WILLIAMS to arrive, MASSEY called DANIELS to check on him. DANIELS told her, "Yeah, I'm all right, I'm just uh… 'bout to have a meeting in a few minutes so I can knock this business. Waiting on my boy to pull up." Based upon their training, experience, and knowledge of this investigation, case agents believe that during this call, DANIELS confirmed to MASSEY that he had arrived in Minnesota and was waiting to meet with WILLIAMS to engage in a narcotics transaction.

119.    On October 2, 2022, GPS tracking on DANIELS' vehicle and physical surveillance showed that DANIELS was in Chicago, Illinois. Interceptions further showed that BRADLEY SR. had set up a meeting for DANIELS with a drug supplier for that date. While in Chicago, at 12:07 p.m., DANIELS called MASSEY from Chicago to ask her to locate some missing money for him. He told her, "I took 2,000 out for me and I think I left it right there on the table." MASSEY replied, "There's no money sitting on the table [U/I]. You sure you didn't put it back on this money bag that I gotta get this bitch?

56

No..." DANIELS then told MASSEY, "Look around for it. I count it out. It's two bands. It's gotta be sitting somewhere. I thought I put it in my pocket, but I didn't." MASSEY stated, "No... I just took all the stuff off the table." DANIELS said, "I took twenty racks with me." He continued, "Okay, grab... get the 6,000 dollar rack and see if it's 6,000 or if it's 8,000. Maybe I put it back in there." MASSEY answered, "No, this is 6,000 here. You want me to check the other one?" DANIELS said, "Yes. No, you ain't need to check the other one 'cause the money is there; I mean, I know the other one is 10." MASSEY said, "The 10.... The 50?" DANIELS said, "Ten... no, not the fifty, 'cause that's all hundreds I took out." DANIELS said, "Look, I stocked the 10,000 back up in there and [U/I] told you it was 10,000 and the freaking thing was 12,000; ..." Case agents believe, based on other intercepted calls, that the supplier was not ready and that the meeting ultimately did not take place. This call, however, demonstrates that DANIELS brought a large sum of U.S. currency for the meeting and that MASSEY was aware of the meeting and anticipated currency exchange. It also demonstrates that MASSEY is familiar with the locations where DANIELS stores currency and how much he keeps in each location, and that DANIELS trusts and tasks her with helping him keep track of that currency.

120.    On October 19, 2022, at 5:56 p.m., MASSEY, using (414) 336-[redacted], called DANIELS at Target Telephone 2. During this call, DANIELS related to MASSEY that he was talking to "Joe," who was in Chicago and he missed his flight to New York. DANIELS further described a call he had with "Joe," stating: "Joe was like, 'Man, that flight 'bout to land to you.' I said, 'When?' He said, 'Today.' I was like, 'You lying. What!? Right now?' He like, 'Yeah, they coming in right now.'" MASSEY questioned, "Well, did it?

57

Did it land?" DANIELS responded, "No, it should be; I mean, it says about 8:30, so we should see them... I mean, hopefully they still coming; I know that they are; so, you know, so that was other things that I didn't get a chance to tell you last time why I was needing to sit around; you know what I'm saying? Because last time I had three flights last time. So... and they came back-to-back and um... I turned around and I forgot that... I forgot that Black flew some people in. You know what I mean? And I had forgot all about that, and then it's so crazy out here. And then I had already knew 'cause it was the first time I was really thinking about was... Morty and Joe but, you know, and Deonte, and then just like... they was flying in and that was on me [PH], I was really, really thinking about.

121.     Based on their training and experience, case agents know that drug traffickers often use code when speaking to each other to conceal the direct meaning of conversations. Case agents are aware that this DTO uses the word "flight" to describe a package or shipment of controlled substances that is en route, and the word "landed" to indicate the arrival of such a shipment. During this call, case agents believe DANIELS was describing to MASSEY that he was expecting the imminent arrival of a shipment of drugs from COLULA ("Joe"), "Morty," and EDWARDS ("Deonte"), and that this was a relief to DANIELS, who did not believe he was going to have anything arriving that day and was hoping to avoid having to make "that phone call" to let someone know he had no supply. DANIELS explained to MASSEY that he had recently received three packages back-to-back, and because things had been crazy as a result, he had completely forgotten he was also expecting a shipment from COLULA. Agents further believe DANIELS told

58

MASSEY that he was supposed to meet BRADLEY SR. ("Black") in Chicago to conduct DTO business.

122.  On October 21, 2022, at 1:23 p.m., DANIELS called MASSEY and, after a discussion about the heavy traffic, asked, "Did you um… I meant to tell you, did you, did you bring that money with you?" MASSEY asked, "Which money, big daddy?" DANIELS replied, "At the house." MASSEY then said, "No, you didn't tell me to bring that." DANIELS replied, "Right yeah, I was—I don't know why I was… it's 'cause I got distracted with Pops and all that other stuff." DANIELS then said, "I end up, um… Black [BRADLEY SR.] wanted me to bring that Gatorade with. I forgot all about that. I forgot it." MASSEY replied, "Oh wow, would you… I thought that you was going to." DANIELS stated, "I know. I had some stuff to take care of." DANIELS then said, "He gon' be upset, but it is what it is." Case agents believe, based on their training and experience and their knowledge of this investigation to date, that "Gatorade" is a code term for an unknown controlled substance. Case agents believe that in this call, DANIELS and MASSEY were each separately on their way to meet with BRADLEY SR. and that DANIELS and MASSEY were discussing DANIELS forgetting to bring a particular substance, as well as money to be used as payment for controlled substances.

123.  In late October, interceptions revealed that DANIELS had sent MASSEY to Illinois to conduct a narcotics transaction on his behalf. Several calls demonstrated that DANIELS was nervously overseeing the transaction from a distance. On October 23, 2022 at 4:35p.m., DANIELS called Jameel BRADLEY JR. (BRADLEY SR.'s son) at (708) 796-███. BRADLEY JR. answered the phone, "Hello? Uh, I think she at the hotel." DANIELS

asked BRADLEY JR., "Hey, where's that? Where is Joelle? Because she scaring the shit outta me, Jay. You gotta get there; she's not answering." BRADLEY JR. replied, "Ok." DANIELS went on: "Ok, cause, all right—now I'm getting fucking nervous. She's not answering the fucking phone." BRADLEY JR. told DANIELS, "Ok, let me call her." DANIELS stated, "And you know the situation."

124.    A few minutes later, at 4:37 p.m., DANIELS was able to reach MASSEY. DANIELS told her, "Come on now. You can't do this to me, love." MASSEY asked, "What, lover?" DANIELS replied, "You know the situation, you cannot be—you have to be able to answer." After some back and forth about the missed calls, DANIELS instructed MASSEY, "Take your brown bag, take the two black ones. Right? Take your brown bag, take the two black ones, right? Put 'em in that brown bag and take them downstairs. So, put your gloves on real quick. Put the two of 'em in the brown bag and take 'em downstairs. Some guys waiting on you. Give those back to them. I'll send you over a receipt. You gotta sort this today. [Pause] Okay, just look in your phone and you'll see it." MASSEY replied, "Okay." DANIELS continued, "I need—need to know [U/I]. It's a blue Silverado. Yeah, baby, come on." MASSEY questioned, "They in front? Can they meet me in the back?" DANIELS responded, "They in the back, I dunno. There's a blue Silverado, just [audio breaks]."

125.    DANIELS told MASSEY multiple times to make sure to bring her room key with her and to make certain it worked before departing. DANIELS told MASSEY, "And if you get down there [audio breaks] that I don't think want you to rush and make a mistake, and you take it back up to the room." MASSEY replied, "Right." DANIELS

60

continued, "Unless you close the drawer for the [U/I], just in case something don't work; just in case somebody have to let you back in the room." MASSEY again affirmed. DANIELS then returned to the subject of gloves: "[U/I] looking in that room. You got your gloves on? You got the bag?" MASSEY replied, "Yeah." DANIELS asked her, "What's the situation? Trynna get a visual on my mind." MASSEY told DANIELS she was putting her gloves on. DANIELS replied, "Okay, yeah. Just don't like to mess with dirty laundry without no gloves." As they continued to talk about "dirty laundry," DANIELS reminded MASSEY, "Not the green ones—the black ones. Not the green gloves." MASSEY replied, "Yeah, I know." DANIELS asked, "Two black gloves, right?" MASSEY replied, "Hmm… let me see."

126.    DANIELS then suggested that MASSEY make a hole in one of the items they were discussing and check it. DANIELS said, "You gotta cut it open and look at it inside." MASSEY replied, "Hold on… [pause] What if I—you said it's ok if I check?" DANIELS replied, "Yeah, it's ok if you check, if you gotta be for sure. Cause I don't [U/I] don't green ones. I cannot wear those green ones. I have to wear my black ones, though." MASSEY replied, "Okay, I was trynna do what I have to, but I [voices overlap]." DANIELS told MASSEY, "Okay, you can punch a hole in there real quick, open up, and look." After some further discussion, DANIELS asked MASSEY whether she found "both of them." MASSEY stated "Nope, I found the one that's not green." Shortly thereafter, MASSEY corrected herself: "Naw, found the one…yeah, I found the one that is green." DANIELS told MASSEY, "Got you, okay. Keep my greens [U/I]. I repeat: Keep the greens."

127.    DANIELS then instructed MASSEY, "When you come back up, you need to, uh… re-pack and re-seal my gloves." MASSEY said she would. DANIELS teased MASSEY that she was probably going to open all of "them." MASSEY told DANIELS that it did not end up being necessary, and she explained, "The first one was [U/I] red, the second—and the second and third one was black and green." DANIELS replied, "So you wanna, you wanna [U/I] three… got you, okay." DANIELS then told MASSEY he needed her to get downstairs, and she confirmed she was going. DANIELS again reminded MASSEY to check the room key and the door lock and to "make sure it turns green" before leaving. He also double-checked that MASSEY had "the bag."

128.    MASSEY told DANIELS she was on her way down in the elevator. Several minutes later, MASSEY asked DANIELS, "Is it like a pickup truck?" DANIELS replied, "Silverado. Blue Silverado truck." MASSEY hesitated for a few moments before deciding that she did see the vehicle DANIELS was describing. DANIELS told MASSEY, "Go sit in the car then give it to him." Moments later, MASSEY was heard talking to an unidentified male, saying, "How you doing? Imma get on the other side." DANIELS urged MASSEY, "Show 'em that picture that I showed you on the phone." A male's voice could be heard in the background, and the call dropped.

129.    Moments later, at approximately 4:55 p.m., DANIELS called MASSEY back. MASSEY said, "I don't know what, uh… the phone hung up." DANIELS asked MASSEY what happened. MASSEY replied, "Oh, no, I was just letting you know it was good. We are fine. Like, I'm going back to my, uh…" DANIELS asked, "Okay, you showed him the [U/I] ticket?" MASSEY replied, "Huh? Yeah. He already got that."

62

130.    Based on DANIELS' cellular location and vehicle GPS data, case agents know that DANIELS was in Milwaukee at the time of these October 23 calls. Based on other interceptions, case agents also know that MASSEY was in a hotel in the Chicago area. Based on their training, experience and knowledge of this investigation, case agents believe that DANIELS was using MASSEY to hand-deliver controlled substances to a male subject on his behalf. When DANIELS was initially unable to get a hold of MASSEY, he appeared extremely concerned, likely due to a fear that MASSEY had been detected by law enforcement. During the call, DANIELS repeatedly instructed MASSEY to wear gloves, which case agents have previously observed DANIELS wearing while in possession of and or delivering controlled substances. DANIELS also appeared to use the word "gloves" later in the conversation to refer to controlled substances. Case agents know based on the investigation to date that the DANIELS DTO uses color-coded inner packaging on kilogram-sized bricks of controlled substances to help easily identify which packages contain which substances without need to unwrap them completely. Case agents believe that when DANIELS referred to the green and black "gloves," he was reminding MASSEY that she could distinguish what was in different packages of drugs by the color of their wrapping and telling her which ones to take to the buyer. Case agents believe that DANIELS advised MASSEY to poke a hole in the outer packaging to reveal this inner wrapping so that she could be certain she was bringing the right controlled substances for the transaction that was to occur outside of the hotel. After the transaction, it seems MASSEY advised DANIELS during their subsequent call that the drug transaction occurred without issue.

63

131.    Case agents' interpretations regarding the October 23 calls were supported by additional calls intercepted the following day. On October 24, 2022 at approximately 2:46 p.m., DANIELS called MASSEY and complained, "You are not keeping me updated, love. You know you on a sensitive carrying situation, and I need to know, like, 'Hey, I'm going over here." After further discussion, MASSEY stated "Okay; well, I'm okay. I'm okay; that stuff is not even... I don't even have it with me; I have it at... it's in my... it's in my luggage in... at a Des Plaines." DANIELS replied, "Got you, got you." MASSEY concluded, "So it's not even on me [U/I]."

132.    DANIELS later asked, "Can you look to see what bank is that so I can go to the bank for the man?" MASSEY did some checking and confirmed for DANIELS, "Yes, it's B. O. A., Bank of America. Okay. I can look at one right now and deposit him his money. Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS was upset that MASSEY was not updating him on her whereabouts and activities during her "carrying situation," which case agents believe was a reference to MASSEY carrying/delivering controlled substances to clients in Illinois. MASSEY reassured DANIELS that she was not carrying the substances at the time they talked, and that they were in her luggage in Des Plaines, where case agents know that DTO member BRADLEY SR. resides. MASSEY and DANIELS also discussed which bank is used by an unnamed male so that DANIELS can deposit "his money." Case agents believe this part of the conversation was in reference to payments that needed to be made to a source of supply.

64

133.    Case agents also intercepted pertinent calls in which DANIELS spoke about MASSEY's role in the DTO. On November 4, 2022, at 2:15 p.m., DANIELS, using Target Telephone 4 placed a phone call to NELSON. DANIELS simultaneously spoke, using FaceTime, with EDWARDS. During the call, DANIELS discussed purchasing and splitting the cost of controlled substances with NELSON, as well as ways to ship controlled substances. DANIELS told NELSON and EDWARDS, "Go to one post office and send one. Go to another post office. That's what me and Joelle would do." DANIELS continued, "Now, follow me here now: This is what me and Joelle were doing, the same thing. We would get the flat rate boxes, we would load up the flat rate boxes, right? And we put the whole thing in the flat rate boxes; you hear what I'm saying? You know what I'm talking about, right? I put the whole thing in a flat rate box, right? Then, I will fill up out the flat rate box, stuff it real good, right? I got a couple books in the flat rate box. I got that book, I got some "Think and Grow Rich" and other some other little flat books that I bought from Barnes and Noble, put that bitch up in there, fill it up, okay? Now, I would go, whenever I would send out like six or seven, me and Joelle would go—I would go to one... I would go to two or three post offices in Long Beach. Two or three post offices in LA. But I never sent all of them out of the same post office. You're see—you're with what I'm trying to tell you? Now, now this is good habit. I'm teaching you because you know... you see how long I did it, and none of my shit ever got caught; you follow me?"

134.    Case agents believe, based on their training and experience and their knowledge of this investigation to date, that DANIELS sharing with NELSON and EDWARDS the best methods to ship controlled substances to avoid detection. In his best-

65

practice descriptions, DANIELS repeatedly referred to MASSEY as assisting him in sending controlled substances split into multiple packages sent from different post offices on the same date, and DANIELS credited this technique as the reason why they had never been "caught."

### E. Milwaukee DTO Distributors

#### 1. Kevin NELSON receives DTO parcels and distributes controlled substances.

135. The investigation to date has revealed that NELSON distributes controlled substances, including opiates and marijuana, for the DTO. NELSON has also accepted parcels containing suspected controlled substances at his residence, SUBJECT PREMISES 4. He has further been known to retrieve DTO-related parcels from other locations.

136. According to a WE Energies representative, NELSON is listed as the subscriber of utilities for SUBJECT PREMISES 4 since June 3, 2022. NELSON was last observed at SUBJECT PREMISES 4 on November 5, 2022, when agents saw him talking with DANIELS on the porch of this residence. NELSON is known to operate a silver GMC Acadia bearing Wisconsin registration plates "ANF-9693." NELSON is the registered owner of this vehicle with a listed address of ███ North Hopkins Street, Milwaukee.

137. On September 11, 2022, case agents conducted surveillance of NELSON at SUBEJCT PREMISES 4. At this time, agents observed the GMC Acadia parked behind the residence on a parking slab. Agents observed two unknown males walked up to the house for a brief period of time. Agents also observed NELSON exit the rear door of his residence and approach the front driver side door of a vehicle, which had the windows

rolled down. NELSON then reached into the vehicle and appeared to hand the driver something. He removed his hand from the vehicle, put it into his front pant pocket, and walked back toward his residence. While walking to SUBJECT PREMISES 4, case agents called NELSON on his known phone number and observed NELSON answer the undercover telephone call.

138.    During the course of this investigation, case agents determined that NELSON has used phone number (414) 676-[redacted] to further DTO activities. Between August 24, 2022 and November 12, 2022, approximately 67 intercepted calls and/or text messages between NELSON and DANIELS were deemed criminal and pertinent in nature. NELSON's role in the DTO is reflected in the following intercepted calls.

139.    On August 31, 2022, at 4:48 p.m., NELSON, using (414) 676-[redacted], called DANIELS at Target Telephone 2. DANIELS stated, "did you want me to come to you real quick?" NELSON replied, "Hey, that stuff you gave me man, that shit garbage, man. Them motherfuckers just complained about that shit twice. Man I…you come and get that I don't know." DANIELS responded, "he did?" NELSON replied, "Yeah, you come and get that, I don't know. I usually…he don't even wanna buy no more!" DANIELS then stated, "Really? Okay, I…I do something different, I mean they [stutters] don't like it?" NELSON stated, "No, that shit…yeah, that shit garbage man, nigga I don't know man. He don't wanna…he don't wanna buy no more man." DANIELS replied, "Impossible." NELSON stated, "[U/I] the other day." DANIELS replied, "Okay, Okay, I come." NELSON stated, "I just … I just gave it to him …" DANIELS stated, "me and you go [stutters] me and you check it out ourselves, but we…that's fine." Based on my training,

experience, and knowledge of this investigation, I believe that during this call, NELSON told DANIELS that controlled substances he (DANIELS) provided him are of poor quality and that customers are complaining about the product. DANIELS then stated he would meet NELSON to address the complaints.

140. In a subsequent call at approximately 4:59 p.m., NELSON called DANIELS at Target Telephone 2. During the call, NELSON stated, "hey bro, I need that shit that you gave me the first time man." DANIELS responded, "no you ain't gotta give me all of that. All you gotta do is tell me when you to the house and then . . . you still got the uh, the soft ones that my son sent . . . had brought over." NELSON replied, "yep!" DANIELS then stated that he would "make it right." NELSON proceeded to tell DANIELS that the customer said "he going to bring it back," but NELSON was explaining he was busy. DANIELS then said, "You call him back, you call him today and you tell them to call so we make it right. . . . Yeah I'm here, I'm here. I'm finna make it right, right now. We're going make sure you good, and that way whenever he show back up, ya'll never have to worry about [voices overlap]."

141. Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, NELSON asked for the controlled substance DANIELS gave him another time, presumably because they were much better quality. DANIELS told NELSON that he would address the poor quality drugs, and that he would do it that same day, recognizing it was important to timely respond to the customer so that the customer continues to buy controlled substances from NELSON.

68

142.    That same day, at approximately 5:10 p.m., digital surveillance reflected that DANIELS and HENTON drove DANIELS' Yukon to and parked in the ▮▮ block of North 37th Street. At approximately 5:32 p.m., case agents conducting physical surveillance observed DANIELS exit the Yukon and walk along side of SUBJECT PREMISES 4. Although agents were not able to maintain visual surveillance of DANIELS, at approximately 5:43 p.m., agents observed DANIELS re-appear, carrying a brown grocery style bag. DANIELS left the area in his Yukon, drove to SUBJECT PREMISES 2, at which point he and HENTON, who was carrying four grocery style bags, entered. At 7:09 p.m., DANIELS and HENTON left the stash location, drove and parked on the east side of North 37th Street, and approached SUBJECT PREMISES 4, staying until approximately 7:25 p.m. Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS and HENTON traveled to NELSON's residence to obtain a portion of the narcotics that NELSON stated was of poor quality. After obtaining the narcotics, DANIELS and HENTON transported the narcotics and possible drug proceeds to SUBJECT PREMISES 2 and returned to SUBJECT PREMISES 4 to resupply NELSON with better quality narcotics.

143.    At 3:03 p.m., on September 1, 2022, NELSON, using phone number (414) 676-▮▮▮▮, called DANIELS at Target Telephone 2. NELSON stated, "Old boy called me this morning right? DANIELS responded, "Yes sir." NELSON stated, "Said he was letting his shit dry [P/H] man, said he was short, 'bout seven grams." DANIELS stated, "Impossible, cause I made sure it was like point seven over." NELSON stated, "Right, he just [U/I]". DANIELS states "Impossible. . . . I don't make mistakes like that." NELSON

69

stated, "Right I'm a send you...I'ma send you his number so you can call him" and "Cause he textin me...he should not be texting, he should not [U/I] so I'ma send you his number." DANIELS stated, "Impossible" and "I did fifty-six point eight." NELSON stated, "right." DANIELS stated, "I did almost sixty seven." DANIELS later said, "You should be [U/I] you let him know, I did fifty six point eight...I know what I did. Fifty six point eight, I know I did fifty six point eight. So ain't no way it no seven g's off, it's impossible." NELSON responded, "That's what I was thinking too, you know what I'm saying." DANIELS stated, "yeah yeah yeah yeah That'll make me end business, I don't like that cause you know how I do business . . . You saw how large...you saw how large it was. If you looked at it, you can look and see how large it was." From my training, experience and knowledge of this investigation, I believe that during this call, NELSON advised DANIELS that a customer was complaining about being shorted 7 grams out of a 56 gram –or 2-ounce—transaction, ("I did fifty-six point eight"), and that DANIELS believed the customer was not shorted. I know that one ounce of cocaine equals 28 grams.

144. The communication continued, and NELSON stated, "Hey you know, you know, what though bro, alright that's what I think I was going to do. I understand business but let him do...I let him do his own thing because, you know what I'm saying, I'm retired of that shit like that, you know what I'm saying." DANIELS stated, "Yeah yeah yeah cause it ain't that, the seven ain't nothin, I'd do it. I'd gladly give him some, I got seven back there, still done up, you can give it to him. But give it to him anyways, I'm just telling you now that's a done deal. . . . But I ain't doing that one no mo'. I Don't do that one no mo'. But I got seven for you, you can get it in a little bit." NELSON stated,

70

"alright, I'ma I'ma send you his number then…I'm on the highway." DANIELS stated, "I don't want his number…I don't want his number." NELSON stated, "I'm on the highway though." DANIELS stated, "I got you…you on the highway goin' down there right?" NELSON stated, "yep." DANIELS replied, "Okay cool, I'll let you know when they send you a box and you can go by and grab it." Based on my training, experience, and knowledge of this investigation, I believe that during this call, DANIELS eventually agreed to provide the 7 grams of controlled substance to the unknown narcotics customer, despite DANIELS' and NELSON's complaints about the legitimacy of the claim made by the narcotics customer that he was provide 7 grams less then agreed upon.

145.    At 4:46pm, on September 2, 2022, NELSON called DANIELS at Target Telephone 2. During the call, NELSON stated "You know, you my motherfucking good luck charm, I swear you is I…I swear you is sometime, man." DANIELS stated, "Why you say that?" NELSON responded, "You know um remember I told you I gave my boy one of them to see what he could do with it right?" DANIELS acknowledged. NELSON continued, "Man he got like three four motherfuckers that want that shit, you know what I'm saying man. Not put together but just like…you know what I'm saying?" NELSON further stated, "I gave you two and a half back so um I'ma give you that four when I see you. . . . But I'ma need you to bring me some of them motherfuckers. Undone single ones, You know what I'm saying?" DANIELS stated he would. NELSON then said, "Because they, they said Phil, they said that that shit right there, it raw and uncut." DANIELS replies "I know it is."

71

146.    Based on their training, experience, and knowledge of this investigation, case agents believe NELSON advised DANIELS that he needed more of an unspecified controlled substances because it was high quality and sold quickly. NELSON further stated that his customer had success finding customers. NELSON advised that he needed more product as soon as he returned to Milwaukee, and DANIELS agreed to re-supply NELSON.

147.    At 1:00 p.m., on September 6, 2022, NELSON, using phone number (414) 676-████, called DANIELS at Target Telephone 2. During the call, DANIELS stated, "What's good bro?" NELSON stated, "Man I need you, man." DANIELS stated, "Okay, um, I'm in Chicago. Soon as I get back in, I will…uh come see you." NELSON stated, "today…today?" DANIELS stated, "Today." NELSON stated, "I miss you too man…goddamn." DANIELS stated, "Yeah, I know, I know, I know, I know. Also we need right now um…I told him when he was going to be able to wrap that up too…cause he's… he calling me for that." NELSON stated, " I know I'ma …I'ma make sure I got him uh…I'm just waiting on this little thing to come through…It's hopefully coming through, the deal tomorrow." NELSON later stated, "I ain't, I ain't I ain't forgot about him I got it." DANIELS said, "Yeah yeah yeah cause he called me, and I told him when I got back in town we gonna get em wrapped up." NELSON stated, "Aight, I know, I know what we got and um, I know we at…" DANIELS stated, "And then I'll let you see um… I'll let you see uh one of the things he sent me too. . . . And then uh somebody told me it's really really really good. Yup so bro, so as soon as I get back, give me a few hours, I'll be back that way ok?" NELSON stated, "Alright bet."

72

148.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, NELSON requested to meet with DANIELS to acquire more product. Agents also believe that DANIELS agreed to bring him more product, and he also agreed to show NELSON new product that he received.

149.    On September 9, 2022, at approximately 2:12 p.m., NELSON, using (414) 676-REDACTED, called DANIELS at Target Telephone 2. During the intercepted call, NELSON stated, "I need, I need shit like that, I need shit like that, that shit ain't nothing like that..that G."  DANIELS replied, "so how many G?"  NELSON stated, "That's two of 'em."  NELSON stated, "Yeah, the one, the one, that one that us the one that we weigh, what number? Like a gram out of that. My guy smoked that one."  DANIELS replied, "alright, that's cool, that's cool.  I see you when we get there I got you."

150.    Based on their training, experience, and knowledge of this investigation, case agents believe that NELSON placed an order to purchase controlled substance from DANIELS.  Based on the call, agents believe that a "G" refers to a gram, which is a common weight unit used by drug traffickers.

151.    On September 15, 2022, at 2:54 p., NELSON, using phone number (414) 676-REDACTED, called DANIELS at Target Telephone 2. NELSON said, [U/I] I'mma hit you up probably [broken audio]." DANIELS replied, "Okay." NELSON said, "Get half of that, half—half of that then uh…". DANIELS stated, "Cool." NELSON then said, "Getting' the other half probably at the end of this weekend."

152.    Based on their training, experience, and knowledge of this investigation, case agents believe that NELSON called DANIELS to inform him that he was going to

73

pay DANIELS half of what he owed him (DANIELS). NELSON would then pay the other half at a later time. Based on their training and experience, case agents know that high-level customers will commonly only pay a percentage of what they are buying and will pay the remaining sum after the product is sold.

153.    On October 1, 2022, at 5:38 p.m., NELSON, using telephone number (414) 676-███, called DANIELS at Target Telephone 4. NELSON said, "What are we looking like, man?"  DANIELS said, "I'll call him right now; I'll call him right now." NELSON said, "Hey, what's all the [unintelligible] you got? Is he gonna get it?" DANIELS said, "He was just calling trying to send a box over but he is sending out two samples first." NELSON said, "Yeah, I wanna [unintelligible]."  DANIELS said, "It's only two flavors; it's only two flavors."  NELSON said, "Yeah; well, let me know what's popping, man." DANIELS said, "He want a G a piece." NELSON said, "Oh, okay."

154.    Based on their training, experience and knowledge of this investigation, case agents believe DANIELS and NELSON discussed a drug transaction. More specifically, case agents believe NELSON asked if DANIELS was in stock with controlled substances. Case agents further believe that DANIELS told NELSON he talked to his supplier, who sent controlled substances via a US mail carrier. ("He was just calling trying to send a box over.") Further, case agents believe DANIELS told NELSON that the supplier wanted $1,000 U.S. currency per pound of marijuana that he was sending. ("He want a G a piece.") Case agents know from training and experience that the average price for one pound of marijuana is $1,000.

On October 16, 2022, DANIELS, using Target Telephone 2, received a call from NELSON, using phone number (414) 676-[redacted]. During the call, DANIELS stated, "go head bro." NELSON replied, "you still ain't call him." DANIELS stated, "Naw cuz you know I busy right now." NELSON replied, "well I'm tired of him callin' me." NELSON continued, "I'm tired of him calling me. . . . He waiting on you calling him he call me and asked what's up with you calling him. You hear me." Later on in the call, DANIELS stated "It like you suppose to answer your calls then. You got to be profitable." NELSON replied "yea," and DANIELS continued, "If you had to answer who you call. You call people who help you make some." NELSON then replied "Well I don't know what's going on with him he ain't even pay me my money he owe me 1000 dollars you know what I'm saying. Yea, but just five him a call Phil let me know."

155. Based on their training, experience, and knowledge of the investigation, case agents believe that during this call NELSON complained to DANIELS about repeated calls NELSON received from an unidentified narcotics customer. DANIELS advised that he (i.e., DANIELS) is unhappy with the narcotics customer based off unpaid drug debts, and NELSON confirmed that the unknown drug customer owes NELSON and the DANIELS DTO $1,000.

156. On November 8, 2022, at 11:10 a.m., NELSON, using (414) 676-[redacted], called DANIELS at Target Telephone 2. During the call, DANIELS told NELSON he was in California. NELSON asked, "You gonna go holler at dude about that situation?" DANIELS replied, "Yeah, yeah, yeah, yeah, yeah. That's where I'm going to go do." DANIELS later stated, "I'm gonna do that in a little bit. But, I've already seen, uh, I

already took a look at everything uh, uh, he picked up and sendin' down." NELSON asked, "They're good?" DANIELS replied, "Yeah, they're good. You'll be, you'll be happy."

157.    Based on other intercepted calls and their knowledge of this investigation, case agents believe that NELSON asked DANIELS if DANIELS went to look at the quality of the controlled substance NELSON wished to purchase. DANIELS told NELSON he (DANIELS) had already looked at the controlled substance and it was of good quality.

158.    Later that day, at 4:25 p.m., DANIELS, using Target Telephone 2, called NELSON. DANIELS asked NELSON, "Bro, what's the address?" NELSON responded, "Address, ████ North 37th Street. At 5:08 p.m., NELSON texted DANIELS asking, "Who is it going too??" At 5:08 p.m., NELSON called DANIELS at Target Telephone 2 and asked, "I thought you were sending it to me?" DANIELS responded, "You are, you got two more coming. Just hold tight. We can't send everything to you 'cause you got so much coming." NELSON affirmed, "All right; let me know." Based on these communications, case agents believe that DANIELS obtained controlled substances and told NELSON he was sending them to NELSON.

159.    At 5:12 p.m. and 5:14 p.m., DANIELS, using Target Telephone 2, texted NELSON photographs depicting purchase receipts from UPS and USPS in Valley Village, California. The receipts reflected the shipment and imminent arrival of three parcels to Milwaukee. Case agents believe that DANIELS sent these photographs to NELSON to show NELSON the packages were dropped off for delivery at UPS and USPS.

160.     At 5:16 p.m., NELSON called DANIELS again. NELSON asked DANIELS, "Did you overdo it or what? Did you do what we talk about? Or…" DANIELS responded, "I did what we talk about." NELSON stated, "Oh, so you didn't do nothin'? Cause there's three packages. You didn't do nothin' extra?" DANIELS later said, "No, no, no; I'm going over there right now myself." NELSON affirmed, "Oh, ok, so." DANIELS further stated, "I only let him do it 'cause he did the, uh, he did the twelve, accordingly to what we talked about." DANIELS continued, "So at the end, um, I get the money for the twelve, so now I gotta go over here myself, and I'm heading there now." NELSON later stated, "You already know, I need that kill shit. I wanna see them motherfuckers die and wake up and call me again. You know what I'm saying? You hear me?" DANIELS asked NELSON to repeat himself. NELSON continued, "I need that kill shit. I need--" DANIELS affirmed, "Okay." NELSON stated, "I need some that kill. I want some motherfucker going to die and they are going to wake up and call me back again. You know what I'm saying?" DANIELS responded, "Gotcha. Well, that's my Buggatti stuff, boy. You want that. That, that's my lick. You ain't ready for my lick yet." DANIELS and NELSON began to argue over pricing. NELSON stated, "But listen, though, that shit shouldn't be that much though now, not now." DANIELS responded, "Shit, you gone crazy. I look right now, I already told you that they still asking for kill, kill." DANIELS later said, "They ask for three. Twenty eight-three-thirty-two, but at the end of the day it's worth it because if I can get it at that number, and if I am able to negotiate, probably get them all at like twenty-seven. I'm still doing good, 'cause then I got twenty-seven, and then I got shipping and everything. Come out to about three when I get done, and I'm wet. 'Cause,

77

if I'm doing fifty, twenty-five, sixty, twenty-five, I'm chillin'; I'm good. My numbers are still A-1. That's what I'm looking for; I'm looking for that." NELSON responded, "That's that, that's that rapper-type shit." DANIELS replied, "They got that, and they got the top quality, and that's what I want to put out there. I want to put that out there, I don't want to put no low grades. I want to be straight high grades. Everything mines is top, top notch. I want the top shelf every time I go in—top shelf, top shelf, top shelf. And then you got the mid-grade, your stuff should be twenty-five, thirty-five, you hear what I'm saying? You should have a twenty-five line and a thirty-five line, and I have a sixty line, and I got a fifty-five line." NELSON responded, "I got some shit that I charge, you know, one fifty. You know what I'm saying?" DANIELS replied, "But yeah, you need to create another line, though. You can't have one solid flat go on both, twenty-five, twenty-five, twenty-five. Naw, n***** going to pay thirty-five. This is my thirty-five, this is my twenty-five. Like you said I got a one twenty-five zip, and I got a 150 zip, you hear what I'm saying?"

161. Based on their knowledge of this investigation, case agents believe that NELSON requested that DANIELS meet with a source of supply for another type of controlled substance. ("So you didn't do nothin? 'Cause there's three packages. You didn't do nothin' extra?"). Case agents further believe NELSON wanted DANIELS to locate a high-quality opiate, such as heroin or fentanyl ("I need that kill shit. I wanna see them motherfuckers die and wake up and call me again."). Based on their experience in speaking with opiate users, case agents know that many users will attempt to find a trafficker with a potent product that will bring them close to overdosing. If a user is able to get to this state, it means the product they purchased was of high quality. Accordingly,

78

NELSON's statements reflect a belief that if his product is strong enough, users will come back to him even after almost overdosing.

162.    Based on the conversation, case agents further believe that DANIELS explained to NELSON his wholesale pricing for controlled substances and the pricing at which he later sells the substances to DTO customers. Case agents believe that DANIELS told NELSON that he may pay anywhere from $28,000 ("28") to $32,000 ("32") for a kilogram of controlled substance. DANIELS talked about negotiating prices with the supplier, and case agents believe that DANIELS told NELSON he will negotiate with the supplier to get the price of the kilogram down to $27,000. ("They ask for three. 28-3-32, but at the end of the day it's worth it because, if I can get it at that number, and if I am able to negotiate, probably get them all at like twenty-seven.")Furthermore, case agents believe DANIELS told NELSON that he sets different prices for the controlled substances he distributes depending on the strength of the product. ("I have a sixty line, and I got a fifty-five line."). Finally, agents believe that DANIELS advised NELSON to do the same, i.e., charge different prices for different "lines" of product ("But yeah, you need to create another line, though. You can't have one solid flat go on both, twenty-five.").

163.    On November 10, 2022, at approximately 12:16 p.m., DANIELS called NELSON to discuss parcels that were shipped to NELSON and parcels that DANIELS wanted NELSON to pick up. During the call, DANIELS instructed NELSON to pick up two packages the following day, one from "Fond Du Lac," believed to be SUBEJCT PREMISES 3 (HENTON), and another one from "across the street." The residence across the street from HENTON's residence is 9905 West Fond Du Lac Avenue, D.B.'s residence.

79

## 2. Dominque LEWIS: Milwaukee DTO Distributor

164. The investigation to date has revealed that LEWIS obtains distribution quantities of controlled substances from DANIELS. Further, LEWIS is believed to distribute narcotics, to include heroin, fentanyl, and cocaine.

165. During the course of this investigation, case agents determined that LEWIS has used phone number (414) 748-███ to further DTO activities. Between August 24, 2022 and October 12, 2022, approximately 5 intercepted calls and/or text messages between LEWIS and DANIELS were deemed criminal and pertinent in nature.

166. On August 24, 2022, at approximately 8:42 p.m. Hales Corners Police Department conducted a traffic stop on a black 2017 Infiniti Q60, bearing license plate ARC-6384, in the 1400 block of West College Avenue, which is in the Village of Hales Corners. The stop was due to excessive window tint and failure to display a front license plate. LEWIS was identified as the driver of the Infiniti, Asia T. LEWIS (DOB xx/xx/1995) was the front passenger, and three small children were in the rear of the vehicle.

167. Upon contact with passengers, officers detected a strong odor of marijuana emanating from the vehicle and observed marijuana "shake" in the center console area. LEWIS told officers he had some "weed" in the car. Officers conducted a search of the vehicle and recovered approximately 41 grams of suspected heroin that tested positive for the presence of fentanyl, 77 grams of crack cocaine (in two plastic baggies), 57 grams of cocaine base, 5 grams of fentanyl, 2 bottles of suspected Promethazine-codeine, small amounts of marijuana, a scale, wire cutters containing suspected drug residue, and a Glock 40 caliber handgun, bearing serial number TDC867, with aftermarket accessories

to make it fully automatic. The handgun was chambered and loaded with 14 rounds of ammunition. The controlled substances and the firearm were located in Asia LEWIS' purse, which was underneath her legs on the front passenger floor.

168.    Asia LEWIS was arrested for the contraband recovered from her purse. During a *Mirandized* interview, Asia LEWIS stated that she and LEWIS were coming from their apartment where they picked something up. When asked specifically about the controlled substances, Asia LEWIS denied knowledge of the controlled substances, and the interview was concluded. Asia LEWIS was charged under Milwaukee County case number 2022CF003465 with possession with the intent to deliver cocaine over 40 grams/use of a dangerous weapon.

169.    LEWIS was conveyed to Hales Corners Police Department where he was cited for the possession of marijuana and then released.  Shortly after his release, on August 24, 2022, at approximately 10:20 p.m., DANIELS, using Target Telephone 2, received a call from phone number (414) 748█████, the phone number LEWIS only hours earlier gave to Hales Corner Police Department. During the call, LEWIS stated to DANIELS, "Some bullshit, my wife took the charges on some shit. So I got booked and released." DANIELS responded, "What?"  LEWIS replied, "Yes, that shit just fucking happened." DANIELS asked, "Where at?"  LEWIS answered, "Out in, out in fucking Hales Corner." DANIELS then stated, "Get the fuck out." LEWIS replied, "Swear to god and my kids in the car, that's the only reason I couldn't run, I didn't run, like. . . . My windshield, they was on some bullshit, I'm like well this the middle of the night folks like, it was this dark, its was dark like this, when all that shit started, when it all occurred,

81

I said that, I been telling them, that's why I don't drive the car out there." DANIELS then

asked, "God Damn. What they get?" LEWIS stated, "Like...they didn't, well they got

something to charge her with, they just got the switch, they just got some grams, umm.

DANIELS stated, "That's it, okay." LEWIS then said, "But it's like, like, there is probably

like two, like two zips of each." DANIELS asked, "What reason did they had to get into

the car?" LEWIS responded, "Weed." DANIELS replied, "Oh no they didn't, fuck.

LEWIS said, "Motherfucking weed, yeah so that's my fault, for sure. Umm so that is my

fault, for sure. So na I mean, can't do shit, I got to see what the fuck, umm, when I get off

the phone, and learn, and see what...umm, see what they are going to do, what her bail

going to be like." Later, LEWIS recognized that he "might not be quite out of the loop."

170.    Based on their training, experience, and knowledge of this investigation,

case agents believe during this call LEWIS called DANIELS to tell him that he was just

stopped by Hales Corner police officers, who searched his car and obtained controlled

substances ("some grams" and "two zips of each") and a firearm ("they just got the

switch").   LEWIS told DANIELS that he would have run from officers, but couldn't

because his kids were in the car. DANIELS asked LEWIS about the basis for the officers'

search of his vehicle, and LEWIS told DANIELS it was because of marijuana. LEWIS

further told DANIELS that his wife was being charged with the contraband in the vehicle.

171.   On September 19, 2022, at approximately 1:40 p.m., digital video

surveillance of ███ West Fond Du Lac Avenue in Milwaukee (DANIELS' residence at

the time), reflected that LEWIS' black Infiniti parked in front of the residence. DANIELS

then got in the front passenger seat of the black Infiniti. Due to the tint on the vehicle,

case agents were unable to identify the driver of the black Infiniti. DANIELS and the driver of the black Infiniti talked for an extended period of time, and at approximately 3:25 p.m., the black Infiniti subsequently left DANIELS' residence with DANIELS inside.

172.    On October 5, 2022, at approximately 2:03 p.m., LEWIS, using phone number (414) 748-[redacted], called DANILES, using Target Telephone 4. During this call, LEWIS asked DANIELS, "Did [unintelligible] ever make it here, back around?" DANIELS responded, "No I didn't, I didn't. But if you want me to get you wrapped up or whatever, I can do something while I'm uh- I can have, uh...wifey meet up with you. And you can give that to her." LEWIS replied, "Okay, yeah, so...okay. Let's do a replay- let's do a replay and then, uh, the two fifty. I got that for you for the two fifty." DANIELS stated, "Oh, you do?" LEWIS stated, "Yeah, so I can-." DANIELS then said, "So you can take care of your business? Well, just, just hold that 'til I get there."

173.    Based on my training, experience, and knowledge of this investigation, I believe that LEWIS contacted DANIELS to buy 250 grams of a controlled substance. At the time of this intercepted phone call, DANIELS was in Minnesota. Because DANIELS' was in Minnesota, DANIELS was going to have someone else deliver the controlled substances to LEWIS, possibly Joelle MASSEY ("wifey"). LEWIS would then pay DANIELS upon his (DANIELS) arrival back in Milwaukee.

F.    COLULA and BARRAZA supply DTO with controlled substances, and EDWARDS facilitates movement of proceeds to California-based suppliers and procures, packages, and sends controlled substances.

1.    Joathan COLULA is a DTO supplier.

174.    The investigation to date has revealed that COLULA is believed to supply

83

the DTO with controlled substances, to include cocaine, and that COLULA operates out of California. COLULA has received cashier's checks from DANIELS and cash deposits from other DTO members. Case agents believe these payments were for controlled substances, including 3 kilograms of cocaine seized in a parcel destined to a Minnesota DTO residence. Furthermore, on numerous occasions, DANIELS sent luggage to California using American Airlines but did not board the flight and travel to California. Case agents believe that DANIELS used these "ghost bags" to send bulk currency to COLULA as drug payments. Currently, case agents learned that DANIELS is depositing cashier's checks and U.S. currency into EDWARDS' business bank account, which EDWARDS subsequently withdraws. Through intercepted communications and financial records, case agents believe that EDWARDS then gives U.S. currency to various DTO suppliers, including COLULA, to pay for controlled substances.

175. During the course of this investigation, case agents determined that COLULA has used phone numbers (213) 844▮▮▮ and (213) 726▮▮▮ to further DTO activities. Wire communications between COLULA and DANIELS, using their known phone numbers, date back to at least November 2021. Between August 24, 2022 and November 12, 2022, approximately 2 intercepted calls between COLULA and DANIELS were deemed criminal and pertinent in nature.

176. Pen register and phone toll information reflect that COLULA's main form of communication with DANIELS is through an encrypted phone application, WhatsApp. Between June 30, 2022 and November 5, 2022, DANIELS, using the account associated with Target Telephone 2, had approximately 1,775 WhatsApp

communications with COLULA's WhatsApp account, (213) 844-█████. Case agents believe, based upon intercepted communications and other information learned through this investigation, that DANIELS and COLULA are using WhatsApp to discuss DTO-related matters.

### 1.1 COLULA supplied the DTO with 3 kilograms of cocaine and laundered DTO proceeds through his business bank account.

177. On or about March 3, 2022, case agents intercepted a 13-pound package sent to FRYER's address in St. Paul, Minnesota. Specifically, the package was addressed to "K-Maree #E ███ Bates Ave Saint Paul, MN 55106-5543." The package was shipped from "DXG Technologies 1001 S Lawson St City of Industry, CA 91748." The parcel was shipped from the UPS store located at 912 E 12th Street Room B, Los Angeles, California. On March 4, 2022, case agents searched this package pursuant to a federal search warrant. Located within the package was a white plastic dog food container with a screw off lid, inside of which contained two plastic bags of suspected narcotics among packaging items to include packing peanuts and expandable foam. A small sample of each suspected kilogram field tested positive for the presence of cocaine. The total amount of cocaine seized was approximately 3,425 grams (1,135 grams, 1,145 grams, and 1,145 grams).

178. About one week before this parcel was set to be delivered—on February 23, 2022—COLULA's Bail Bonds Wells Fargo bank account ending in x0363, received cash deposits of $107,000 from Leroy HENTON (HENTON's son) and FRYER. Examination of financial information revealed that Leroy HENTON deposited $31,000 in cash and FRYER deposit $76,000 into COLULA's x0363 account on the same day but from different

states. Based on their training and experience, case know that there is normally a delivery cost associated with the shipment of cocaine, and that a kilogram of cocaine would be approximately $25,000-$30,000. Agents further believe that the deposit amounts correspond to the approximate 3 kilograms of cocaine seized on March 3, 2022.

179.    COLULA opened up account ending in x0363 at Wells Fargo Bank on or about July 18, 2013. This account was opened in the name of "Joathan Colula, Joathan Colula Bail Bonds." During the course of the investigation, records were reviewed from this account from January 2020 to February 2022.

180.    Between January 2020 and February 2022, COLULA's x0363 account received at least $203,000 from members of the DANIELS DTO for what is believed to be controlled substances. In addition to the $107,000 received and noted above, the payments are detailed as follows:

    a.    On September 10, 2021, BRADLEY JR. obtained a cashier's check for COLULA in the amount of $11,000.

    b.    On October 1, 2021, COLULA deposited a cashier's check from DANIELS' and B. DANIELS' First Response Supportive Care (FRSC) bank account drawn from BMO Harris for $50,000.

    c.    On October 27, 2021, MASSEY obtained a cashier's check for COLULA in the amount of $12,000.

    d.    Two cashier's checks in the amount of $7,850 and $15,300, dated December 2021, were drawn from DANIELS' Wells Fargo account to COLULA.

181.    Funds attributable to the DANIELS DTO accounted for approximately 46% of all the incoming funds into COLULA's x0363 account. COLULA's account also received cash deposits (that were unable to be traced to the DANIELS DTO). The above-

referenced DTO payments, combined with cash deposits, accounted for 68% of all deposited funds into this account. Outgoing Zelle and Cash App payments to individuals, cash withdrawals, and payments to retailors accounted for approximately 80% of all outgoing funds during this time.

### 1.2 Intercepted calls and phone connections establish COLULA's DTO involvement.

182.    On October 7, 2022, at approximately 1:40 p.m., DANIELS, using Target Telephone 2, called MASSEY at (414) 336-▮▮▮▮. During this call, DANIELS stated, "I gotta get up now. I gotta go to Chase Bank, get my stuff going." MASSEY responded, "Oh you was sleeping? You was sleeping good, huh? You're about to get out." DANIELS replied, "Oh but you know what though, that's cause a couple days in a dope roll I got up real real early." Later in the conversation, DANIELS stated, "I'm about to go...about to get myself together and then go uh...go uh uh with him and get Joe taken care of so he can take care of my business."

183.    Based on their training, experience, and knowledge of this conversation, case agents believe that during this call DANIELS informed MASSEY that he needed to go to Chase Bank ("I gotta go to Chase Bank") to electronically transfer money for COLULA ("Joe") as payment for previously fronted controlled substances or to pay for more controlled substances.

184.    Shortly after this call, on October 7, 2022, at approximately 2:12 p.m., the court-authorized GPS location information for DANIELS' GMC Yukon reflected that it traveled to Chase Bank in West St. Paul, Minnesota. Based on their training, experience,

and knowledge of this investigation, case agents believe that DANIELS went to Chase Bank to electronically transfer U.S. currency as payment for controlled substances.

185.    On October 19, 2022, at approximately 12:53 p.m., COLULA, using (213) 844-█████, called DANIELS at Target Telephone 2. COLULA said, "Yo, what up, Phil?" Case agents were not able to understand DANIELS' response. COLULA said, "[U/I] Yea, I was out in Chicago for a couple hours. Well, all night really. From like, from like 8 to 8. For like 12 hours." DANIELS replied, "What's up?" COLULA responded, "I'm out here in New York now." DANIELS later said, "You called me yesterday. And I didn't get back to you. I see your flight got transferred." COLULA responded, "Yea, yea I'm out here in New York now. I wanted just go see what there was to do. You know?" DANIELS questioned, "Really?" COLULA later asked, "Um, no news with that?" DANIELS exclaimed, "Yes, Sir!" COLULA then said, "I haven't it. Cause I been, I been, I've been just you know, like, I was stuck at the uhh airport for a couple hours." DANIELS replied, "Right!" COLULA told DANIELS, "As soon as I get my room right now I'm going to sit there and see what I can figure it out." DANIELS replied, "I ain't, I ain't see nothing." COLULA responded, "Okay, cool, I'll call you back in a few." DANIELS questioned, "I mean ain't nothing what's its name, did you check it?" The call ended shortly after.

186.    Case agents believe that during the above-referenced call, COLULA told DANIELS that he was recently in Chicago and then was in New York. Agents further believe that COLULA asked DANIELS whether DANIELS received either a parcel containing controlled substances or a delivery of controlled substances. ("Um, no news with that?") DANIELS indicated he had not received it yet. ("Yes, Sir!") COLULA then

88

told DANIELS that he would check on the status when he arrived at the hotel. ("As soon as I get my room right now I'm going to sit there and see what I can figure it out.")

187.    As described earlier, after this call, at approximately 5:56 p.m. DANIELS spoke with MASSEY, at which time he relayed that "Joe" was in Chicago and missed a flight to New York. Based on the sequence and context of the calls with COLULA and MASSEY, case agents believe that DANIELS' subsequent reference to "Joe" in his conversation with MASSEY is a reference to COLULA. ("I was talking to Joe, and Joe"). Case agents further believe that DANIELS told MASSEY he had to stay in Minnesota longer because the controlled substances COLULA sent to DANIELS was to be delivered on October 19. Case agents did not intercept a subsequent call between DANIELS and COLULA regarding the incoming controlled substances, which was referred to in code as the "flight" that was "'bout to land." However, WhatsApp pen register data reflected that DANIELS and COLULA spoke numerous times on October 19, 2022, using the application. Case agents know that DANIELS uses references to "flights" and has counseled other DTO members to use this code when referring to DTO parcels.

188.    Additionally, DANIELS and COLULA have had phone communications on the days surrounding parcel deliveries, leading case agents to believe that the parcels contained controlled substances and that COLULA supplied the controlled substances located within.

189.    As an example, on January 26, 2022, case agents conducted surveillance of a UPS delivery truck's attempt to deliver a UPS package to SUBJECT PREMISES 2. The sender of the package was DXG Technology, Michael Herrera, 1001 S. Lawson Street, City

89

of Industry, California. Herrera is the same individual who sent packages believed to contain controlled substances located in DANIEL's and MASSEY's residence on January 5, 2022. Upon delivery, there was no answer at the door and the package was ultimately delivered to a UPS drop location at CVS. On or about January 26, 2022, DANIELS' Target Telephone 2 had telephone contact with COLULA's phone number.

### 1.3    DANIELS sent ghost bags to COLULA.

190.    On numerous occasions, DANIELS sent luggage to California using American Airlines but did not board the flight and travel to California. Case agents believe that DANIELS used these "ghost bags" to send bulk currency to COLULA as drug payments. On one occasion, COLULA was observed picking up the luggage from the airport in California.

191.    On April 5, 2022, at approximately 6:00 a.m., the location information indicated that DANIELS' Target Telephone 2 was in the area of the Minneapolis-Saint Paul International Airport (MSP). Case agents also learned that DANIELS purchased a plane ticket to Los Angeles International Airport (LAX), California, at this time, and that DANIELS checked in luggage. However, DANIELS' phone location data reflected that DANIELS left the airport at approximately 6:24 a.m. and returned to 234 Bates Avenue in St. Paul. DANIELS' luggage landed in LAX at an estimated time of 11:30 a.m., Pacific Standard Time (PST). According to initial information obtained by American Airlines, the luggage was subsequently picked up by an Uber driver. Telephone records further indicated that COLULA, using phone number (213) 844-███, called DANIELS' Target Telephone 2 at approximately 12:19 p.m. and again at 12:33 p.m. PST on this day.

192.    Agents contacted LAX and spoke with a representative of TSA. TSA confirmed that x-ray images of DANIELS' luggage were captured as the luggage was flagged in the system due to what was believed to be bulk currency in the luggage. Your affiant examined x-ray images and noted that the shape and size of the items depicted in the images appear to be consistent with multiple stacks of U.S. currency.

193.    Subsequently, case agents became aware of a UPS package delivered to [redacted] W. Fond Du Lac Ave., Milwaukee, Wisconsin, on April 8, 2022. The UPS package was sent from a listed sender of "Y," at the UPS Store address of 1360 S. Figueroa Street, Los Angeles, California, COLULA's city of residence. The parcel was mailed from the UPS store in California on April 6, 2022, a day after the suitcase arrived at the LAX airport. Based on training and experience, as well as the TSA x-ray images, telephone communications between COLULA and DANIELS, and the timing of the parcel, case agents believe that DANIELS' checked baggage was a method of smuggling drug proceeds, through American Airlines, for a drug payment to COLULA.

194.    On or about April 15, 2022, DANIELS purchased a ticket with American Airlines, flight number 1384, departing from O'Hare International Airport, Chicago, Illinois (ORD) on April 15, 2022, at 6:32 p.m. and traveling directly to LAX. Court-authorized GPS data for DANIELS' black GMC Yukon reflected that the vehicle traveled from Milwaukee to ORD. Subpoenaed video surveillance footage and flight information from ORD reflects DANIELS checking in what was identified as a teal/light green color luggage with a black collapsible handle, to the American Airline check-in counter. Case agents confirmed that DANIELS did not travel on that flight. However, the luggage was

91

transported on the flight to LAX. HSI investigators conducted surveillance, at case agents'
request, on the aforementioned luggage at the destination baggage carousel. Case agents
obtained video footage of a subject, positively identified as COLULA, at the destination
baggage carousel. Investigators with HSI subsequently observed COLULA grab a green
roller bag and exit the terminal. COLULA then entered the parking structure for Terminal
4. Agents observed pictures of the bag retrieved by COLULA and positively identified
the bag as the same luggage checked in to American Airlines by DANIELS. Agents
observed COLULA enter a gray Ford with California registration 8LRA436 (the
registration did not register to the Ford vehicle). The vehicle had Uber and Lyft stickers
in the upper left corner of the rear window.

195.    On July 25, 2022, DANIELS was scheduled to depart from MSP at 9:58 a.m.
and travel to LAX (American Airlines flight 1270), with a layover at Phoenix Sky Harbor
International Airport (PHX, flight 2311). According to location information, DANIELS'
Target Telephone 2 was located at MSP at approximately 3:45 a.m. on July 25, 2022. At
approximately 4:53 a.m., video surveillance at an American Airlines check-in counter
showed DANIELS checking in one piece of luggage.  At approximately 5:15 a.m., location
information for DANIELS' phone reflected it departed MSP. On July 25, 2022, a detective
assigned to the PHX Commercial Narcotic Interdiction Unit applied for, and was granted,
a State of Arizona search warrant by the Superior Court of Arizona, In and For Maricopa
County (search warrant number SW2022-108623), authorizing a search of the luggage
sent by DANIELS. The search resulted in the seizure of $105,002. Based on WhatsApp
communication records between DANIELS and COLULA around this time frame, case

92

agents believe that the seized money was intended for COLULA as a payment for controlled substances.

### 1.4 DANIELS travels to California and with COLULA.

196.  The investigation has also revealed that DANIELS traveled to California in February 2022. During this time, he and COLULA had telephone communications. More specifically, on February 9, 2022, case agents observed DANIELS, HENTON, and Leroy HENTON drive from DANIELS' former residence located at ■redacted■ West Fond Du Lac Avenue, Milwaukee, Wisconsin, to a BMO Harris Bank in Milwaukee, and then to General Mitchell International Airport. DANIELS, HENTON, and Leroy HENTON checked their bags and subsequently flew to San Diego, California, using American Airlines. On this same day, February 9, 2022, DANIELS' Target Telephone 2 received an incoming call from COLULA at phone number (213) 844-■redacted■. Additionally, on February 10, 2022, DANIELS, using Target Telephone 2, had six telephone conversations with COLULA at (213) 844-■redacted■.

197.  HSI/U.S. Border Patrol records checks revealed that COLULA and DANIELS crossed the U.S./Mexico border together by vehicle on October 27, 2021. The port of entry into the United States, used by DANIELS and COLULA, was at San Ysidro. These records further revealed that COLULA had an additional U.S./Mexico border crossing on March 11, 2022, with port of entry being Otay Mesa. Based on your affiant's training and experience, Mexico based cartels and sources-of-supply source U.S. based DTOs with controlled substances to include methamphetamine, cocaine and fentanyl, which is smuggled across the U.S/Mexico border.

93

### 2. Julio BARRAZA

198. The investigation to date has revealed that BARRAZA works with COLULA to supply the DANIELS DTO with controlled substances, to include methamphetamine and cocaine. BARRAZA sends parcels suspected to contain controlled substances to various DTO-associated addresses.

199. During the course of this investigation, case agents determined that BARRAZA has used phone number (213) 725-[redacted] to further DTO activities. BARRAZA and DANIELS do not communicate by wire communications or by WhatsApp communications.

200. However, according to court-authorized pen register and trap and trace data, BARRAZA's known phone account has consistent wire communications with telephone number (213) 844-[redacted], used by COLULA. Between October 29, 2021 and November 4, 2022, COLULA and BARRAZA had approximately 590 wire communications.

### 2.2 BARRAZA sends methamphetamine and cocaine to Milwaukee and St. Paul to facilitate the DANIELS' DTO

201. As described above, on January 5, 2022, DANIELS' and MASSEYS' residence at 8708 N. Deerwood Drive, Brown Deer, Wisconsin, was searched pursuant to a federal search warrant, which search yielded approximately four pounds of methamphetamine that case agents believed was shipped to MASSEY and the Deerwood Drive address. The shipping label on the box was dated on December 22, 2021, and indicated it was shipped by Michael Herrera with the listed address of 1421 W. Pico

94

Boulevard, Los Angeles, California. That information is associated with the listed UPS account for DXG Technologies.

202.    After the search warrant at MASSEY's residence was executed, case agents began investigating the listed sender of the seized parcel containing methamphetamine. Further investigation revealed that the UPS account affiliated with DXG Technologies lists that account under the user/sender of Michael Herrera, telephone number of (818) 333-[redacted] and the address of 1421 W. Pico Boulevard, Los Angeles, California. Account records reflect that the address associated with DXG Technologies is 1001 S. Lawson Street, City of Industry, California. A subpoena was sent to the leasing company associated to the listed DXG address (Lawson Street address), and return information revealed that DXG Technologies had no affiliation with that location since 2013. Further investigation revealed that the Lawson Street address was currently occupied by an unaffiliated business.

203.    Using open-source databases, case agents were unable to locate a "Michael Herrera" affiliated with DXG Technologies. Case agents were also unable to locate any information regarding the listed telephone number of (818) 333-[redacted], or any information linking a "Michael Herrera" to the Pico Boulevard address. Open-source databases revealed DXG technologies (USA) was a camera company in California and operated until 2013. That business is currently listed as terminated. Additionally, their website is entirely in Indonesian.

204.    Investigators later became aware of another UPS parcel that was sent to [redacted] N. Deerwood Drive, Brown Deer, Wisconsin. The parcel was shipped on January 4,

2022, from the UPS store located at 912 E 12th Street Room B, Los Angeles, California. The parcel listed a weight of 7.90 pounds and had the sender name of "Michael Herrera." The parcel was sent under the business account for DXG Technologies at the address of 1001 S. Lawson Street, City of Industry, California. UPS records indicated the parcel was subsequently delivered on January 10, 2022, and that the parcel was left at the front door of the Deerwood Drive address.

205.    Investigators obtained video surveillance from that UPS store location, which depicted a Hispanic male dropping off the above-referenced parcel on January 3, 2022. A still image of the parcel sender was obtained from the video. Case agents used facial recognition software that accessed open-source databases and subsequently located an Instagram profile picture from Instagram account "dsavagelifestyle." The photo depicted seven Hispanic males standing together, posing for the camera. The picture included the Instagram account of "savagezag." The Instagram profile picture of "savagezag" is consistent with the still image that depicted the sender of the UPS parcel that was dropped off on January 3 and shipped on January 4. Investigators issued a subpoena to Instagram for the subscriber information affiliated to the account "savagezag." Subscriber information from Instagram listed an email address of julio-barraza@hotmail.com. A check of law enforcement records revealed Julio C. BARRAZA (H/M XX/XX/74) as the user of that email account. Furthermore, investigators obtained a California Department of Transportation photo of BARRAZA and confirmed that BARRAZA was the sender of the UPS parcel, depicted in the January 3, 2022 surveillance video.

206.    Then, as explained above, on or about March 3, 2022, case agents intercepted a 13-pound package sent to FRYER's address in St. Paul, Minnesota, which was searched, found to contain approximately three kilograms of cocaine, and linked to COLULA through payments to his business bank account. Case agents were able to retrieve video surveillance from the originating UPS store located at 912 E. 12th Street Room B, Los Angeles, California, the location where the narcotics-laden parcel was sent from. Video surveillance depicted the parcel sender, who was primarily faced away from the camera angle. Although the camera angle primarily depicted the back of the parcel sender, case agents noted that the hair color, hair style, hair line, top profile and stature matched known images and video of BARRAZA. The video along with the totality of evidence confirmed that BARRAZA was indeed the sender of the narcotics-laden UPS parcel sent to 234 Bates Avenue.

207.    During the course of the investigation, case agents obtained a subpoena, sent to Verizon Wireless, for subscriber information associated with the phone number (213) 725-███. Information obtained from Verizon Wireless revealed that the subscriber information for phone number (213) 725-███ list to the business account for House of Bail Bonds, Inc. at 116 Astronaut E. S Onizuka Street, Los Angeles, California. Although there were nine listed telephone numbers under this account, Julio BARRAZA is listed as the contact for the individual number of (213) 725-███. Furthermore, financial records indicated that on July 10, 2021, BARRAZA wired $1,000 from California to a location in Mexico. Listed on the transaction account was the name "Julio BARRASA" with a listed date-of-birth of XX/XX/1974, and a sender telephone number of (213) 725-███ Records

97

further indicated that BARRAZA used a Driver's license to conduct the transaction. The address listed on the financial transaction was ███ Esperanza Street, California. BARRAZA's California Driver's license also lists this address.

208.　According to court-authorized pen register and trap and trace data, from February 28, 2022 through March 5, 2022, (the time period when the narcotics-laden parcel was sent to the Bates address and seized) DANIELS, using Target Telephone 2, had 4 wire communications with COLULA, using (213) 844-███ Between that same time period, BARRAZA, using the (213) 725-███, had 39 wire communications with COLULA, using (213) 844-███

209.　Further investigation reflects that BARRAZA is believed to have sent numerous parcels containing suspected controlled substances to the DANIELS DTO. When sending these parcels, BARRAZA used the moniker/alias "Michael Herrera."

210.　Through the examination of subpoenaed UPS records, case agents identified at least 19 parcels that were sent, between October 7, 2021 and September 9, 2022, to identified DTO locations from the account affiliated with Michael Herrera/DXG Technologies (including the parcel sent to Bates Avenue in Minnesota).[8] These parcels

---

[8] Based on training and experience, case agents know that UPS allows account holders to choose what is reflected as the sender information on each shipping label. The shipping label can reflect the account holder's name (i.e. Michael Herrera) or the business name affiliated with the account (i.e. DXG Technologies). Additionally, the shipping label can reflect the address(es) linked to the account holder, the business affiliated with the account holder, or the address of the UPS Store from which the parcel was mailed.

are identified below. All parcels were sent from the UPS Store located at 912 E. 12th Street

Room B, Los Angeles, California, unless otherwise noted.

| Appx. Date of Delivery | Sender Account | Recipient | Recipient Address | Weight |
|---|---|---|---|---|
| 10/7/2021 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Joelle MASSEY | [redacted] N. Deerwood #374 Dr., Milwaukee, WI | Unknown |
| 10/18/2021 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Joelle MASSEY | [redacted] N. Deerwood Dr. Milwaukee, WI | Unknown |
| 10/25/2021 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Joelle MASSEY | [redacted] N. Deerwood Dr. Milwaukee, WI | Unknown |
| 11/8/2021 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Joelle MASSEY | [redacted] N. Deerwood Dr. Milwaukee, WI | Unknown |
| 11/18/2021 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Joelle MASSEY | [redacted] N. Deerwood Dr. Milwaukee, WI | Unknown |
| 12/07/2021 | Michael Herrera 1421 W Pico Blvd. Los Angeles, CA (sent from UPS Store located 1360 S. Figueroa St. Los Angeles, CA) | Currently unknown | [redacted] N. Deerwood Dr. Milwaukee, WI | Unknown |
| 12/28/2021 | Michael Herrera 1421 W Pico Blvd. Los Angeles, CA (sent from UPS Store located 1360 S. Figueroa St. Los Angeles, CA) | Joelle MASSEY | [redacted] N. Deerwood Dr. Milwaukee, WI | Unknown |
| 1/10/2022 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Joelle MASSEY | [redacted] N. Deerwood Dr. Milwaukee, WI | 7.9 pounds |
| 1/25/2022 (attempted delivery and subsequent | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | K. Marie Bently | [redacted] Bates Ave #E St. Paul, MN | 7.3 pounds |

99

| | | | | |
|---|---|---|---|---|
| pickup at UPS) | | | | |
| 1/27/2022 (attempted delivery on 1/26 and subsequent pickup at UPS by Christopher DANIELS) | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Christopher DANIELS | [redacted] N. Teutonia Ave. 2 Milwaukee, WI | 9.2 pounds |
| 2/4/2022 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Diane Ellis | [redacted] W. Fond Du Lac Ave. Milwaukee, WI | 9.4 pounds |
| 2/9/2022 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Michelle HAUCK | [redacted] W. Fond Du Lac Ave. Milwaukee, WI | 6.8 pounds |
| 2/9/22 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | K. Marie Bently | [redacted] E. Bates Ave. St. Paul, MN | 9.5 pounds |
| 2/15/22 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | K. Marie | [redacted] E. Bates Ave. St. Paul, MN | Unknown |
| 2/16/2022 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Michelle HAUCK | [redacted] W. Fond Du Lac Ave. Milwaukee, WI | Unknown |
| 3/7/2022 | DXG Technologies 912 E 12th St. Suite B Los Angeles, CA | Diane Ellis | [redacted] W. Fond Du Lac Ave. #1 Milwaukee, WI | Unknown |
| 8/24/2022 | Michael Herrera 1421 W Pico Blvd. Los Angeles, CA | Ramona FRYER | [redacted] Jessie St. Saint Paul, MN | 7.5 pounds |
| 9/9/2022[9] | Michael Herrera 1421 W Pico Blvd. Los Angeles, CA | Andre Garner (appears as "andre gamer" but through | [redacted] W. Fond Du Lac Ave. Milwaukee, WI | 7.7 pounds |

[9] The video footage obtained from the August 24 and September 9 parcels depict the sender wearing a baseball-style hat and a medical mask. Upon examining the video footage, case agents have currently been unable to determine the identity of the sender of these parcels.

| | | investigation recipient has been identified as Andre Garner) | | |
|---|---|---|---|---|

### 3. Deonte EDWARDS purchases, obtains, and packages controlled substances and launders money for the DTO.

211. The investigation has revealed that EDWARDS is a member of the DANIELS DTO who facilitates the movement of U.S. currency to DANIELS' sources-of-supply, also based out of California. EDWARDS further facilitates and coordinates the movement of controlled substances to DANIELS and other DTO members, operating out of Milwaukee, Wisconsin, and St. Paul, Minnesota.

212. During the course of this investigation, case agents determined that EDWARDS has used phone number (949) 513-[redacted] to further DTO activities. Between August 24, 2022 and November 12, 2022, approximately 36 intercepted calls and/or text messages between EDWARDS and DANIELS, using Target Telephones 2 and 4, were deemed criminal and pertinent in nature. Furthermore, between March 25, 2022 and November 11, 2022, EDWARDS has approximately 241 communications with DANIELS' Target Telephones.

213. Between approximately August 11, 2022, and September 29, 2022, EDWARDS, using WhatsApp account (949) 513-[redacted], had approximately 38 WhatsApp communications with COLULA's WhatsApp account, (213) 844-[redacted], compared with 10 wire communications during this time period.

### 3.1 Intercepted calls establish EDWARDS purchases controlled substances and launders DTO proceeds.

214.     On September 1, 2022, at 4:53 p.m., DANIELS, using Target Telephone 2, called EDWARDS at (949) 513-[redacted]. During the call, EDWARDS says he "didn't get with him yet," that he "got the cash," and that he was waiting to talk to "Doc" or "the boss" before calling "Shrimp." DANIELS later stated, "Get after him and then I was gunna put some more in there for him today. I just didn't. I didn't wanna overwork it." DANIELS then advised, "Let me know when he get to you and you give him that okay?"

215.     Based on their training, experience, and knowledge of the investigation, case agents believe that during this conversation, DANIELS directed EDWARDS to provide drug payment to the California-based supplier "Shrimp," later identified to be the moniker for Julian RAMIREZ through WhatsApp records, open-source databases, and an intercepted phone call. EDWARDS was planning on meeting "Shrimp" (i.e., RAMIREZ) at an unknown address that EDWARDS had provided. Agents further believe the parties discussed future payments to the California-based controlled substance supplier and subsequent shipments of controlled substances to the DANIELS DTO.

216.     On September 8, 2022, at approximately 1:46 p.m., DANIELS, using Target Telephone 2, received a call from EDWARDS at (949) 513-[redacted]. During the call, DANIELS stated, "wheel it back, so that they can get the deal." EDWARDS advised DANIELS that EDWARDS was "trynna see if we good to do some fuckin' business." DANIELS responded, "I can do some today, I go uh... I can go make a deposit today and then have

102

you order the money for tomorrow." DANIELS advised EDWARDS that the money would be deposited in approximately one hour. Later in the conversation, DANIELS discussed DANIELS' financial goals and becoming a millionaire. As the call continued, DANIELS had a conversation in the background with HENTON. During the conversation between DANIELS and HENTON, DANIELS discussed money and agents heard machine sounds and shuffling sounds in the background. Based on their training, experience, and knowledge of the investigation, case agents believe that the background noises over DANIELS' intercepted line was a money counter. DANIELS subsequently resumed the conversation with EDWARDS and stated, "be going to the bank in about thirty, forty minutes."

217. Based on their training, experience, and knowledge of the investigation, case agents believe that EDWARDS advised DANIELS of EDWARDS' desire to make money by the illegal movement of drug proceeds and controlled substances. DANIELS advised EDWARDS that DANIELS would be sending payment directly to EDWARDS for payment for the controlled substances, as further evidenced in the following intercepted communication, which occurred hours later.

218. On September 8, 2022, at approximately 5:11 p.m., DANIELS, using Target Telephone 2, called EDWARDS at (949) 513-████ and asked for "the account number." EDWARDS then provided the account number of "88637████."

219. On September 8, 2022, at approximately 1:46 p.m., DANIELS, using Target Telephone 2, received a call from EDWARDS at (949) 513████. DANIELS asked if EDWARDS "saw the deposit today?" EDWARDS advised the deposit was pending and

further advised, "Yeah, fucking [U/I] was pending, they didn't let me order it until that was fully clear." EDWARDS further advised DANIELS, "Yeah... I think it'll be cleared by tomorrow hopefully and then I can go there and order it." DANIELS confirmed "O.K.," and EDWARDS then asked, "And then fucking, uh.. How much do you want me to order?" DANIELS answered, "Uh.. seventeen five, seventeen five" [i.e., $17,500]. EDWARDS then advised, "Yeah, I'll order it, and then find out when it'll be ready."

220. Based on their training, experience, and knowledge of the investigation, case agents believe that DANIELS called EDWARDS to confirm EDWARDS' receipt of U.S. currency into EDWARDS' identified bank account, which payment is believed to be intended as a drug payment. Financial records for DANIELS and EDWARDS were obtained via subpoena. Banking records show that on September 8, 2022, a check from the account under the business Intelligent Investments Inc. (affiliated with DANIELS) was deposited into JP Morgan Chase account ending in x9319, affiliated with Tier One Records, for the amount of $17,500. Corporate fillings, subpoenaed records of banking institutions and open-source databases has identified EDWARDS as the operator of Tier One Records.

221. On October 14, 2022, at approximately 2:39 p.m., DANIELS, using Target Telephone 2, called EDWARDS at (949) 513-redacted. EDWARDS asked, "Nineteen to Morty or twenty-two?" DANIELS replied, "Um no… twenty-two to Morty." EDWARDS agreed, "Aight." DANIELS stated, "And nineteen uh…to Shrimp." EDWARDS replied, "Got it. I just [U/I]." DANIELS said, "And then, the one that I'm- the one that's today . . . is seventeen Morty, nineteen Shrimp." Linguists were unable to decipher EDWARDS'

response. DANIELS said, "The one that I'm putting in there today." EDWARDS replied, "Oh, you already put one in?" DANIELS said, "It's going in right now." EDWARDS responded, "Oh, okay. Uh...what was I about to say? I'm at the route to Morty right now, then I'ma pull up on Shrimp."

222.     Based on their training, experience, and knowledge of the investigation, case agents believe that during this conversation, DANIELS told EDWARDS he was going to wire U.S. currency to EDWARDS. Agents further believe the parties discussed that EDWARDS would then meet with drug trafficking suppliers in California, to include RAMIREZ (i.e., "Shrimp" and "Morty" (currently unidentified)) and give to the traffickers the money that DANIELS had originally wired. Accordingly, case agents believe that DANIELS sent U.S. currency to EDWARDS to pay for controlled substances.

223.     On October 14, 2022, at approximately 2:47 p.m., DANIELS, using Target Telephone 2, called EDWARDS at (949) 513-[redacted]. During the call DANIELS advised, "Make sure you let each person know you're re-routing back down on them, do you hear me?" DANIELS continued, "So just say, let 'em know, say, 'Hey, I should be right back at you with another seventeen.' Ya' hear me?" EDWARDS confirmed, "Yeah" and DANIELS continued, "And then, let Shrimp [PH] know Imma be coming back at you with another nineteen, it's in the account but I can only pull out so much at a time. I want that, you gotta make sure you tell 'em that, so that way they mind is at ease, and they be not, they don't be thinking like, you know what I'm saying? Like, 'aw man, Doc didn't send all the money." EDWARDS stated, "You know that shit's not gonna clear over the weekend...," referring to the check that DANIELS sent to EDWARDS' identified bank

105

account. DANIELS responded, "No, no... that's fine, it don't matter. As long as they know you coming, you hear what I'm saying? Boom, you good. You hear them saying, as long as they you coming next week, I'll be at you, next week Imma have another one. You know? Boom, boom... I should probably have you two next week. You know, just say, 'I should probably have two of them next week, just' ... sit tight let me pull it." EDWARDS advised DANIELS that EDWARDS was "30 minutes out right now."  Both EDWARDS and DANIELS then discussed payments to both "Morty" and "Shrimp," (i.e., RAMIREZ), with DANIELS stating, "I promised them that twenty – two, and if he don't see that 22 [i.e., $22,000], he gone have something to say. You know they count me as my word. You know what I'm saying, like... I told them like, by Friday I guarantee I can get you 22. You know what I'm saying? I want to keep my word. Shrimp good, he gone to have to be patient." EDWARDS advised, "This boy just texted me saying he not gonna make it to the pickup spot." EDWARDS confirmed with DANIELS that the delivery of U.S. currency would be completed that day, referring to payment to the narcotics suppliers. As the conversation continued, DANIELS advised, "I know with Shrimp, Shrimp is not going stop calling until he start..." EDWARDS responded, "Start seeing some money, yeah." DANIELS stated, "Yeah, right. Once he know he earning, earning- we good. He good. [VOICES OVERLAP] when you talk to Shrimp, you say, 'You got three more coming.' It just gone to take me a second, what his-name [PH]? You got three more coming." EDWARDS then asked, "Shrimp three more and Morty two more?" DANIELS answered, "Yes. Yep, two more."

106

224.     Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS directed EDWARDS on current and future distribution of U.S. currency (drug payments) to California-based controlled substance suppliers to include "Morty" and RAMIREZ (i.e., Shrimp), for illegal substances fronted to the DANIELS DTO.

225.     On October 14, 2022, at approximately 4:31 p.m., DANIELS, using Target Telephone 2, received a call from EDWARDS at (949) 513-███. EDWARDS stated "Morty is taken care of…" EDWARDS further advised, "I talked to Shrimp, he's not gonna be back into town 'til like four o'clock, so I'ma try to get with him today, if not, I'ma make it to him tomorrow…but…I'ma see what we end up doing." DANIELS questioned EDWARDS regarding whether EDWARDS received the deposit, and EDWARDS responded, "Yeah, I seen it. It's in the account." During the phone conversation EDWARDS advised, "Uh, it's actually Shrimp calling me right now, uh, let me call you right back." Pen register and trap and trace data from EDWARDS' WhatsApp account revealed that EDWARDS had an application-based communication (call) with RAMIREZ's identified telephone number of (626) 615-███ at 4:32 p.m., followed by multiple WhatsApp messages/communications occurring from approximately 4:32 p.m., until approximately 5:58 p.m.  In a subsequent call that day, at 4:36 p.m., EDWARDS, using (949) 513-███, called DANIELS, using Target Telephone 2 and advised DANIELS that EDWARDS was "meeting up with Shrimp [i.e., RAMIREZ] right now." DANIELS advised EDWARDS to contact DANIELS at the conclusion of EDWARDS' in-person meeting with RAMIREZ.

226. On October 27, 2022, EDWARDS, using (949) 513-redacted, called DANIELS at Target Telephone 2. EDWARDS stated, "Shit…I'm flying out tomorrow." DANIELS responded, "Shit…damn. I didn't know that. You know why? He wanted to-Morty wanted to see you today." EDWARDS questioned, "Today?" DANIELS responded, "Yeah. Why don't you give him a ring real quick." EDWARDS affirmed, "Alright." DANIELS stated, "And then I'll see if you can…uh…swing it by Joe, but if not, if you gotta go, then, I'm just gonna let- I'ma let Joe; I'ma let Joe uh, hit it- take care of it." EDWARDS responded, "Alright, uh…that's alright. I'ma call Morty but I'll try and figure out something else too though."

227. Based on their knowledge of this investigation, case agents believe that during this call, EDWARDS told DANIELS that he (EDWARDS) was flying out the next day, and DANIELS did not know that. DANIELS also told EDWARDS that "Morty" wanted to see him (EDWARDS) that day and advised EDWARDS to call "Morty." DANIELS further informed EDWARDS that if EDWARDS cannot get the money to "Morty," then the money could go to "Joe," i.e. COLULA. Case agents believe that this money is for EDWARDS to make drug payments to COLULA and Morty.

### 3.2 DANIELS/EDWARDS Money Laundering Transactions

228. EDWARDS and DANIELS are engaged in the laundering of money generated from the sale of controlled substances supplied to the DTO. More specifically, evidence reveals that they use their business bank accounts to conduct transactions designed to conceal or disguise the source, origin, nature, ownership, or control of the proceeds.

229.    Between May 31, 2022, and September 30, 2022, EDWARDS has received at least approximately $200,000 from DANIELS, either in the form of cashier's checks from accounts linked to DANIELS or in cash. More specifically, EDWARDS has received at least $71,000 in cashier's checks from DANIELS' business, FRSC, or Intelligent Investments[10] and at least $129,000 in cash deposits from DANIELS and FRYER. Records further reflect that EDWARDS withdraws cash in close proximity to these deposits.

230.    On or about February 9, 2021, EDWARDS opened account ending in x0326 at Bank of America. This account was in his name and ultimately closed around September 2022. Financial records reflect the following deposit/withdrawal activity with respect to EDWARDS' x0326 account:

   a.    $20,700 cashier's check from FRSC deposited on or about April 25, 2022; two cash withdrawals of $10,000 each from separate Bank of America California branches on April 26, 2022.

231.    EDWARDS opened account ending in x1459 at Bank of America in the name of Tier One Records, which account was closed in or around August or September 2022. Financial records reflect the following deposit/withdrawal activity with respect to EDWARDS' x1459 account:

   a.    $20,251 cash deposit (by DANIELS in Illinois) on or about May 31, 2022; two cash withdrawals of $10,000 each from separate Bank of America California branches on May 31, 2022;

   b.    $20,268 cash deposit (by DANIELS in Illinois) on or about June 14, 2022; $20,000 cash withdrawal at a Bank of America branch in Long Beach, California;

---

[10] DANIELS and HENTON have previously opened up bank accounts in the name of the business Intelligent Investments.

      c.      $300 and $18,000 cash deposits (by FRYER in Minnesota) on or about July 6, 2022;

      d.      $70,500 cash deposit (by FRYER in Minnesota) on or about August 1, 2022; two cash withdrawals of $10,000 each from separate Bank of America California branches on August 1, 2022.

232.     Additionally, on or about August 18, 2022, EDWARDS opened a Chase Bank account ending in x9319 in the name of Tier One Records. EDWARDS deposited 3 cashier's checks from Intelligent Investments, which listed "payroll check" in the memo line, into his Tier One Records account ending in x9319 in the amounts of $15,000 (August 19, 2022), $17,750 (August 27, 2022), and $17,750 (September 8, 2022).

233.     Based on their training and experience, case agents believe that this circular flow of money is designed to disguise the criminal nature of the underlying proceeds.

### G.    MACIAS is a source of supply working with DANIELS, BRADLEY SR. and CRUZ-GONZALEZ to supply methamphetamine, cocaine, and fentanyl to the DTO.

234.     The investigation has revealed that MACIAS supplies controlled substances, to include methamphetamine, cocaine, and fentanyl, to the DANIELS DTO. The investigation has further revealed that BRADLEY SR., CRUZ-GONZALEZ, and DANIELS work together to procure controlled substances from MACIAS. Between November 7 and 10, 2022, DANIELS traveled to California on behalf of the DTO. During this trip, DANIELS met with MACIAS to procure controlled substances, and he also sent EDWARDS to MACIAS' house to provide payment and obtain controlled substances. DANIELS departed LAX on November 10, 2022. On November 11, 2022, a parcel destined to a Milwaukee DTO-related address was searched pursuant to a search warrant and

110

found to contain one kilogram of fentanyl. Based upon intercepted calls, and the stamp or "signature" on the fentanyl, case agents believe that the fentanyl was supplied by MACIAS.

235.    During the course of this investigation, MACIAS has had contact with DANIELS, BRADLEY SR., and CRUZ-GONZALEZ. During the course of this investigation, case agents determined that MACIAS has used phone number (760) 906-█████ to further DTO activities. Between approximately November 8, 2022 and November 11, 2022, approximately 18 intercepted calls between MACIAS and DANIELS were deemed criminal and pertinent in nature. Between approximately November 8, 2022 and November 12, 2022, approximately 15 intercepted calls between MACIAS and BRADLEY SR. were deemed criminal and pertinent in nature.

236.    Additionally, between July 20, 2022 and November 11, 2022, MACIAS had 26 contacts with DANIELS at Target Telephone 2, 5 contacts with BRADLEY SR. at Target Telephone 3, 49 contacts with BRADLEY SR. at Target Telephone 5, 22 contacts with additional numbers believed to be used by BRADLEY SR., and 72 contacts with CRUZ-GONZALEZ, at her known intercepted phone number (323) 604-█████.

### 1.    MACIAS is believed to supply methamphetamine to the DTO.

237.    On October 7, at 3:43 p.m., BRADLEY SR., using Target Telephone 3, called CRUZ-GONZALEZ at (323) 604-█████ During the conversation, CRUZ-GONZALEZ questioned, "The fuck it did…why the fuck did his people send that shit." BRADLEY SR. replied, "You gotta understand that with him, because, that's not right on our end, bro, like, that's not cool…How we gonna develop a relationship and this shit—right now, it's

111

not even…" CRUZ-GONZALEZ replied, "That's what I was telling him." BRADLEY SR.

stated, "This don't even look good on them." CRUZ-GONZALEZ said, "Like, you

already made me look bad. I'm like, now this, like, c'mon now. He's like 'nah, that's

bullshit,' he's like, 'you know I've never done shit like this.' I'm like, exactly! So what the

fuck is going on? I'm like, why did you say you didn't do it, so look at what they fuckin'

sent!" BRADLEY SR. replied, "Right bro. Come on, man." CRUZ-GONZALEZ said, "I'm

like bro, it's one after another thing. Dude, I'm like, I keep hearing it. I'm like, that shit's

not cool. Man, he's like, 'that's bullshit, like, you know I never give you shit like that.' I'm

like, exactly. The fuck. I'm like, what is that? I'm like, this has never happened."

BRADLEY SR. stated, "Well, it's happened to us now. All five of 'em, bogus as hell. I'm

sitting here watchin' him opening 'em up. All them black; it's all of 'em black. And all of

'em is shake. All of it shake...So what he gonna do? Like, we gonna send this shit back to

him, or what?" CRUZ-GONZALEZ replied, "I'm telling him that shit right now."

BRADLEY SR. questioned, "Like, how we gonna do this? He'll give us our money back?

238.    Based on their training, experience, and knowledge of this investigation,

case agents believe that CRUZ-GONZALEZ and BRADLEY SR. purchased five kilograms

of a controlled substance. CRUZ-GONZALEZ and BRADLEY SR. received the controlled

substance, but were unsatisfied with the purity or quality, ("All five of 'em, bogus as

hell"), and wished to get their money back, ("He'll give us our money back?"). Case

agents know that good quality-controlled substances result in a larger customer base and

larger profits. Therefore, BRADLEY SR. and CRUZ-GONZALEZ were upset with the quality of the controlled substance they received.

239. After the above noted call, phone toll records reflect that CRUZ-GONZALEZ, using (323) 604-[redacted], had 3 phone contacts with MACIAS on October 7, 2022 (5:36 p.m., 6:24 p.m., and 6:28 p.m.) Based upon the close proximity of CRUZ-GONZALEZ' contacts with MACIAS, case agents believe she called MACIAS to address the poor quality substance that MACIAS supplied.

240. On November 7, 2022, at 9:47 p.m., BRADLEY SR., using Target Telephone 5, called CRUZ-GONZALEZ at (323) 604-[redacted]. BRADLEY SR. stated, "Hello, Gucci said he give me no five motha fucking uh, them five he owe me to my brother. He out there." CRUZ-GONZALEZ replied, "To give you five of the work?" BRADLEY SR. responded, "What he owe me! Five, five pounds!" CRUZ-GONZALEZ stated, "Okay, let me see if I can get ahold of it. Hold of him, okay." BRADLEY SR. replied, "Say, my brother's out there right now." CRUZ-GONZALEZ said, "He was, he was telling me, he was just telling me about on Saturday. He was like I got work. But it's the same like. Let me just talk to him." BRADLEY SR. replied, "I want no bull, I don't want that same shit." CRUZ-GONZALEZ affirmed, "I know, that's what I'm telling you. He has that bullshit again and that's what I told him. They don't want that. If that's what you got, then send the money." BRADLEY SR. stated, "Yup, my brother out there right now." CRUZ-GONZALEZ said, "But, if he's over there he can go check it out." BRADLEY SR. affirmed, "Yup!" CRUZ-GONZALEZ said, "So, let me, let me. Fuck man. Let me try and get ahold of this stupid ass." BRADLEY SR. affirmed, "Yes, indeed." CRUZ-GONZALEZ replied,

"Yeah, cause he not picking up or nothing babe." BRADLEY SR. said, "Alright, try and get ahold of em."

241.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call BRADLEY SR. and CRUZ-GONZALEZ discussed the situation from the October 7 call regarding the bad narcotics they received and their attempt to get their money back. Based on these two calls, as well as their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. and CRUZ-GONZALEZ received 5 pounds of poor-quality methamphetamine ("Five, five pounds!"). Based on their training and experience, case agents know that crystal methamphetamine is exclusively sold by the pound when bought in bulk. Controlled substances such as cocaine and heroin are commonly sold by the kilogram when sold in bulk. Case agents know that "work" is a common slang term for a controlled substance such as methamphetamine, cocaine, heroin, or fentanyl.

242.    Furthermore, case agents believe that during the November 7 call CRUZ-GONZALEZ told BRADLEY SR. that she would contact the source of supply, later determined be MACIAS, to return or replace the poor quality methamphetamine they received. CRUZ-GONZLEZ is believed to have stated that she recently talked to MACIAS, who informed her that he (MACIAS) had more methamphetamine ("work"). CRUZ-GONZALEZ and BRADLEY SR. agreed that if it was the same methamphetamine as previously received, they did not want it. ("I want no bull, I don't want the same shit.")

If MACIAS had the same product, CRUZ-GONZALEZ and BRADLEY SR. wanted their money back. ("If that's what you got, then send the money.")

243.    Additionally, case agents believe that BRADLEY SR. told CRUZ-GONZALEZ to have MACIAS give the new product to DANIELS ("Yup, my brother out there right now."). At the time of the November 7 call, DANIELS was in California. Case agents know that BRADLEY SR. commonly calls DANIELS his "brother." Case agents further believe that CRUZ-GONZALEZ stated that DANIELS should go make sure the methamphetamine was of good quality before they purchased more. ("But, if he's over there he can go check it out.").

244.    Two days later, on November 9, at 10:36 p.m., MACIAS call BRADLEY SR. at Target Telephone 5. During this call, BRADLEY SR. stated, "You met my brother last night." MACIAS responded, "Yep." BRADLEY SR. replied, "He like you, so we are gunna be doing more business with you."

245.    Case agents know that BRADLEY SR. and DANIELS refer to each other as "brother." Therefore, agents believe that this call reflects that MACIAS met DANIELS the previous night, November 8, 2022, (as will be demonstrated below), and that BRADLEY SR. and DANIELS plan to arrange more drug business in the future.

246.    Further, location information for DANIELS' Target Telephone 2 reflected that on the evening of November 8, 2022, he left EDWARDS' residence around 8:30 p.m. and arrived in the vicinity of MACIAS' residence located at ███W. Broadway, Anaheim,

California, around 12:00 a.m. on November 9, 2022. DANIELS' remained in the vicinity of MACIAS' residence until approximately 2:50 a.m.

### 1.1 DANIELS' California Trip: DANIELS meets with COLULA and obtains controlled substances from MACIAS.

247.    On November 6, 2022, DANIELS, using Target Telephone 4, was in contact with Carl JENKINS at phone number (312) 485-████. DANIELS and JENKINS made plans to travel to Los Angeles, California, to meet with their respective sources of supply. During a call with JENKINS at approximately 6:23 p.m., DANIELS asked JENKINS whether "he" would "already have it set up where the dude gone have him on deck." JENKINS replied in the affirmative. DANIELS then stated, "That's good, 'cause they got so many of them, right? 'Cause when we start do doing them, we gonna be doing 'em like, one, one, one, one, one . . . we gone it all at once, one, one, one, one, one, and then boom. 'Cause I got the guy, we got a guy already coming too, so we got a guy coming too. What I'm trying . . . what I'm doing right now is just really trying to make it to where the dude can give it to us at that low number. 'Cause I like that twelve number. I ain't had that in a minute."

248.    Based on their training, experience, and knowledge of this investigation, case agents believe DANIELS and JENKINS discussed having a narcotics supplier set up to supply them when they arrive in California. Agents further believe that due to their suppliers possessing large amounts of controlled substances, DANIELS told JENKINS that they will purchase numerous kilogram levels of controlled substances at one time ("'Cause they got so many of them, right? 'Cause when we start do doing them, we gonna

be doing 'em like, one, one, one, one, one . . . we gone it all at once...”). Case agents further know that kilogram levels of fentanyl are less expensive than kilogram levels of other controlled substances. Accordingly, agents believe that DANIELS and JENKINS planned to purchase kilogram levels of fentanyl. (”Dude can give it to us at that low number. 'Cause I like that twelve number.”)

### 1.2    DANIELS met with COLULA and EDWARDS.

249.    On November 7, 2022, case agents conducted surveillance on DANIELS and observed that he made a stop at a Chase Bank branch in Norridge, Illinois before arriving at ORD and meeting JENKINS. Based on their knowledge of this investigation, case agents believe that DANIELS went to Chase Bank to obtain U.S. currency and/or send cashiers' check(s).[11] Case agents saw DANIELS walking around ORD with a brown duffel bag, while JENKINS had a grey backpack with neon green zippers. Case agents witnessed DANIELS and JENKINS board a flight for Los Angeles.

250.    Once DANIELS and JENKINS arrived in Los Angeles, California investigators conducted surveillance on DANIELS and JENKINS and observed them meet with COLULA at the airport. At approximately 7:15 p.m.,[12] California investigators observed DANIELS and JENKINS walk out of the Enterprise rental car kiosk without renting a vehicle and meet with COLULA. DANIELS, JENKINS, and COLULA then

---

[11] Due to the recency of this transaction, bank records have not yet been obtained.

[12]    To correlate the intercepted calls with surveillance activities, all time stamps during the period in which DANIELS was in California are still noted in Central Standard Time (CST).

117

entered a white Toyota Rav4. COLULA drove DANIELS and JENKINS to the Hertz rental car kiosk at LAX, and all three went inside. After speaking with the rental car agents, DANIELS, JENKINS, and COLULA walked to a Hertz rental vehicle parking lot and got into a black Hyundai Tucson bearing California registration plates of 9AZP961. DANIELS then drove COLULA back to his Rav4, and both vehicles left separately.

251. Investigators followed DANIELS and JENKINS away from the airport. Based on intercepted calls between EDWARDS and DANELS at this time, DANIELS was navigating to EDWARDS' address. Shortly after 8:00 p.m., investigators observed DANIELS and JENKINS park in front of EDWARDS' residence. Investigators observed EDWARDS standing on the sidewalk, greeting DANIELS and JENKINS. DANIELS was holding his duffle bag and JENKINS was holding his backpack. EDWARDS, DANIELS, and JENKINS then walked into the apartment courtyard and out of view.

252. Based on these November 6 calls between DANIELS and JENKINS, case agents believe that DANIELS introduced JENKINS to COLULA on this date. Based on the short duration of DANIELS' and COLULA's meeting at the airport and in the rental vehicle, case agents believe that DANIELS provided COLULA with U.S. currency and/or a cashier's check when they saw one another.

253. After meeting COLULA, DANIELS drove directly to EDWARDS' residence, where he and JENKINS entered carrying bags. Case agents believe, based on

their knowledge of this investigation, that DANIELS brought controlled substances or a cashier's check to EDWARDS.

### 1.3 DANIELS arranges drug transactions with MACIAS, EDWARDS obtains controlled substances from MACIAS, who packages and ships drug parcels to the DTO.

254. On November 9, 2022, at approximately 8:52 p.m., DANIELS, using Target Telephone 2, received a call from MACIAS at (760) 906-███. During the call, DANIELS asked MACIAS what he was up to. MACIAS stated that he was almost to his (MACIAS') house. DANIELS then said, "Okay, we gon' slide; we gon' fall through." MACIAS responded, "Okay, uh, I was ask if you need the other one." DANIELS asked, "Um, you know, you know, the rest of that one that you had?" MACIAS stated, "Uh-huh." DANIELS replied, "I want to come get that." MACIAS then said, "All right, uh, the other one I finna—I finna keep breaking that one down." DANIELS stated, "Boy, I was on my way. I was on my way for it, Jimmy. After DANIELS repeated that he was on his way for it, MACIAS replied, "You wish. In case you want, you want to take half of it? If you want to take a nine-piece out of it, yeah?" DANIELS then said, "Okay cool; I do that." MACIAS then said, "Just leave me something, because you'd be, you'd be getting like one and two, so." DANIELS stated, "All right, I got you. Yeah, yeah then listen... I'm gonna be having my brother, my brother doing it. I'm gonna have my brother coming by for that two, ok?" MACIAS acknowledged. DANIELS continued, "'Cause I be doing some small ones out here and I let just so he can make some money... But he's our little runner. Whenever you need him, he's gon run. That's that one, the first number I sent you. It say, 'Deonte.'" MACIAS said, "Okay. Hold up, what do you—you want to leave him with a half right

there just in case he comes?" DANIELS said, "Right, yeah, right. See, that's what I'm saying, like when I, I want to do something like that. You know what I'm saying?"

255. Based on their training, experience, and knowledge of this investigation, case agents believe DANIELS wanted to purchase one kilogram of cocaine from MACIAS, who had two kilograms ("I was ask if you need the other one."). Agents further believe MACIAS told DANIELS he (MACIAS) was breaking down one of the kilograms and DANIELS could have a "nine-piece," which agents know is a reference to nine ounces of cocaine. MACIAS then told DANIELS that he (MACIAS) can give him half of the kilogram, or 500 grams, which DANIELS accepted. Agents further believe that DANIELS informed MACIAS that EDWARDS ("Deonte") is a runner (a person who picks up/delivers money and narcotics) for the DTO, and that EDWARDS will be assisting picking up narcotics. At approximately 10:35 p.m., MACIAS called DANIELS, who said that he "got an extra energy" and was on his way to meet MACIAS to pick up the cocaine.

256. Location information for DANIELS' Target Telephone 2 reflects that on November 9, he left EDWARDS' residence at 10:33 p.m. and arrived in the vicinity of MACIAS' house around 11:15 p.m. DANIELS then left MACIAS's house around 12:20 a.m. the following day.

257. On November 10, at 11:29 a.m., MACIAS called DANIELS at Target Telephone 2, at which time DANIELS stated, "I mean, like 12 o'clock." MACIAS stated, "Okay, I'm just waiting on this [U/I] to call me so I can go pick those up." DANIELS

120

replied, "Tell that fool to bring his ass home. Tell him to get his ass up. We got shit to do. We trynna get that shit out today."

258.    Based on their knowledge of this investigation, case agents believe that DANIELS was attempting to meet with MACIAS at 12:00 p.m. to purchase more controlled substances. Case agents knew that DANIELS had a flight to Chicago on November 10, 2022, and therefore believe that DANIELS wanted MACIAS to hurry because DANIELS wanted to ship the controlled substances before his plane left.

259.    At 11:30 a.m., MACIAS called DANIELS back at Target Telephone 2 and stated, "I just talked to him right now." DANIELS replied, "You did? What did he say?" MACIAS stated, "He told me to go pick up those two that he said he didn't come with the food for the other one, for the one." DANIELS replied, "Okay, cool. Well, go grab those two real quick, and then we just, we gonna try wrapping everything up."

260.    Case agents believe that MACIAS told DANIELS he (MACIAS) called his controlled substance supplier and obtained two kilograms of a controlled substance to sell to DANIELS. MACIAS' supplier was unable to obtain the third kilogram that DANIELS had originally requested, but DANIELS indicated he would obtain those from MACIAS at a later time.

261.    On November 10, at 5:39 p.m., DANIELS, using Target Telephone 2, called MACIAS. DANIELS stated, "I'm sending my little brother to you because I'm getting on my plane, and he gonna handle everything." MACIAS replied, "Okay, I was gonna ask you, ummm, you need these two ASAP?" DANIELS replied, "I need them ASAP. Just, I'm send them—listen: Give them to my brother, you good to go." DANIELS later stated,

121

"Take them what's his name. I'm gonna start sending you bread immediately. You hear me?" DANIELS continued, "The one who you—who's coming to you now, right? He's the one that's going to be bringing, he's the one who's going to be bringing money to you. You hear me? So, listen to me: You and me are going to be in communication all this week and all next week. You're going to have nothing but money coming. I gotchu. I gotchu." MACIAS replied, "Ok, yeah, 'cause—'cause I was gonna say, about that [U/I], remember I told you I was going to get that semi-truck tomorrow? Yeah, I [U/I] some bread for that, so."

262.    Through interceptions, case agents know that DANIELS commonly refers to EDWARDS as his "brother" or "little brother." Therefore, case agents believe DANIELS told MACIAS he was sending EDWARDS to obtain two kilograms from MACIAS ("[Y]ou need these two ASAP?"). Case agents further believe that DANIELS told MACIAS that EDWARDS would be bringing MACIAS U.S. currency ("bread") in exchange for the controlled substances.

263.    At 5:57 p.m., DANIELS, using Target Telephone 2, called MACIAS and stated, "Don't worry about the, uhhh, Playboy right now. He gonna give you the other 15. Take—put that with that." MACIAS affirmed, "Okay, yeah." DANIELS said, "And hold that for what you giving me right now, okay? And then when I get home, right? . . . I'll send, I'll send out some more and we can—we will wrap up that. We just tell your boys and them to hold off on the Playboy right now."

264.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call DANIELS told MACIAS not to worry about the

122

fentanyl ("Playboy") at the moment. Case agents believe "Playboy" in the context of this call refers to fentanyl because on November 11, 2022 case agents seized a DANIELS DTO parcel and observed that the "Playboy bunny" logo was stamped on a brick of substance that field tested positive for fentanyl. Case agents further believe that DANIELS told MACIAS to put the money EDWARDS would soon be delivering towards the current drug order. DANIELS told EDWARDS that once he returned home, he would send more money for the fentanyl ("Playboy").

265.    On November 10, at 7:00 p.m., DANIELS, using Target Telephone 2, called EDWARDS. DANIELS stated, "You ain't responding quick enough." EDWARDS responded, "Oh, okay, you said. 'Did you give him the fifteen hundred?' Yeah, I gave him fifteen hundred and give you two. Oh yeah, he gave me two; yeah, he gave me two. Before he gives somethin' [U/I], I need to see what Morty gave [U/I]. Yeah, I'm just pulled up to Home Depot right now. [Stammers] Basically, yeah. Morty... I gotta count how much he gave, but, it feel like... It feel like it probably three or four." DANIELS stated, "Right, I have to see what it is first." DANIELS later stated, "You said he gave you—what is it he gave you? He shoulda gave you five." EDWARDS responded, "Well, it feel like that. That's what I'm sayin'. [Stammers] It felt like at least four." EDWARDS later said, "All right, bet. Fuckin aaa... well that n**** Norm, he was, I was gonna be dropping him off before I even got back to the crib. So, what I'll do is I'll just FaceTime you when I walk to Home Depot. And I'll show you what it is right there in the trunk." DANIELS later said, "Okay, so first of all, bro, bro I don't want you goin' to Home Depot and doin' all that. I want you to go home first." EDWARDS questioned, "So, I don't need

123

the foam right now?" DANIELS stated, "You do. But you can go back out and get the foam, bro." DANIELS later said, "No, no, no, go take everything home first." EDWARDS affirmed, "All right." DANIELS later said, "Come on, now. Quick, boom, boom, boom. Always! Don't be in that. Nope. When you do too much, try to do more than one thing at the same time, you make mistakes. You don't wanna make mistakes."

266. Based on their knowledge of this investigation and this conversation, case agents believe that EDWARDS procured controlled substances for DANIELS through "Morty" and MACIAS. Because EDWARDS was in possession of a large amount of controlled substances, up to four or five kilograms, DANIELS was worried about EDWARDS not answering the phone. DANIELS was also concerned about EDWARDS going to Home Depot to get "foam" before "securing" the substances at his residence. Case agents know that members of the DTO have previously used foam to package controlled substances for shipment. Based on their training and experience, agents know traffickers do this to fill voids in the package and prevent the substances from being disturbed during transit. Case agents believe that DANIELS told EDWARDS to drive the controlled substances, including two kilograms from MACIAS, to his residence and "secure" them before completing other tasks, because the longer the controlled substances are in the vehicle the higher the likelihood that EDWARDS could be stopped by law enforcement or encounter another problem. Based on this conversation, case

agents believe that EDWARDS obtained controlled substances for the DTO with the intention of packaging and shipping them.

267. Later in the conversation, EDWARDS stated, "So now, this is what I remember Morty said. Uh, his boy was supposed to bring one more and he told me to call him when I was leaving Anaheim. So, he could probably correlate it with me on my way back, uh, towards Hollywood. So should I call that n**** right now?" DANIELS affirmed, "All right. Call him now." DANIELS later told EDWARDS, "And then, ask him, ask him about that girl that he was supposed to let me mess around with. All right?" EDWARDS replied, "He said it's at a warehouse he just wasn't able to get to it today." EDWARDS later asked DANIELS, "So you want three, two and girl?" DANIELS replied, "Three and two, and I still wanna fuck with ol' girl." DANIELS later said, "Okay, just tell him. He knows that, right? Just tell him he supposed to gave me… he supposed gave me three, right? Then he gave me the uh, uh, two, uh, black tires. And then he still supposed to let me fuck with ol' girl. So you should have in total six."

268. Case agents further believe that during this call, DANIELS expressed his desire to buy cocaine, referred to here by the common street name "girl," from a California-based supplier with whom EDWARDS would later meet. Case agents believe that DANIELS wanted EDWARDS to obtain kilograms of different controlled substances with at least one being a kilogram of cocaine ("two black tires," and, "Then he still

125

supposed to let me fuck with ol' girl. So you should have in total six."). Case agents believe that "black tires" is code for another kind of unknown narcotic.

269. According to location information for EDWARDS' phone, at 4:10 p.m. on November 10, 2022, EDWARDS' phone was in the vicinity of his residence. EDWARDS thereafter traveled to MACIAS' residence, arriving at approximately 7:44 p.m. EDWARDS returned to his residence at approximately 9:35 p.m.

270. Based on their training, experience, knowledge of this investigation, to include the intercepted calls and EDWARDS' location information, case agents believe EDWARDS traveled to and obtained from MACIAS controlled substances. Agents further believe that EDWARDS intended to package and send the controlled substances to the DANIELS DTO.

### 1.4 EDWARDS packages and ships controlled substances and one kilogram of "Playboy" fentanyl is seized.

271. As a result of DANIELS' California trip, case agents are aware of at least 5 drug-related parcels that were shipped to various DTO addresses. Since DANIELS returned from California, he has communicated over Target Telephone 2 with EDWARDS about ensuring EDWARDS "has enough money for supplies," to include "foam." DANIELS and EDWARDS also discussed the status of multiple parcels that were shipped to DTO addresses, trying to determine which ones were delivered and where the others were in transit.

126

272.     On November 11, 2022, case agents located an 11-pound parcel, sent from California on November 8, 2022, set to be delivered to ▮ West Fond Du Lac Avenue. The listed sender on the parcel was Diego BIRRUETA of 13330 Victory Boulevard, Van Nuys, California. The listed recipient of the parcel was Andre Garner of ▮ West Fond Du Lac Avenue, Apartment #1, Milwaukee, Wisconsin. The parcel was thereafter searched pursuant to a warrant. Upon opening the parcel, case agents found an off-white plastic dog food container surrounded by Styrofoam packing peanuts. Within that container agents located a white brick-like substance contained within multiple layers of wrapping and surrounded by other packaging materials to include children's items and foam. The brick-like substance was stamped with the Playboy Bunny logo in the center of the object. The suspected controlled substance field tested positive for the presence of fentanyl and weighed 1,125 grams.

273.     During an intercepted phone call on November 10, 2022, at 5:57 p.m., between DANIELS, using Target Telephone 2, and MACIAS, using (760) 906-▮, DANIELS referenced "Playboy" numerous times. DANIELS stated, "Don't worry about the, uh, Playboy right now… Just tell your boys and them to hold off on the Playboy right now." Case agents know that traffickers commonly stamp their products as a signature. Based on the stamp located on the seized brick of fentanyl and the intercepted phone calls, case agents believe that DANIELS either obtained the fentanyl from MACIAS or from an unidentified co-conspirator who works with MACIAS. Based upon previously discussed intercepted calls between NELSON and DANIELS, wherein NELSON wanted DANIELS to obtain the "kill shit," and DANIELS told NELSON to pick up the parcel

127

"across the street," [redacted] W. Fond Du Lac) case agents believe that the parcel containing the fentanyl was destined for NELSON.

### H. Minnesota DTO Operations: DANIELS and WILLIAMS Manufacture Controlled Substances at DTO Stash Location; FRYER and SMITH are DTO Distributors

274. Based upon intercepted communications and physical and electronic surveillance, case agents have determined that DANIELS travels to Minnesota on a monthly basis. Once in Minnesota, physical and electronic surveillance reflects that DANIELS spends time at a stash residence located at [redacted] Thomas Avenue North, Minneapolis, Minnesota (the "Thomas Stash") and that WILLIAMS is also typically at the Thomas Stash when DANIELS is there. Furthermore, physical surveillance reflects that when DANIELS arrives at the stash location, he spends a lot of time waiting for WILLIAMS' arrival, suggesting that DANIELS does not have independent access to the Thomas Stash. In addition to meeting with WILLIAMS, DANIELS also spends time at his residence that he shares with FRYER on Reindeer Lane, where it is believed he and FRYER receive controlled substances. While in Minnesota, DANIELS supplies controlled substances to distributors, including FRYER and SMITH, collects drug proceeds, and ensure that Minnesota distribution operations are running smoothly until his return. Upon leaving Minnesota, DANIELS usually travels to either Chicago or Milwaukee to collect drug proceeds, facilitate further distribution efforts, or oversee the receipt of controlled substances, often times sent through the mail. Case agents believe that on occasion DANIELS transports controlled substances manufactured and/or received in Minnesota to Milwaukee and/or the greater Chicago area for distribution.

128

### 1. Michael O. WILLIAMS manufactures and distributes controlled substances.

275.   The investigation to date has revealed that WILLIAMS and DANIELS operate the Thomas Stash. Furthermore, intercepted calls, physical and digital surveillance, and documentary evidence reveal that DANIELS and WILLIAMS manufacture controlled substances and prepare them for distribution at this location. WILLIAMS is also believed to be a DTO source of supply and to distribute controlled substances in the Minneapolis/St. Paul area. Further, during the course of this investigation, case agents have observed WILLIAMS and DANIELS engage in suspected narcotics transactions in Minnesota. The address at ███ Thomas Avenue was WILLIAMS' primary residence from approximately March 2022 to August 2022 at which time WILLIAMS' moved to ███ 83rd Avenue N. Brooklyn Park, Minnesota, a residence purchased by WILLIAMS' wife and WILLIAMS' daughter.

276.   During the course of this investigation, case agents determined that WILLIAMS has used phone number (612) 471-███ to further DTO activities. Between August 24, 2022 and November 12, 2022, approximately 8 intercepted calls and/or text messages between WILLIAMS and DANIELS were deemed criminal and pertinent in nature. Furthermore, between April 8, 2022, and June 8, 2022, a toll analysis demonstrates that WILLIAMS was in contact with DANIELS' Target Telephone 2 approximately 21 times.

## 1.1 DANIELS and WILLIAMS use the Thomas Avenue stash to manufacture and store controlled substances.

277. Intercepted communications and surveillance reflect that DANIELS and WILLIAMS manufacture and store controlled substances at the Thomas Stash. During the course of this investigation, case agents learned that DANIELS and WILLIAMS frequented this location on numerous occasions and were observed entering/exiting with bags that case agents believe to contain controlled substances.

278. Furthermore, during period in which DANIELS' vehicle and phone location reflects he is not in Minnesota, WILLIAMS' vehicle information reflects that he regularly frequents the Thomas Stash location, sometimes stopping at the address multiple times per day.

279. Between August 24, 2022, and October 29, 2022, case agents believe DANIELS and WILLIAMS used the Thomas Stash to manufacture controlled substances on at least three occasions (approximately August 28-29, October 9, and October 28). Location information for WILLIAMS' vehicle (a black 2018 Dodge Durango bearing Minnesota Registration HDV059) and DANIELS' GMC Yukon, and physical and digital surveillance, reflect WILLIAMS and DANIELS were both at the Thomas Stash during these times. Additionally, intercepted calls during or shortly after these Thomas Stash house visits, wherein DANIELS recounts "working" and being "sick from work," lead case agents to believe that DANIELS and WILLIAMS bring controlled substances to this location, mix and/or add cutting agents/adulterants to the substances, and prepare the substances for distribution. Based on their training and experience, case agents know that

the manufacturing of controlled substances can involve cooking the substance (in the case of cocaine) and adding adulterants to narcotics. Through this process, the person manufacturing the substance can be exposed, through contact and/or fumes, to the controlled substance, which can cause the person to feel sick.

280.    On August 28, 2022, at approximately 10:18 a.m., DANIELS, using Target Telephone 2, called WILLIAMS at (612) 471-redacted. During this call, DANIELS stated, "You know what imma do today, imma be on my way to see you." Subsequently, location information for DANIELS' phone (Target Telephone 2) showed it travel to the area of the Thomas Stash.

281.    On August 28, 2022, at approximately 3:05 p.m., DANIELS, using Target Telephone 2, called FRYER at (952) 381-redacted. During the call, DANIELS stated, "Remember that flight we just took the other day? Okay... the big person that was on the flight." FRYER acknowledges, and DANIELS then directed, "Okay, I need you to get him and then I need you to get remainder of what it is that we have left for Wisconsin. You know, the normal thing you usually umm.." FRYER responded that she had "more in storage," and DANIELS repeated his request that she get the "remainder" and to "wipe the seat down and sanitize the seat and stuff like that... 'Cause I don't want him to sit and he, you know, he, he, he catch a virus or getting germs. just wipe him down real clean." DANIELS asked FRYER to bring it because "Mike and I wants to see it." DANIELS and FRYER continued to discuss the location at which they planned to meet. DANIELS told FRYER that "they moved places," and asked FRYER, "You got Mike and I's old office address? Can you send that to me real fast? . . . I know it's like thirty-two something."

131

FRYER eventually responded, "Lowry and Penn, get you Lowry and Penn. When you get you Lowry and Penn you just keep going and you're going to run into it. It's like right after you get to the post office." After continued discussion regarding the address, DANIELS stated, "Okay, that's Lawry, that's Lowry Street, that's-- oh okay... Got you. Ain't a street called Thomas? Huh?"

282.     Based on their training, experience, and knowledge of this investigation, case agents believe that during this conversation, DANIELS directed FRYER to pick up a parcel containing narcotics that was recently shipped to ▮▮ Jessie Street, St. Paul, on August 24, 2022,[13] and to gather the remaining narcotics from the storage location. ("Remember that flight we just took the other day? Okay... the big person that was on the flight. . . . Okay, I need you to get him and then I need you to get remainder of what it is that we have left for Wisconsin.") I further believe that DANIELS asked FRYER to bring the narcotics she gathered to the location near Lowry Avenue North and Thomas Avenue North, which is the closest intersection to the Thomas Stash. I further believe that DANIELS told FRYER that he was meeting with WILLIAMS ("Mike and I wants to see it."), which meeting was subsequently surveilled by case agents, as described below.

283.     On August 28, 2022, at approximately 4:23 p.m., digital surveillance reflected that DANIELS parked his GMC Yukon across the street from the Thomas Stash.

---

[13] On approximately August 24, 2022, a parcel was sent to ▮▮ Jessie Street, Street, St. Paul, Minnesota. Case agents believe that this parcel is connected to the DTO because the parcel was sent from "Michael Herrera," from the same UPS store, as other DTO parcels sent to Milwaukee, Wisconsin.

132

At approximately 4:45 p.m., case agents observed FRYER, driving the white Honda Accord bearing Minnesota plates GNG-360, arrive at this location. DANIELS and FRYER spoke for an extended period of time outside this residence. At approximately 6:03 p.m., case agents conducting physical surveillance observed WILLIAMS arrive in his black Dodge Durango. At 6:05 p.m., WILLIAMS exited his vehicle and met with DANIELS and FRYER outside the Thomas Stash. Thereafter, WILLIAMS used keys to enter the residence while DANIELS and FRYER stayed outside. At 6:07 p.m., WILLIAMS was observed exiting the Thomas Stash with a white plastic grocery bag that appeared to be full. Based on the size of the bag, case agents suspected the bag contained U.S. currency. WILLIAMS and DANIELS then got into the black Dodge Durango and drove away from the residence. FRYER entered her vehicle and also left the area. At 6:16 p.m., only nine minutes after leaving, WILLIAMS and DANIELS returned to the Thomas Stash. WILLIAMS immediately went to the front of the residence and opened the door using keys. DANIELS went to his black GMC Yukon and obtained from the rear hatch three large bags that all appeared to be full and heavy. DANIELS then went inside the residence.

284. Based on their training, experience, and knowledge of the investigation, case agents believe that WILLIAMS brought U.S. currency out of the residence and that WILLIAMS and DANIELS drove to a different location to conduct a transaction. When they arrived back to the Thomas Stash case agents believe DANIELS brought bags suspected to contain controlled substances inside of the residence.

133

285. Court-authorized location information for DANIELS' and WILLIAMS' vehicles reflected that they remained at the Thomas Stash throughout the overnight hours on August 28 into August 29, 2022. Additionally, on August 29, 2022, at approximately 2:03 a.m., FRYER, using telephone number (312) 244-[redacted], called DANIELS on Target Telephone 2. During this call, FRYER asked DANIELS what address he was at. DANIELS said, "3122." FRYER said, "Thomas Ave N. right? DANIELS then confirmed the address was [redacted] Thomas Ave. N.

286. On August 29, 2022, investigators observed DANIELS and WILLIAMS arrive and enter the Thomas Stash. Approximately 30 minutes after they entered, DANIELS and WILLIAMS were observed entering WILLIAMS' black Dodge Durango (WILLIAMS driver, DANIELS passenger) and drive up and down nearby streets without an apparent destination. Through training and experience, case agents know that drug dealers and those engaged in criminal activity will drive in a manner that is irregular, often times with no apparent destination, to check if they are being followed. This is referred to as a "heat check." Several minutes later, investigators observed WILLIAMS and DANIELS arrive back at and enter the Thomas Stash.

287. During calls on August 29, DANIELS stated that he is sick, as noted below.

    a.    On August 29, 2022, at approximately 3:04 p.m. DANIELS, using Target Telephone 2, called MASSEY at (414) 336-[redacted]. In summary DANIELS told MASSEY he was throwing up and not feeling well.

    b.    On August 29, 2022, at approximately 4:27 p.m., FRYER, using (612) 244-[redacted], called DANIELS at Target Telephone 2. In summary, DANIELS told FRYER he had just finished throwing up and that he could not get on the road until he feels better. A voice in the background asked FRYER if DANIELS had COVID, which FRYER

134

said DANIELS did not have COVID but was sick from "working" and did not wear a mask while "working."

288.    Based on their training and experience, case agents know drug traffickers who manufacture and package controlled substances will often times become sick and overcome by fumes if the area in which this process taking place is not well ventilated and proper protective equipment is not worn. According, case agents believe that DANIELS was sick because he and WILLIAMS manufactured and packaged controlled substances at the Thomas Stash location for a significant period of time.

289.    Based on their training, experience, and knowledge of this investigation, including their observations of DANIELS and WILLIAMS, the location information for their vehicles, and DANIELS being sick due to working, case agents believe that the DANIELS DTO uses the Thomas Stash to manufacture and store controlled substances.

290.    On Sunday, October 9, 2022, at 11:09 a.m., DANIELS, using Target Telephone 2, called WILLIAMS at (612) 471 redacted . DANIELS told WILLIAMS, "Okay cool. Hey listen, I think I got us, I think I got us I think I got us into a we can put our brains together while I was waiting at the house my mind went to thinking so I went over to Michael's and now I'm gonna be on my way back." Later in the conversation, DANIELS stated, "So I went to Michaels I think I got what we need so get on up and I'll meet you at the crib." WILLIAMS responded, "Alright, I'll be there in like fifteen minutes."

291.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call DANIELS told WILLIAMS that he (DANIELS) got what they needed and would be traveling back to meet WILLIAMS soon. Based on

135

the below information, case agents believe that DANIELS told WILLIAMS he went to the store to purchase items used to manufacture and package controlled substances, and that the "crib" was a reference to the Thomas Stash.

292. GPS data on DANIELS' GMC Yukon reflected that on this day, October 9, at 10:21 a.m., the Yukon arrived at Home Depot located at 1520 New Brighton Boulevard, Minneapolis, Minnesota. This Home Depot is attached to numerous other stores with one of the stores being Michael's Crafts. At 10:48 a.m., the Yukon drove around the building to the other side of the parking lot and parked in front of Michael's Crafts. After a short time at Michaels, the Yukon traveled directly to the Thomas Stash. At approximately 11:54 a.m., fixed electronic surveillance captures DANIELS' black GMC Yukon arriving and parking on the street just outside the Thomas Stash. DANIELS was observed pacing up and down the street. At 12:02 p.m., DANIELS walked to the front door of the Thomas Stash, stood by the door for several seconds, then walked back towards the street. At 12:04 a.m., WILLIAMS arrived in his black Dodge Durango at the Thomas Stash, parked in front, and walked towards DANIELS. At approximately 12:06 p.m., multiple individuals were observed carrying in bags. At 12:07 p.m., WILLIAMS re-entered his Durango and drove away from the area, while DANIELS entered the Thomas Stash. It is unclear if WILLIAMS returned to the residence on October 9, 2022, as the affixed vehicle GPS device ran out of battery.

293. After the intercepted communication noted above occurred, authorities obtained from a representative at The Home Depot still shot photographs of DANIELS in the store, as well as DANIELS' Home Depot store receipt from his transaction on

136

October 9, 2022. According to the still shot photographs, DANIELS was depicted in The Home Depot near the checkout at approximately 10:40 a.m. The receipt, date and time-stamped October 9, 2022, at 10:40 a.m., reflects that DANIELS purchased numerous items that relate to controlled substance manufacturing, packaging, and distribution, some of which included two Tyvek coveralls protective clothing, numerous nickel-plated stencil numbers, safety glasses, a gallon of acetone, two respirators, folding knife, plastic gloves, and sixty yards of Stucco tape. Based on my training, experience, and knowledge of this investigation, I know that individuals who manufacture and packaged controlled substances for distribution wear protective clothing, safety glasses, gloves, and respirators to protect themselves from the harmful substances they are manufacturing for sale. Additionally, intercepted phone calls over Target Telephone 2 reflect that DANIELS has told individuals about how potent or strong his controlled substances are and that he needs to wear a mask when working with them. I also know that individuals who manufacture kilograms of controlled substances will use a hydraulic press to make the controlled substance into "brick" form. Commonly, the traffickers will stamp numbers, letters, or symbols on top of the brick as a "signature" to identify their product. I believe that DANIELS purchased the nickel stencil markers to mark the product he planned to manufacture at WILLIAMS' residence. Furthermore, I know that acetone is a common product that is used by traffickers to "wash" cocaine. More specifically, I know traffickers will add acetone to cocaine that has many cutting agents in it that affect the purity of the cocaine because the acetone removes the cutting agents, resulting in a purer product. Additionally, I also know that traffickers that manufacture kilogram levels of controlled

137

substances commonly wrap the kilogram in plastic coverings and then wrap the plastic in tape numerous times. Traffickers do this to prevent the controlled substance from breaking apart and to attempt to prevent any odor from being emitted that could be detected by a law enforcement canine.

294.    On October 28, 2022, at approximately 12:59 p.m., DANIELS, using Target Telephone 2, called MASSEY at (414) 336-███3.  MASSEY asked DANIELS what he was doing.  DANIELS said, "Oh you know me.  Grind, working, doing what I do." MASSEY asked, "You almost done?" DANIELS said, "Oh, me? Yeah, yeah. Imma get some things wrapped up. I got somethings that I'm working on with Mike. I still got a few lil' things to take care of with Mike." MASSEY asked, "Make time for what?" DANIELS said, "Just the business.  Business we wanted to do." Court-authorized location information for WILLIAMS' vehicle reflected that it remained at the Thomas Stash from approximately 1:40 p.m. until 7:05 p.m. on October 28, 2022, and from approximately 11:47 a.m. until 7:47 p.m. on October 29, 2022. As stated previously, location information also reflected DANIELS was at the Thomas Stash on these dates as well.

### 1.2    Physical and digital surveillance establish WILLIAMS' DTO involvement.

295.    Using court-authorized GPS location information for WILLIAMS' black Dodge Durango and DANIELS' black GMC Yukon, case agents working together with Minnesota investigators ("MN investigators") learned that between May 19, 2022, and June 4, 2022, WILLIAMS' and DANIELS' vehicles were located in the same vicinity on various occasions. More specifically, the digital surveillance reflected that their vehicles

were in the same vicinity on or about May 19-20, 2022, at which time both vehicles were near the area of ██ Bates Avenue, St. Paul, Minnesota, from approximately 11:30 p.m. to 12:24 a.m. Case agents know that FRYER and DANIELS shared a residence at ██ Bates Avenue at this time, and that the Bates Avenue residence was used to receive controlled substance-laden packages. On May 21, 2022, WILLIAMS' and DANIELS' vehicles were both in the vicinity of the Thomas Stash beginning at 10:30 a.m. At approximately 2:00 p.m., that same day, both vehicles were together near N. Sheridan Ave & N. 8th Avenue. Both vehicles then returned to the Thomas Stash where they remained for a longer period of time. WILLIAMS' and DANIELS' vehicles were again in the vicinity of the Thomas Stash on May 23, 2022 (around 7:00 p.m.), May 29, 2022 (around 4:00 p.m.), and June 4, 2022 (around 9:00 p.m.).

296. On June 27, 2022, MN investigators followed DANIELS' black GMC Yukon to the Thomas Stash, where it arrived at approximately 6:43 p.m. Upon arrival, MN Investigators observed DANIELS and FRYER exit DANIELS' vehicle, and both obtained large plastic bags from the rear of the Yukon and entered the Thomas Stash from the front door. Approximately thirty to forty-five minutes later, FRYER exited the Thomas Stash, obtained from the Yukon a large black and white duffle bag, which appeared to be heavy based on how she was carrying it and its appearance, and entered the residence with this bag. At approximately 9:00 p.m., DANIELS and FRYER exited the Thomas Stash. FRYER remained in possession of the black and white duffle bag, which appeared to be lighter in weight. WILLIAMS also exited the residence and talked with DANIELS outside before DANIELS and FRYER drove away in the Yukon. MN Investigators followed DANIELS'

139

to a park located at 1000 East 14th Street (KGOD Park) and observed them meet with an unidentified black male at the park. Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS and FRYER left the Thomas Stash with controlled substances and subsequently met and conducted a drug transaction with an unidentified male in the park.

297.    On July 6, 2022, case agents conducted electronic surveillance of DANIELS' Yukon as DANIELS traveled from Milwaukee, Wisconsin to ███ Bates Avenue, St. Paul, arriving at approximately 8:30 a.m.  DANIELS then drove to the Thomas Stash at approximately 1:04 p.m. MN investigators conducted physical surveillance at this location and observed DANIELS exit his vehicle and pace up and down the sidewalk for a period of time, leading investigators to believe he was waiting for someone.  DANIELS was wearing a white t-shirt, blue jeans, and blue rubber gloves on his hands. DANIELS retrieved a large black duffel bag out of the back seat area of his GMC Yukon and placed it in the trunk of the Yukon. At approximately 1:46 p.m., WILLIAMS arrived at this location driving his black Dodge Durango and met with DANIELS. DANIELS removed the bag he earlier put in the Yukon and walked into the Thomas Stash with WILLIAMS. At approximately 6:45 p.m., MN investigators observed DANIELS, who was no longer wearing latex gloves, exit the residence carrying the black duffel bag with which he entered. DANIELS entered his GMC Yukon and left the area.

298.    Based on their training, experience, and knowledge of this investigation, case agents believe that WILLIAMS and DANIELS met at the stash location to exchange drug proceeds, controlled substances, and/or firearms.

### 1.3 Intercepted calls and surveillance further establish WILLIAMS' DTO involvement.

299. On October 4, 2022, at 10:15 p.m., WILLIAMS, using (612) 471-redacted, called DANIELS at Target Telephone 2. During the conversation, WILLIAMS stated, "We gunna have to sit down and figure out this situation with the umm with the 700 boy." DANIELS replied, "Okay, you said, what you say?" WILLIAMS stated, "I said we gunna have to figure out these 700, I been pushing these people away." DANIELS replied, "Oh no, we got that, we got that, and I got 8s comin'. I got that. We getting that. That's, That's listen… You know I'm already on it [coughs] like yesterday. You hear me? And he said…". WILLIAMS affirmed, "Yea…" DANIELS continued, "He said he got the six comin' right now, got your seven following it, and said after that he will send you nothin' more than eights or better. Nothin' more than eights or better. That's what I said, I been promising, I said you can't tell me that no more cause he gon he knows, he wants to know, [ . . . ] So, so, so I told him that's it. Hey Mike, I told him, that's it." WILLIAMS responded, "Yea. That's all the motha fucking we need."

300. Based on their knowledge of this investigation, case agents believe that WILLIAMS wanted to meet with DANIELS to speak about a specific weight of a controlled substance they would be purchasing. ("We gunna have to sit down and figure out this situation with the umm with the 700 boy.") Case agents know that heroin is commonly referred to as "boy" and therefore believe "boy" in this context may be a reference to heroin. Case agents further believe that DANIELS told WILLIAMS that six kilograms of a controlled substance would be delivered to them. ("He said he got the six

comin' right now, got your seven following it, and said after that he will send you nothin' more than eights or better.") Case agents further believe that WILLIAMS was waiting on seven kilograms of a controlled substance to be delivered. DANIELS then told WILLIAMS that WILLIAMS will be receiving nothing less than eight kilograms at a time from their supplier ("…nothin' more than eights or better").

301.    On November 11, 2022, at 1:34 p.m., WILLIAMS, using (612) 471-[redacted], received a call from DANIELS at Target Telephone 2. During the call, WILLIAMS advised, "So the, so, the money that he gave me yesterday I never counted it." DANIELS replied, "Got you." WILLIAMS then explained, "I just don't [U/I] things because I feel like it's some came missing [. . . ] miscounted or whatever the fuck [U/I]." During the conversation, DANIELS asked, "Okay, can you count it for me? Uh... please bro." WILLIAMS responded, "I got you. . . . I'll just put it in the money counter anyway, I just don't like touching shit." DANIELS stated, "Me and you both, we the same way, we just so [U/I] but I can tell you right now, when somebody puts somethin' on my hand I always count it, regardless of [. . . ] they say they gave one thing." WILLIAMS stated, "It's like being in a room and some came up missing, you know you don't steal it but you still feel guilty, like, damn!"

302.    Based on their training, experience, and knowledge of this investigation, case agents believe that WILLIAMS was unsure if WILLIAMS was shorted drug payment after collection of drug proceeds from an unspecified drug customer. DANIELS requested WILLIAMS count the money, prompting WILLIAMS to advise that a money counter would be used to ensure the drug debt was paid in full by the unknown drug

142

customer. Case agents are aware that large scale narcotics distributors collect large amounts of U.S. currency from drug customers, often times requiring the use of money counters to quickly and accurately confirm the amounts of drug proceeds collected.

### 2. Ramona FRYER receives and distributes controlled substances and launders DTO proceeds.

303.    The investigation to date has revealed that FRYER operates the hub of Minnesota-based DTO operations. FRYER, also known as "Mona," is believed to be in a romantic relationship with DANIELS, and the two share a residence in Eagan, Minnesota. FRYER is believed to distribute controlled substances, accept parcels that contain suspected controlled substances, and launder drug proceeds by wiring large amount of U.S. currency to suspected supplier(s) in California.

304.    During the course of this investigation, case agents determined that FRYER has used phone numbers (612) 244-████ and (952) 381-████ to further DTO activities. Between August 24, 2022 and November 12, 2022, approximately 78 intercepted calls and/or text messages between FRYER and DANIELS were deemed criminal and pertinent in nature.

305.    FRYER has been involved in the DTO for a significant period of time. According to the forensic extraction of MASSEY's phone, messages between MASSEY and FRYER, using (612) 865-████, were located. As an example, in a text message dated May 17, 2021, MASSEY texted FRYER over what appears to be a dispute regarding the relationships among MASSEY, DANIELS, and FRYER. Within her message, MASSEY stated the following: "On another note, thanks for making money for us, we truly

143

appreciate you and all of the hard work that you put in. One things fasho, you a hustla. But another things for certain, that's all you are for us. Period. Take care though & be safe in them streets love [heart emoji, peace emoji]"

306.    Based on their training, experience, and knowledge of this investigation, case agents believe that MASSEY sent FRYER a text message in part to recognize that the only role FRYER serves is that of a worker for the DTO ("thanks for making money for us" and "you a hustla").

### 2.1    Intercepted calls establish FRYER's DTO involvement.

307.    On October 11, 2022, at approximately 7:28 p.m., DANIELS, using (773) 948-[redacted], Target Telephone 4, called FRYER at (952) 381[redacted]. During this call, DANIELS asked FRYER, "Okay, can you come grab, can you come back to Thomas and grab some of the stuff to go put it up? . . . I got something that needs to go to the house and then, I mean... one gotta go to that boy, and then the other ones needs to be put up until he needs the next one." FRYER clarified, "So one needs to go home and one needs to go to the spot." DANIELS then responded, "What needs to go home is the lil' um... the lil' brown piece that I gotta put together. . . . So I gotta, I gotta put that together and I need a, I need a magic blender; I need that from either Target or Walgreens. Do you know where ours is at?" FRYER said she thinks the blender is in the car. Later, FRYER asked DANIELS if he had a "sealer," with him, and he responded, later stated, "Yeah , I got a sealer with me right now, but... I mean, at the same time I'm still inside of this place and it's not fully uh... how do you say it? It's not aired out from the stuff. . .. Still needs to be like wiped out one time in a clean environment and then resealed so it don't get no fumes to it. [U/I]

144

this stuff is powerful. They continue to discuss FRYER meeting DANIELS and vacuum sealer noise can be heard at various points in the background of this call. DANIELS later advised FRYER, "anything that you gonna be traveling on the road, right, I don't want you to have it in that car, everything in that car is sealed, and fumes get out onto the packages. . . . You gotta keep that in mind; because you be thinking to yourself, "well, I grabbed out of the car; it was sealed; it was washed in the [U/I], boom, boom, boom..." but it's got fume on it. See what I'm saying? Anything you take out of that car gotta be wiped down, resealed again. Keep that in mind now; you can plan on to wipe if you want to . . . I know you gonna fight it but it ain't gonna be all real at the time. I'm telling you. 'Cause it ain't be... that car, you got everything that [U/I] and you can smell it; it's super strong because you ain't got everything sealed in that car. Specially you don't seal this stuff here; this stuff here is strong as hell; if you know, every wrapper and everything in that car; that's why you can't open it up in that car, or leave it in there and leave it unsealed for days and just figure is good, and it clouds everything in the car; that shit's loud as hell. [U/I] we deal some fake ass shit, do we not."

308.    Based upon their training, experience, and knowledge of this investigation, case agents believe that during this conversation, DANIELS directed FRYER to pick up large quantities of controlled substances from the Thomas Stash (where DANIELS was located) and take them to numerous unknown locations.  During this intercepted phone call, DANIELS spoke about heat sealers, a blender ("magic blender"), and about wiping the quantities of controlled substances so there is no odor to the items to avoid detection of law enforcement and law enforcement K-9's. Case agents further know that drug

145

traffickers often use blenders to mix controlled substances, often times with adulterants, for distribution. Agents further know that drug traffickers, particularly higher-level traffickers, will use heat sealers to package controlled substances.

309. On October 13, 2022, at approximately 4:23 p.m., FRYER, using phone number (952) 381-[redacted], called DANIELS at Target Telephone 2. DANIELS stated, "They painted multiple in colors; red, white, blue, grey... stuff like that. They got different characters shapes, all of them. But, they supposed to be 'it – it', right? Are you cool with five dollars or four? We can try to get them done at that, at that other number. If we can get them for twenty - five . . . If we gave them, would you be okay with three to four bucks to start off, in case Ray [PH] can get the number up. He say, basically they go for a quarter, but at a quarter, you is like, you take a nickel, but if you're gonna do them at twenty, would you be cool with four bucks on each one?" FRYER replied, "[U/I] four dollars each one?" DANIELS replied, "Each one, yes." Later in the conversation, DANIELS asked FRYER, "What you buy a jar for?" FRYER replied, "Like a thousand! A little more at the most. And they think we finna give them fifteen dollars a pill, that's ridiculous! I would never do that."

310. Based on their training, experience, and knowledge of the investigation, case agents believe that during this conversation, FRYER and DANIELS discussed ecstasy/MDMA pills. Case agents know that ecstasy/MDMA pills are commonly different colors and commonly have different imprints. Case agents know that "jars" is a common slang term used to describe a quantity of ecstasy/MDMA. Case agents know that a jar of ecstasy/MDMA consists of 100 pills.

146

311.    On Saturday, October 22, 2022, at 7:58 p.m., FRYER, using (952) 381-[redacted], called DANIELS at Target Telephone 4. FRYER asked, "It says 40 on it?" DANIELS replied, "Yeah." FRYER affirmed, "Okay." DANIELS stated, "Yup, that's it. He gonna give you a G too."

312.    Four minutes later at 8:02 p.m., an unknown male using (312) 776-[redacted], UM6202, called DANIELS at Target Telephone 4. UM[redacted] stated, "I'm outside, big bro." DANIELS replied, "Cool, she finna pull up in a white car." DANIELS later said, "So, yeah, she finna pull up. She finna pull up. She gonna let me know, she gonna be there in a few minutes. She gonna be in a white Honda." UM[redacted] stated, "I will…tell her I'm parked down…" DANIELS asked, "And you got that G for her, right?" UM[redacted] continued, "…in between two cars…I got a G for her? How much she gonna give me, Big Bro?" DANIELS responded, "No, no, no…she finna give you 40 g's of fentanyl."

313.    Based on the timing of the above two described calls, as well as their training, experience, and knowledge of this investigation, case agents believe that DANIELS instructed FRYER to meet with UM[redacted] to sell UM[redacted] 40 grams of fentanyl. Case agents know that FRYER drives a white Honda Accord and case agents have observed FRYER driving this vehicle. Case agents believe that UM[redacted] was going to pay $1,000 for the fentanyl up front. ("And you got that G for her, right?") Case agents know that traffickers commonly give buyers a controlled substance for a fraction of the total price, i.e. partially front, and then collect the remaining sum owed after the buyer sells the product.

147

314.     On October 27, 2022, at approximately 5:58 p.m., FRYER, using (952) 381-

[redacted], called DANIELS at Target Telephone 4. DANIELS said, "Okay...let's talk. I need

the- I need the pills, right?" FRYER said, "Mhmm." DANIELS said, "and bring me

a...bring me a fourteen of hard." FRYER responds, "Fourteen of hard. Okay." DANIELS

said, "And then, bring me one of them packages of pills." FRYER said, "Okay."

315.     Based on their training, experience, and knowledge of this investigation

case agents believe that during this call DANIELS requested FRYER to bring him 14

ounces of crack cocaine and a package of methamphetamine (M/30) pills. Case agents

further believe FRYER agreed.

316.     On September 9, 2022, at approximately 6:40 p.m., FRYER called DANIELS

at Target Telephone 2.  During this call, FRYER exclaimed, "Boy, Boo! And you belittle

me. I bring you thousands of dollars! . . . And you belittle me, nigga I bring you thirty

thousand, and you act like that ain't shit! I bring you fifty sometimes, and you act like

that ain't nothin." DANIELS responded, "But that's for your benefit though, Mona!"

FRYER replied, "I just brung you thirty thousand and you gave me five hundred dollars."

Again, DANIELS stated, "But Mona, but it's for your benefit! . . . Right, but you're

reaping. You just talking about what you bringing me, but you're reaping! I'm giving you

something, so you can reap, so that you can benefit, so you can increase your wealth,

though." FRYER then said, "I'm not though, how am I reaping off that? If everything is

being tooken away, I'm not reaping off of nothing. I'm doing this for you, at this point."

Later in the conversation, FRYER stated, "You pay other people for people but look how

you treat me! You treat me like I ain't nothing." DANIELS responded, "How that-- no,

148

no, no, no.. don't tell me it ain't got nothing to do with me. See-- see-- see, her's your problem—here's your problem. You say it has nothing to do with me.. Mona, mona.. without me it was never created!" FRYER replied, "Babe, without us! 'Cause it was my thing! We are a team!" After more conversation, DANIELS stated, "Before we get to the "us" part.. Mona, Mona, Mona.. stop, stop, stop.. it's not no "always been no us." FRYER responded, "Yes, it has. It's been us since the first day I fucking met you."

317.    Based on their training, experience, and knowledge of the investigation, case agents believe that during this call, FRYER complained about her lack of compensation received from DANIELS for her distribution of controlled substances and delivery of drug proceeds to DANIELS in large amounts, including $30,000 and $50,000. I further believe that DANIELS told FRYER that he is providing her with an opportunity to profit, but FRYER told DANIELS that they have worked as a team to profit from their narcotics trafficking since she met him.

318.    On October 28, 2022, DANIELS, using Target Telephone 2, received a call from FRYER, using (952) 381 [redacted]. During the call, DANIELS advised, "Yeah, I was on my way to uh; I had an appointment with Mike [WILLIAMS] that I need to see Mike about." FRYER responded, "Alright. Well I got everything, I was just gonna grab some, uh...what did you say we doin' again? Is those point fours?" FRYER then continued, "What you say- you said we not doin' the whatshername no more, you want us; you said, something. Did you say twenty or did you say thirty? What I'm selling 'em for?" DANIELS advised FRYER to sell at the "regular price." FRYER responded, "30?" DANIELS confirmed, "Yeah, yeah, yeah. I think so."

149

319.    Based on their training, experience, and knowledge of the investigation, case agents believe FRYER sought direction from DANIELS regarding what FRYER should charge customers for the unspecified, controlled substances.

### 2.3    DANIELS and FRYER receive and store drugs at their Minnesota house.

320.    Between approximately January 25, 2022 through October 11, 2022, at least 13 parcels suspected to contain controlled substances were delivered to addresses associated with FRYER and DANIELS.  These parcels have been identified as being associated with the DTO because the parcels have been traced to the same group of senders, and the recipients included FRYER and FRYER's daughter, K.M.B. (using variations of K.M.B.'s name). The parcels have been sent to the following addresses:

  a.    ███ Bates Avenue, Saint Paul, Minnesota, a former residence shared by DANIELS and FRYER; and

  b.    ███ Reindeer Lane Eagan, Minnesota, the current residence shared by DANIELS and FRYER.

321.    Based on training, experience, and the knowledge of this investigation, case agents believe DANIELS and FRYER have been shipping controlled substances to their residence using FRYER's daughter's name to distance their association with the suspicious drug parcels and to avoid law enforcement detection.

### ███ Bates Avenue

322.    As detailed earlier in this Affidavit, a parcel destined for ███ Bates Avenue was seized and searched pursuant to a warrant, revealing approximately three kilograms of cocaine.  The parcel was addressed to "K-Maree," and shipped from "DXG

150

Technologies." Before this parcel was shipped, FRYER deposited $76,000 in cash into COLULA's Bail Bonds account, for what case agents believe to be the cocaine later shipped to her residence.

323.    Thereafter, on April 26, 2022, a United States Postal Inspector located a suspicious drug parcel addressed to "Kay'Mari Bentley" at ██ Bates Ave #3 Saint Paul, Minnesota. The parcel was sent from Malone BROWN at 4104 E 7th Street Apartment S, Long Beach, California.  This suspicious drug parcel, which weighed approximately 4 pounds, was seized and searched due to the strong smell of fresh marijuana. The drug parcel was found to contain marijuana.

324.    Court authorized location data for DANIELS' Target Telephone 2 reflected that it had been at or near ██ Bates Avenue on various dates in February and March 2022, including during the overnight hours. On many occasions, case agents followed the phone pings to and from Saint Paul and Milwaukee.

325.    According to a law enforcement database, utilities for ██ Bates Avenue, Apartment E, Saint Paul, listed to DANIELS from approximately April 2020, until approximately April 2021. On approximately April 30, 2021, the utilities for this address then began listing to FRYER, who remained the utility holder until at least March 2022.

326.    In June 2022, law enforcement conducted physical surveillance at ██ Bates Avenue and located FRYER's white Honda Accord parked in front of the residence. A registration check of the white Honda reflected it listed to DANIELS with an address of ██ Bates Avenue, Apartment E.

327. Case agents believe FRYER and DANIELS used this Bates Avenue residence until approximately September 2022, at which time FRYER was arrested in Wisconsin Dells, Wisconsin, on an outstanding warrant (detailed below).

### ██ Reindeer Lane Eagan, Minnesota

328. In approximately September 2022, FRYER and DANIELS moved to the residence located at ██ Reindeer Lane, Eagan, Minnesota. The investigation reveals that DANIELS and FRYER are currently using this residence to further their DTO operation in the Minnesota metro area.

329. Location information for DANIELS' GMC Yukon reflects that it has frequented the vicinity of the Reindeer Lane residence since September 2022. Additionally, MN Investigators have observed DANIELS' GMC Yukon and FRYER's Honda Accord parked at this residence in October 2022.

330. On October 18, 2022, at approximately 8:30 p.m., DANIELS, using Target Telephone 2, called "Billy" at (414) 688-██. The call was over three hours long, during which the parties discussed the large amounts of money DANIELS has made and how DANIELS has made others money. Throughout this phone call, case agents heard sounds in the background of the call that they believe, based on their training and experience, to be consistent with the use of a vacuum sealer, a vacuum, a blender, and a money counter machine. Also during the call, "Billy" said, "We drug dealers" and "they never change who they are." Based on sounds heard on previous intercepted phone calls where DANIELS is identified as "cooking" controlled substances, case agents believe the sounds heard during DANIELS' call with "Billy" were consistent with manufacturing controlled

152

substances for distribution and sales. At the time of this call, DANIELS' vehicle and phone reflected that he was at ██ Reindeer Lane furthering DTO activities.

331.    Parcels suspected to contain controlled substances were sent to ██ Reindeer Lane, Eagan, as recently as October 6 and 11, 2022. Both parcels were once again addressed to FRYER's daughter and sent from addresses in California.

### 2.3    FRYER traveled to Wisconsin to facilitate DTO operations.

332.    On July 15, 2022, law enforcement conducted surveillance of DANIELS as DANIELS traveled from Milwaukee, Wisconsin, to a Kwik Trip located at 1171 Wisconsin Dells Parkway, Wisconsin Dells, Wisconsin.  While waiting at Kwik Trip, FRYER arrived driving the white Honda Accord, and DANIELS was observed refueling the white Honda Accord. While wearing blue latex gloves on both hands, DANIELS removed an unknown item from the passenger compartment of the white Honda Accord and placed it inside the vehicle that DANIELS drove to Kwik Trip. The item DANIELS removed from FRYER's vehicle was consistent with the size of a kilogram quantity of narcotics, and DANIELS held it against his side as he walked. DANIELS and FRYER engaged in a lengthy conversation, ultimately leaving in their respective vehicles in which they arrived. DANIELS was observed by law enforcement returning to Milwaukee alone. Based on their training, experience, and knowledge of this investigation, case agents believe that during this meeting, DANIELS met with FRYER and obtained from her vehicle more controlled substances for distribution in the Milwaukee area.

333.    On September 5, 2022, at approximately 9:58 p.m., FRYER, using phone number (612) 244-██, called DANIELS at Target Telephone 2.  During the intercepted

call, FRYER informed DANIELS that they were getting complaints. FRYER stated "they sayin it's messed up, he said it didn't when he cooked it, it didn't even do nothing, he said it didn't change, he said, when he did what he do, it didn't do nothing." DANIELS replied, "what you mean, when he cooked it?" DANIELS later on stated, "That's okay, I'll fix it . . . and I told Mike, I knew it, I knew I couldn't do it without that, cause they want it put in there." Based on their training, experience, and knowledge of this investigation, case agents believe that "Mike" is a reference to WILLIAMS. On August 28, 2022, case agents further believe that DANIELS was with WILLIAMS manufacturing controlled substances in Minnesota. Based on their training and experience, case agents believe that WILLIAMS inadvertently made a mistake when manufacturing the discussed controlled substances, and DANIELS indicated that he would make arrangements to resolve that issue.

334. On September 6, 2022, at approximately 7:46 p.m., FRYER, using (612) 244-████, called DANIELS at Target Telephone 2. During the intercepted, DANIELS told FRYER he was getting ready. DANIELS stated, "Okay, I'm thinking I'm thinking about um I'm thinking about the next thirty minutes, or so, you could head out. So, what I want you to do is, too, make sure you just group together, or whatever, the money and the stuff you got, and bring it with you." FRYER replied, "yeah, gotta go home and we're good." Based on their training, experience, and knowledge of this, case agents believe this call was a continuation of the pervious call mentioned above, and that DANIELS was resolving the issue with the discussed flaws of the controlled substances. Furthermore, DANIELS wanted FRYER to collect the flawed product and the money (drug proceeds)

154

and to meet DANIELS. According to intercepted calls, and location data from DANIELS' vehicle and phone, case agents know that DANIELS and FRYER met by the rear parking lot of 225 W. North Street, DeForest, Wisconsin, on September 7, 2022 to address the complaints FRYER received regarding supplied narcotics.

335. On September 26, 2022, at approximately 1:07 a.m. the Wisconsin State Patrol conducted a traffic stop on a blue Mini Cooper Hatchback bearing Minnesota registration HFS657 on Interstate 90/94 near mile parker 80 due to this vehicle deviating from the driving lane on several occasions. The driver and sole occupant of the vehicle was identified by a Minnesota driver's license as FRYER. A record check revealed a full extraditable felony warrant had been issued for FRYER out of Minnesota's Ramsey County Sheriff's Department for "Dangerous Drugs-4th Deg Drugs." During the stop, the trooper observed FRYER using her phone to speak to an unknown male. A review of telephone records reflects that FRYER was talking with DANIELS on Target Telephone 2 at this time. During the course of this traffic stop a police K-9 conducted a free air sniff and alerted to the vehicle. A search of the Mini Cooper revealed the following: two cellular devices; a diamond designed purse/clutch on the front passenger seat that contained $2,410 in U.S. currency in small denominations that was held together by rubber bands; a suspected hand-written drug ledger on the rear passenger seat; and a backpack in the rear compartment that contained a notebook containing documentation of payments, pricing, and transactions (another drug ledger), along with $9,748 in U.S. currency. The currency in the backpack was bundled as follows: 7 bundles containing

155

$850 each, and 4 white envelops that were labeled "X" ($300), "P" ($1,747), "US" ($750), and "D" ($1,001).  The total amount of U.S. currency recovered was $12,158.

336.    Based on their training, experience, and knowledge of this investigation, case agents believe that the U.S. currency in FRYER's possession at the time of her arrest constitute drug proceeds, and that FRYER drove to the Wisconsin Dells area to meet DANIELS to provide the drug proceeds to him. Electronic surveillance of DANIELS' GMC Yukon reflected that DANIELS left SUBJECT PREMISES 2 on September 25, 2022 at approximately 11:11 p.m. and traveled to 921 Wisconsin Dells Parkway, Wisconsin Dells, Wisconsin, arriving on September 26, 2022 at approximately 12:51 a.m. According to phone toll records, FRYER and DANIELS spoke numerous times on September 25, 2022.  At least three phone calls were made between DANIELS and FRYER once DANIELS began traveling to the Wisconsin Dells area, with the last call occurring at the time of the traffic stop of FRYER.

337.    FRYER was arrested for the outstanding arrest warrant and turned over to Ramsey County Adult Detention Center located in St. Paul, Minnesota.  On October 7, 2022, DANIELS picked up FRYER upon her release from custody.

338.    A search warrant for FRYER's phones was executed, which search revealed images of at least three UPS receipts for packages shipped to K-Maree Bentley or Kay Marii Bentley at ▮▮▮ Bates Avenue Apt. E, St. Paul, Minnesota.

**2.4    FRYER deposited cash into DTO funnel account.**

339.    In addition to the deposits into COLULA's account, FRYER also deposited a large amount of cash into EDWARDS' business account (Tier One Records). More

156

specifically, FRYER deposited $18,000 and $75,000 in EDWARDS' account on or about July 6, 2022, and August 1, 2022, respectively.

### 3. Carla SMITH, a/k/a Carla FRYER

340. The investigation to date has revealed that SMITH is assisting the DTO by distributing controlled substances in the Minneapolis/St. Paul, Minnesota area. The investigation further revealed that SMITH broke into a DTO stash location to assist in the retrieval of DTO tools necessary for the DTO's continued operation. Based on intercepted communications, case agents believe that SMITH is FRYER's mother. SMITH is known to use the last name FRYER, however, her Minnesota driver's license is listed as SMITH. SMITH is believed to be residing at ███ Skillman Avenue East #207, North St. Paul, Minnesota.

341. During the course of this investigation, case agents determined that SMITH has used phone number (651) 263-███ to further DTO activities. Between August 24, 2022 and November 12, 2022, approximately 99 intercepted calls and/or text messages between SMITH and DANIELS were deemed criminal and pertinent in nature.

### 3.1 Intercepted calls establish SMITH's DTO involvement.

342. On August 28, 2022, at approximately 3:44 p.m., DANIELS, using Target Telephone 2, received a call from FRYER at phone number (612) 244-███. During the call, FRYER stated, "I put the thing on the table 'cause I deal with her first as I'm counting the pills, right? I was telling him [U/I] the pills." DANIELS responded, "Okay." FRYER replied, "You gotta count some pills we gotta count together at this point because we're rich [PH] and we gonna count them together and make sure [U/I] off, you know boom

157

'imma count 'em first and then you re-count 'em.' type shit. I give her the bag, she say 'uh, uh, uh, I don't want this shit.' I said 'Mom, it's the same thing!' She's like 'Umm, I want a chunk, I want one big chunk.' I'm like 'Mama I don't have that, all I got...I've been telling you all I got is the bag.'" DANIELS then comments that "she wants some candy."

343.    Based on their training, experience, and knowledge of the investigation, case agents believe that during the above-referenced call, FRYER discussed with DANIELS the counting of "pills" with SMITH ("Mom"). Further, case agents believe FRYER told DANIELS that SMITH wanted a "chunk," which agents know is a common phrase for a portion of controlled substances removed directly from a brick or kilogram quantity of a particular narcotic. Based on this investigation, case agents believe that the DANIELS' DTO distributes fentanyl compressed into pill form. Therefore, agents believe that FRYER referred to counting fentanyl pills with SMITH, however SMITH wanted powder fentanyl rather than fentanyl in pill form, and FRYER explained that she tried to tell SMITH it was same. ("'Mom, it's the same thing!'")

344.    On September 30, 2022, at 6:53 p.m., DANIELS, using Target Telephone 4, called SMITH at (651) 263███.  During this call, DANIELS said, "Hey, I just thought about something. . . You listening to me?" SMITH said, "Uh, huh." DANIELS said, "How much? How much did he get? What did he get?" SMITH said, "He got the whole 14." DANIELS said, "Okay, so listen. Three different people . . . you listening to me?" SMITH said, "Uh, huh." DANIELS said, "Three different people . . . three different people cooked those okay? So here's what I want you to do right? . . . Take a piece...take...go into each one. Take a piece out of each one right. Go back over there with him and let him sample.

. . . 'You hear me?'" SMITH said, "Uh, huh." DANIELS said, "Mark mark the bags. Listen. Mark the zips, 1, 2,3, 4." SMITH said, "Okay. Right." DANIELS said, "And then go back there and take a piece out of each one and let him test each one. Cause I gave you four of 'em right?" SMITH said, "Right. You did." DANIELS said, "Let his people sample each one. And figure out each one. And the one that. The one that the say is good, give him the 14 out the one he say is good. You listening to me?" SMITH said, "Okay." DANIELS said, "So the one he say is good give him the 14 out of the one he say is good. If he say ain't none of 'em good, then call me and let me know." SMITH said, "I'm sorry, yea I'm hearing you."

345. Based on their training, experience and knowledge of this investigation, case agents believe that DANIELS discussed with SMITH the poor-quality cocaine that was manufactured by three different people ("three different people cooked those"). Case agents know cocaine traffickers often "cook" powder cocaine into crack cocaine. Case agents further believe DANIELS explained to SMITH how to fix their customers' complaint regarding the cocaine. He told her to mark each bag of cocaine with a number, ("Mark the zips, 1,2,3,4,"), take one gram from each Ziploc bag and provide them as samples to the customer. If the customer liked the cocaine from a certain zip-lock bag, then SMITH would give all 14 grams of cocaine from that specific bag ("give him the 14") to the dealer.

346. On October 1, 2022, SMITH, using phone number (651) 263[redacted], and DANIELS, using Target Telephone 2, had a text message conversation between approximately 2:44 p.m. to 3:38 p.m. SMITH stated, "So Mona must aint get a chance to

159

get the phone back going nobody aint call it all week just my people. . . Been hitting me up." DANIELS responded, "Yea." "Wow." "That's not good." SMITH replied, "Not at all cause they didn't want the last stuff. . . She was suppose to text everybody when she got back from seeing you."

347. Based on their training, experience, and knowledge of the investigation, including their knowledge of FRYER's recent arrest and subsequent custodial period, case agents believe that during this text message conversation, SMITH told DANIELS that FRYER's customers have not reached out to SMITH since FRYER was arrested and remained in custody. Case agents further believe that SMITH reiterated that their customers did not like the controlled substances that were previously delivered, ("they didn't want the last stuff"), and that FRYER was supposed to address their customers' complaints after meeting with DANIELS, ("She was suppose to text everybody when she got back from seeing you.").

348. On October 2, 2022, at 8:48 p.m., SMITH, using (651) 263-█████, called DANIELS at Target Telephone 2. SMITH said, "She said everything is tail tail, the spot has been compromised, you need to know right now, the spot has been compromised. I'm like oh my gosh, she was like, yeah." DANIELS replied, "I'm gonna get in there, that's not the problem, but the thing is, did they go up in there and touch it?" SMITH said, "That's the thing we trying to figure out, because they lock the top lock because the key that we got don't go to this house, it go to the bottom lock." DANIELS said, "What they got on the window da..da.. prevent you from busting it?" SMITH said, "Umm, some little board or some shit, I don't know, we can't see, I can't see all the way through, but this is

a board or something other there. . . . And we thought the ladder was still out here because we had this top window unlock." DANIELS said, "So you telling me...on that bottom level there's not one window y'all can bust to get inside of it." SMITH said, "Yeah...yeah [U/I] gonna bust that but the camera right here." DANIELS said, "What camera?" SMITH said, "On the, right here on the next block, they go [U/I] every damn thing, there three of them...it's new." DANIELS said, "That's not gonna matter because once we get in there and get out of there, we gone." SMITH said, "I can't believe she even left the shit in this house, why would she do that." SMITH said, "Yeah she said the spot been compromised and they need a new spot, and I'm like why the fuck she didn't even take it to the storage or something." DANIELS said, "So that's what we got to do, y'all got to bust one of them window real quick, y'all got to bust one of them window so we can get up in there. And then and then, bust it, bust it get in there real quick liquidate everything really fast and be gone." SMITH said, "Umm umm [sound of shattered glass in the background] She bust the window." DANIELS said, "And definitely make sure she all good, just go on up in there and go watch." SMITH said, "Yeah and we gotta to get this car, I might have to get this car towed too, to come at her house." DANIELS said, "Yeah yeah yeah, we'll get that done too. Whatever you got to spend mama, don't worry about it, I'll take care of it. I'm gonna get that car, actually get that car towed to to a mechanic because she said somehow the car died and the key won't come out of the ignition." SMITH said, [sound of glass breaking] "Oh Caniya got in there because the lights out. Let me call her and tell her she need to be in and out [sound of glass breaking]."

161

349.     On October 2, 2022, at 9:09 p.m., SMITH, using (651) 263-███, called DANIELS at Target Telephone 2. SMITH said, "There's a lot of shit in here."  SMITH said, "I can't even put this thing in my car so we had to put it in the other car. We gotta get this car towed from over here before the morning." DANIELS said, "Okay. We locking everything up." SMITH said, "This thing is too big, you know my fucking car . . .  I'ma have to lock these doors. You're going to have to get somebody to unlock this door." DANIELS said, "Oh no I got the key." SMITH said, "Ok, ok, ok I'm gonna have Caniya put this other thing in there and we gonna lock he car and we out this bitch." DANIELS asked, "Did she have money laying around there too?" SMITH said, "I didn't see no fucking money. We didn't see all that." SMITH said, "Yea, ok I'm seeing Caniya couple bags." DANIELS asked, "you got, you got my um, my sealer and everything too?" SMITH said, "Yea, we got what was in there. We just got the weed, the stuff, she must have the silver and all that." DANIELS asked, "She's got the silver and the money machine?" SMITH said, "Uh the money machine! Yea." DANIELS asked, "Did you get that?" SMITH said, "I don't know. I ain't go in there. Shit. I didn't go in there, I'm the look out!" SMITH is heard asking Caniya FRYER if the money machine was inside the house. Caniya FRYER is heard saying, "Everything in there but the gun." SMITH asked Caniya FRYER, "The silver in there?" Caniya FRYER is heard in the background repeating, "Everything in there but the gun!" SMITH later said, "I got the money machine, is this the money machine or the sealer? I think it's the sealer." A male voice is heard in the background during several occasions during this phone call.  SMITH said, "I'm taking the sealer now.  It's fucking heavy." DANIELS said, "Momma you should

162

put that in your car and take it to your house." DANIELS asked, "Did RAY help too?" SMITH said, "Yea, he alright. He the one who broke the window." SMITH said, "Sigh...okay we got everything secure. Yea we."

350.     Based on their training, experience, and knowledge of this investigation, case agents believe during these calls, SMITH was breaking into a stash location to collect items that are used for drug trafficking, i.e. money counter, plastic sealer, and controlled substances, and DANIELS was making sure that SMITH got every item removed. Case agents further believe that SMITH informed DANIELS that the "spot"—or the place that FRYER was using as a stash house—was no longer safe to use ("the spot has been compromised"), and the two discussed breaking into the house to retrieve the items to continue their drug trafficking activities ("they need a new spot"). DANIELS told SMITH that he planned to get the car towed from the residence. ("I'm gonna get that car, actually get that car towed.") SMITH also stated that there was a lot of drug trafficking items in the house that needed to be removed. ("There's a lot of shit in here.") Case agents are aware Caniya FRYER is one of SMITH's daughters. SMITH resides with Raymond BARNETT who case agents believe was the "Ray" who assisted SMITH and Caniya FRYER break into this stash house to remove the drug trafficking items. According to the GPS data for DANIELS' vehicle, DANIELS was in route to Minneapolis, Minnesota. Case agents later learned this stash location was ███ Jessie Street in St. Paul.

351.     On October 4, 2022, between approximately 8:13 a.m. and 11:05 a.m., DANIELS, using Target Telephone 2, sent the following text messages to SMITH at (651)

263-[redacted]: "Up and ready when you are"; "Waiting on you so we can go handle business"; and "Tell me when I can swing by."

352.     On October 4, 2022, at approximately 12:06 p.m., SMITH, using (651) 263-[redacted], called DANIELS at Target Telephone 2. DANIELS asked, "Did we get the sealer bags from out of there, too? Or just the sealer?" SMITH stated, "we got all that out of there." SMITH also said they got the car towed to her house, which DANIELS said was "smart." SMITH continued, "She got the [U/I] in the garage last night, so everything's clear on that side. I'm like, 'Oh, shit, girl… you should've told me last night I had a feel thinking we had the toys with that [U/I].' That's when she said, 'No, I just got off the phone with her, she was on break.'" DANIELS responded, "I think it just come to you, and then I'll wait until I can get into the car and get whatever." DANIELS later stated, "Yeah, they are, they in the car, yeah." SMITH replied, "Yeah, they in my car." DANIELS then stated, "I need to come by your house and then just sell out the rest of the meat so it don't spoil; sell the rest of that meat so it don't spoil, and then get you what you need." DANIELS then stated he was on his way to SMITH's Skillman residence.

353.     Based on their training, experience, and knowledge of this investigation, case agents believe that during this call SMITH told DANIELS she had FRYER's vehicle towed from the Jessie Street stash location to her residence on Skillman Avenue and that it was in the garage. Agents further believe DANIELS told SMITH he would come over to retrieve the drug trafficking items that were located in the towed vehicle at SMITH's

residence.[14]  Additionally, case agents believe that DANIELS told SMITH he would come get controlled substances from SMITH's residence and sell them before they lose potency and lose re-sale value.  ("I need to come by your house and then just sell out the rest of the meat so it don't spoil; sell the rest of that meat so it don't spoil, and then get you what you need").

354.    Also on October 4, 2022, at approximately 12:18 p.m., case agents observed DANIELS leave an apartment building on Bradley Street, N, Maplewood, Minnesota (residence of another Minnesota narcotics distributor), carrying a large black duffel bag that appeared to be heavy. DANIELS placed the bag inside his GMC Yukon. At approximately 2:45 p.m., case agents observed SMITH exit her residence and drive away. At approximately 3:05 p.m., case agents observed DANIELS arrive at SMITH's residence in his Yukon.  DANIELS exited the vehicle and removed the same large black duffel bag that DANIELS carried out of the Bradley Street residence. The black duffel bag appeared to be heavy as DANIELS carried it inside SMITH's residence. Thereafter, case agents observed DANIELS exit the apartment building carrying the large black duffel bag, which appeared to be heavy based on how the bag was hanging as DANIELS carried it and placed it into DANIELS' Yukon.

355.    Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS brought other drugs or drug proceeds to SMITH at her

---

[14] In a subsequent text message on October 4, 2022, at approximately 8:01 p.m., DANIELS texted SMITH, asking: "Did you get the car or do I need to get it towed you know we put all of the stuff in there." This bolsters case agents' belief that SMITH loaded up drug trafficking items ("stuff") into the vehicle.

165

residence ("then get you what you need") and took possession of the items SMITH, Caniya FRYER, and BARNETT removed from the Jessie Street stash house.

356.    On October 9, 2022, at approximately 6:16 p.m., DANIELS, using TARGET TELEPHONE 4, called SMITH at (651) 263-█████. SMITH said, "we like the yellow stuff better than... all white stuff is finished." DANIELS said, "Really?" DANIELS said, "I told you. So, okay... okay, so listen, tell her... I just told her to grab two; so I told her to grab you, to grab you two of the yellow, and tell her don't, don't do that. I'll save all the yellow for her." SMITH said, "Okay." DANIELS said, "I'll save all the yellow for her; so tell her to grab, tell her to um... I told her to go make me up two of them, right? Tell her to take it out of the big one." SMITH asked, "Take it out the big one?" DANIELS said, "Break it off the block." SMITH said, "Okay." DANIELS said, "Don't even mess with the one that is made up inside of there. That's all white. So tell her to get the white, 'cause we using yellow to [U/I] a lot of it. I know the yellow was paint on." SMITH said, "Yea, I got a number of good compliments." DANIELS said, "It ain't as powerful as the yellow." SMITH said, "Okay; well she here..." DANIELS said, "So, don't give no more of that away; we gonna keep that for the line." SMITH said, "Oh, keep the yellow for the line?" DANIELS said, "Yeah. The one that's in the small pack; tell her to open up the big block..." FRYER then took the phone and spoke with DANIELS. DANIELS asked FRYER, "Yeah, you not gon'... are you gon' come back to the house to make up the two? Or are you gon' make that at your momma's?" DANEILS said, "The big square. Okay, inside the big square is another zip that's made up; don't touch that; just break it off of the big block; of the big square; make the two off the big square." FRYER said, "Okay; I was just gonna

use what I had; you know I still have like four, too." DANIELS said, "What I'm saying to you is right now momma said that the yellow, everybody loves it, so... I'mma cook up all that yellow and turn it all hard." FRYER said, "Right; I'm picking, I'm getting all her... the other, the rest of it now." DANIELS asked, "The rest of what?" FRYER said, "The street... I mean, the samples; I'm picking that up right now." DANIELS said to SMITH, "You got those three, momma?" SMITH said, "No, 'cause I sold two and I'm giving her nine hundred dollars now." DANIELS said, "I know; now I'm saying I gave you four and then I made you three more, and the yellow one." SMITH said, "'Cause I just gave you nine hundred from this half; because this was my money I made on top of [U/I] over there. I ain't made my pocket yet; I just put that in there." DANIELS said, "I said I got a four and the package is over there that's at momma's, a four is already made up in there. It was nine zips in that whole package." SMITH said, "Oh, she thought it was four." DANIELS said, "That ain't four zips; look how big the package is. You look at the package and don't think, 'hey, four zips that big?'

357. Based on their training, experience, and knowledge of the investigation, case agents believe during this conversation, DANIELS told SMITH to make two ounces of cocaine by breaking it off from a block of one kilogram ("I told her to go make me up two of them, . . . Tell her to take it out of the big one" and "Break it off the block"). Case agents know that a kilogram of cocaine or heroin is usually in the shape of a rectangle and that is known as a block. SMITH said she had gotten good compliments of the yellow cocaine she sold already. DANIELS said he is going to cook the yellow to make crack cocaine. ("I'mma cook up all that yellow and turn it all hard.") FRYER then entered the

167

conversation and told DANIELS she was picking up samples that DANIELS had already made. Based on their training and experience, case agents know it is common for drug traffickers to provide samples of controlled substances before selling a larger quantity. DANIELS refers to SMITH as "momma" regularly. At the end of the call, DANIELS said he had a package containing four ounces at SMITH's residence, ("I got a four and the package is over there that's at momma's"), and the parties discussed whether a package that contained nine ounces was mistaken for containing four ounces and was sold for the price of four instead of the higher price of nine ounces.

358. On October 9, 2022, at 6:42 p.m., SMITH, using (651) 263-▮▮▮▮, called DANIELS at Target Telephone 4. SMITH said, "Who do I get the pills from then? Since I ran out." DANIELS said, "She's got 'em" (referring to FRYER). SMITH said, "Well I know you in the lab, so, you wanna call me when you done? Cause I don't want you to mess up shit. I need you to do that shit correctly . . . So we can be in this money right. You know?" DANIELS responded, "Man, you see she just gave the shit away though?" SMITH replied, "Yeah...we gonna get this shit right. Don't even stress...Don't stress, okay? I'm talking to you. We gonna get it together. I'ma make sure she get it together. Don't stress, okay?"

359. Based on their training, experience, and knowledge of this investigation, case agents believe that SMITH was looking for methamphetamine pills (M/30) or the "blue cheese" that the DANIELS DTO is known to sell. SMITH's reference to DANIELS being in the "lab," leads case agents to believe she knew DANIELS was "cooking" or manufacturing and packaging controlled substances. It is believed SMITH told DANIELS

168

to call her when he was done because she (SMITH) needed DANIELS to concentrate on manufacturing a good quality product because she relies on the quality of the drugs to maximize her distribution profit. ("Cause I don't want you to mess up shit. I need you to do that shit correctly.")

360.    On November 11, 2022, at 5:22 p.m., SMITH, using (651) 263-███, called DANIELS at Target Telephone 2. During the call, DANIELS asked "You saw-- you saw them two I sent you yesterday? It had a lil' extra over." SMITH replied, "Oh! The—yes." DANIELS advised, "Yeah, I think I made one fifty-eight point-five [58.5] for you." SMITH confirmed stating, "Yeah, you did." DANIELS confirmed, "fifty-six," and SMITH replied, "I got it." DANIELS commented "They should love what you got right now." DANIELS then commented, "Oh, yeah. They should love this. Everything that I'm giving you right now, they should love it. I mean-- this is-- no, no, no. [Stuttering] These-- they-- I mean.. I'm giving you, like.. old, old, old, old-school. Glasshouse." SMITH confirmed "Right, I could tell by the color." DANIELS then stated, "mean. Yeah, it's . . . it's see-through, it's clean. It's see-through, it's clean and it's—it's pure." DANIELS continued to comment on the purity of the drugs and indicated, "So, he's like 'yo mans or whatever, [stuttering] you can hel--you can brag on those.' Tell him, you can give that to any of his people, they goin', they standin."

361.    Based on their training, experience, and knowledge of this investigation, case agents believe that SMITH received a portion of crystal methamphetamine (i.e., "56" or "58.5" grams) from DANIELS for distribution. DANIELS further bragged about the

169

high quality and purity of the narcotics and how drug customers would have a high degree of satisfaction.

I. **Chicago DTO Operations: DANIELS, BRADLEY SR., and CRUZ-GONZALEZ procure controlled substances and conduct DTO activities in the Chicago, Illinois area.**

1. **Jameel BRADLEY SR.**

362. The investigation to date has revealed that BRADLEY SR. procures and/or attempts to procure and distributes narcotics for the DTO. BRADLEY SR. is believed to reside in Forest Park, Illinois. He is further believed to distribute narcotics, including methamphetamine, cocaine, and fentanyl, in the greater Chicago, Illinois, area. Intercepted calls reflect that BRADLEY SR. finds new narcotic suppliers and then introduces the supplier to DANIELS. On one occasion, September 2022, BRADLEY SR. and DANIELS traveled to Memphis, Tennessee, to meet a new narcotics supplier and obtain narcotics. BRADLEY SR. has also worked with DANIELS and CRUZ-GONZALEZ to obtain controlled substances from MACIAS.

363. During the course of this investigation, case agents determined that BRADLEY SR. has used phone numbers (815) 701-[redacted], Target Telephone 3, and Target Telephone 5 to further DTO activities. Between September 30, 2022 and November 12, 2022, approximately 270 intercepted calls and/or text messages between BRADLEY SR. and others were deemed criminal and pertinent in nature.

364. As discussed earlier, CS 2 provided information regarding transporting controlled substances from California to Wisconsin on approximately four or five times at the direction of DANIELS and BRADLEY SR. An example of one incident detailed by

170

CS 2 was that on one occasion, CS 2 stated that BRADLEY SR., DANIELS, an unknown female (possibly "Trina"), and CS 2 were at a Marriot hotel in Los Angeles, California. CS 2 observed BRADLEY SR. and DANIELS taking apart a washing machine inside a hotel room. CS 2 observed BRADLEY SR. and DANELS putting book-shaped objects inside of the washing machine. CS 2 stated that BRADLEY SR. told CS 2 that they were putting marijuana in the washing machine. CS 2 did observe an approximate 3-gallon size bag full of marijuana go into the washing machine. However, CS 2 stated that the book-shaped objects were much different than the bag that contained the marijuana. CS 2 observed that the book-shaped objects were wrapped in green tape. CS 2 observed five to ten book-shaped objects going into the washing machine. Case agents believe the book-shaped objects to be kilogram size quantities of controlled substances.

365.    CS 2 further stated that BRADLEY SR. and DANIELS loaded the washing machine onto a Dodge pick-up truck. BRADLEY SR., "Trina," and CS 2 then drove the Dodge pick-up truck to Milwaukee to meet with C. DANIELS. CS 2 stated that they arrived at an apartment complex in Milwaukee. CS 2 stated that there was a row of about five or six apartments that all looked exactly alike. Case agents know that DANIELS and C. DANIELS resided at ▮redacted▮ West Fond Du Lac Avenue, which is a single apartment in a multi-unit building. Further, within this area, there are nine different buildings that look exactly alike. Based on CS 2's statements and description, case agents believe the truck and washing machine were taken to ▮redacted▮ West Fond Du Lac Avenue. Once at the apartment, CS 2 observed the washing machine unloaded off of the truck.

### 1.1 BRADLEY SR. and DANIELS drove to Memphis to obtain narcotics.

366.     Intercepted calls and physical and electronic surveillance, as described below, reflect that DANIELS and BRADLEY SR. drove to Memphis in September 2022 to meet a supplier and obtain narcotics.

367.     On August 31, 2022, at 2:41 p.m., BRADLEY SR., using (815) 701-█████, called DANIELS at Target Telephone 2. During the conversation, BRADLEY SR. stated, "Yes..I'm telling you though, we just gotta go down there and put our body- our footwork in, and man, I'm telling you. It's gonna turn out real great. When I'm telling you it's gonna turn out great, it's gonna turn out great. Because, uh, there's one person that deals with all the heavies [P/H], you know what I mean? He's just going to- you get his number, you know, he gives your number to him, and, you know, he do what he do. You know, he brings all the heavies in. So...and I'm telling you, [U/I], like, that dude, he does an amazing job. There was like [U/I] ugh, and they, they took it down there and they was like 'oh, this is great.'" BRADLEY SR. later stated, "I don't want to turn down nothing, I wanna get everybody, you know?" DANIELS replied, "Mmm, that's right." BRADLEY SR. then stated, "Get him, get him, get him, cause it's money to be made on all ends. What we don't make in one hand we gain in the other one. And man, it adds, it adds up. You heard?" Based on their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. was in contact with a potential new controlled substance supplier, and BRADLEY SR. arranged a meeting between the potential supplier and DANIELS. Agents know that traffickers will commonly attempt to find new

172

suppliers in the hopes of finding a better or cheaper product. Additionally, agents know that traffickers will commonly have more than one source of supply in the event that another source of supply is out of product or arrested by law enforcement.

368.    On August 31, 2022, at 3:07 p.m., BRADLEY SR., using (815) 701-███, called DANIELS at Target Telephone 2. After greeting each other, BRADLEY SR. connected another person into the phone call, whom he greeted as "Renee," a/k/a FNU LNU 1. BRADLEY SR. stated, "Tell Phil what he just say when you called down there...what they said, when 'Rel [P/H] called?" Renee replied, "He said, uh, he was calling whoever he needed to call. . . . "So he told 'Rel some shit, he said I be waiting on it, he said the boss man himself who need it, he coming with us this time, or some shit. And that's when I snuck on him, because I'm like, shit, he tellin' yo ass; I don't know why he tellin' people he comin'. DANIELS then stated, "Right. We talked to him...we comin' sis. We out here. I'm on the road already." Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, BRADLEY SR. was attempting to find DANIELS another controlled substance supplier, using "Renee" and "Rel" as third parties to set up the meeting between DANIELS and the supplier.

369.    Later on in the conversation, DANIELS asked "Renee" for an address for them to go to. "Renee" stated that she has a couple addresses for them, but she will not give them to DANIELS until the meeting is set. Case agents know that suppliers keep their addresses secret to prevent law enforcement detection and to avoid being robbed of controlled substances and/or drug proceeds. Later in the conversation, "Renee" stated, "Shit...we can make them when 'Rel' get off work...Try to...I don't want to cross that

motherfucker; I saw the way he hit when we came." BRADLEY SR. replied, What you talking 'bout?" Renee said, "Cause they gone be move.. the gone be like flies on shit." DANIELS stated, "Mmm, so when we get down there?" Renee then said, "That's how they was when we goin'." BRADLEY SR. exclaimed, "I told you…bro, I told you! When that motherfucker came down there, man, it was woo! They came back loaded!" Renee replied, "You woulda thought we was rich and famous." During this portion of the call, case agents believe that BRADLEY SR. and "Renee" recounted a time in which they personally, or someone they know, purchased controlled substances from the supplier. When BRADLEY SR. stated, "They came back loaded," agents believe that they came back with a large amount of product from the supplier. Agents further believe that BRADLEY SR. and "Renee" were trying to sell DANIELS on meeting with this new supplier.

370. Immediately after this call is ended, BRADLEY SR., using (815) 701-█████, called DANIELS at Target Telephone 2. During this call, DANIELS stated, "You know how I am. I do that shit in one day. I'll wake up real early and be sittin' in that motha fucking place." From their knowledge of this investigation, case agents know that DANIELS commonly takes long road trips and normally travels through nighttime hours. Therefore, agents believe that DANIELS told BRADLEY SR. that they are going to drive to meet the new prospective supplier. Later on in the conversation, BRADLEY SR. stated, "It's a go for us Friday. It's a go." DANIELS replied, "Please." BRADLEY SR. then stated, "This what I been waitin anyways. I been wanting on that for a minute. Cause when I get a pay stub I'm like O, my God. And it's still sweet." Based on their training

174

and experience, and knowledge of this investigation, case agents believe that during this call, BRADLEY SR. advised DANIELS that they would go Friday to meet with the new source of supply, ("It's a go for us Friday. It's a go."), and that he is expecting to make a large amount of U.S. currency through the upcoming narcotics transaction.

371.    On September 1, 2022, at 10:23 a.m., BRADLEY SR., using (815) 701-redacted called DANIELS at Target Telephone 2. During the call, DANIELS and BRADLEY SR. confirm they are going to leave the next day and discuss travel plans. Later in the conversation, DANIELS stated, "We have that ready for next time and maybe you could check, check all of that out. That way when we do, we already be all set up. You know what I'm sayin?" BRADLEY SR. replied, "Okay, we we ain't gonna do it this time?" DANIELS then stated, "No, no, no, not this time' cause it is too short notice."

372.    Based on their training and experience, case agents believe that during this call, DANIELS told BRADLEY SR. that they were not going purchase a large quantity of product from the supplier because DANIELS could not get enough money together in time. Instead, they are going to go down there to inspect the product.

373.    Later in the conversation, BRADLEY SR. stated, "I put visual on it yesterday, so…" DANIELS responded, "You had visual?" BRADLEY SR. replied, "Yeah, yesterday but I really…". DANIELS exclaimed, "Dang!" I ain't look at it, you know what I mean…'cause too many people was around, so." During this portion of the call, agents believe that BRADLEY SR. told DANIELS that he already observed the controlled substances. DANIELS later stated, "You buy ten of those, ten of 'em." BRADLEY SR. responded, "Yeah, sellin' em." DANIELS replied, "You hear me? No! Not sell 'em!"

175

BRADLEY SR. then said, "Oh, use them?" DANIELS then exclaimed, "Right!" DANIELS later stated, "Hey listen, I got you boom boo we gonna tell you [U/I] you fly in, you see, you fly back down and gonna meet you where you are." BRADLEY SR. replied, "Yup, that's true, that's right, wooo." DANIELS then said, "Here's the fee, here is the cost. Here is the monthly, here is the monthly charge. Now we got a monthly fee covered on all ten of 'em. Ten different bosses."

374.    During this conversation, agents believe that DANIELS and BRADLEY SR. discussed how they are going to operate once they secure a connection with this supplier. Agents further believe that DANIELS told BRADLEY SR. that they were eventually going to purchase ten kilograms of a controlled substance at once. ("You buy ten of those.") DANIELS and/or BRADLEY SR. would then find ten different people, who will pay for the product, to sell the kilograms. ("Here's the fee, here is the cost. Here is the monthly, here is the monthly charge. Now we got a monthly fee covered on all ten of 'em. Ten different bosses.")

375.    On September 2, 2022, location data for DANIELS' GMC Yukon and Target Telephone 2 reflected that DANIELS left his residence in Milwaukee around 5:00 p.m. and arrived at BRADLEY SR.'s residence, ████ Des Plaines Avenue in Illinois, at approximately 8:03 p.m. According to physical surveillance, DANIELS went inside the residence, and DANIELS and BRADLEY SR. exited the residence around 10:45 p.m. and left the area. DANIELS left in his Yukon, while BRADLEY SR. left driving a silver Ford Explorer bearing Illinois registration plate DF 13600, which vehicle was registered to him. Case agents followed DANIELS and BRADLEY SR. as they left the area. While in route

176

to Memphis, BRADLEY SR. called DANIELS at Target Telephone 2 (September 3 at 12:59 a.m.), and they discussed slowing down and setting cruise control because they just saw a deputy or trooper on the highway.

376.     DANIELS and BRADLEY SR. arrived at █████ Allandale Lane, Memphis, Tennessee, on September 3 at approximately 7:43 a.m. At approximately 11:59 a.m., BRADLEY SR. exited the residence and entered the driver seat of DANIELS' black GMC Yukon, which he parked in front of █████ Fox Meadows Road, Memphis, Tennessee. Case agents also observed BRADLEY SR.'s silver Ford Explorer parked at this residence.

377.     At 12:18 p.m., BRADLEY SR. exited the Fox Meadows residence with an unidentified male, and subsequently drove DANIELS' Yukon to a Walmart located at Winchester Road in Memphis. Case agents conducting physical surveillance observed BRADLEY SR. at the money service counter. While inside Walmart, at 1:14 p.m., BRADLEY SR., using (815) 701-█████, called DANIELS at Target Telephone 2. During the call, BRADLEY SR. stated, "Hey! I'm finna come…yea, Imma talk to you." DANIELS asked, "You coming to get me?" BRADLEY SR. replied, "It's gonna go down. Yeah, you want me to come get you?" DANIELS told BRADLEY SR. to come get him whenever BRADLEY SR. was ready. BRADLEY SR. responded, " . . .  I'm at Walmart right now, [U/I] send some money," and that "then I'm finna grab this machine." BRADLEY SR. thereafter stated, "The bullet right? The one I'd be getting right?" DANIELS replied, "Yes, sir." DANIELS and BRADLEY SR. each say "Like magic."

378.     Based on their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. went to the Fox Meadow residence to meet with

the prospective new supplier, and subsequently electronically transferred money in preparation for the narcotics transaction. ("It's gonna go down."). Agents further believe that BRADLEY SR. purchased a Magic Bullet food blender ("machine," "bullet," and "magic") to use for mixing controlled substances with adulterants, sometimes to test for purity, and sometimes to increase profit at the point of distribution.

379.    After leaving Walmart, BRADLEY SR. and the unidentified male returned to the Fox Meadows Road residence, went inside and subsequently exited. BRADLEY SR. then entered the black GMC Yukon, left the residence, and drove around the City of Memphis making numerous turns, making U-Turns, and driving through parking lots. Based on their training and experience, case agents believe that BRADLEY SR. drove in this fashion to determine if he was being followed and therefore at risk for detection by law enforcement or others that wish to rob him.

380.    On September 3, 2022, at 5:04 p.m., BRADLEY SR., using (815) 701-████, called DANIELS at Target Telephone 2. During the call, DANIELS told BRADLEY SR. that he (DANIELS) was at Bed, Bath, and Beyond. BRADLEY SR. then stated, "You ain't on you way back yet? Everybody waiting." DANIELS replied, "I'll be right back, soon as I grab this here, uh, this magic stick." BRADLEY SR. later asked, "Should we go get old boy, or we goin [U/I] these down. DANIELS replied, "Y'all can go get him. Y'all… that'll kill time, 'cause when I get back there, you know I'm do what I do." Based on their training and experience, case agents believe that DANIELS' was purchasing a blender ("magic stick"). Agents know that traffickers use blenders to mix controlled substances with adulterants, and that was the intended use for the blender. Agents further believe

that BRADLEY SR. asked DANIELS if they should purchase heroin along with other controlled substances, ("Should we go get old boy"), as agents know that heroin is commonly referred to as "boy."

381.     On September 12, 2022, at 9:00 p.m., BRADLEY SR., using (815) 701-▮▮▮, called DANIELS at Target Telephone 2.   BRADLEY SR stated, "He said we're short." DANIELS responded, "What you say?" BRADLEY SR. replied, "It's supposed to be 19 thousand and seven hundred. You owe me three hundred." BRADLEY SR. later stated, "Don't you think we need to sit down and talk." DANIELS replied, "Yeah, yeah, yeah, yeah, yup, yup, yeah just make sure we talk this week or whatever [U/I] we get together." Based on their training, experience, and knowledge of this investigation, case agents believe that during this call BRADLEY SR. told DANIELS that he did not give the supplier enough U.S. currency in payment for the controlled substances, and the two agreed to discuss the issue at a later time.

### 1.2     Intercepted calls establish BRADLEY SR.'s involvement in the DTO.

382.     On August 27, 2022, BRADLEY SR., using (815) 701-▮▮▮, called DANIELS at Target Telephone 2. BRADLEY SR. stated, "Uh, is ready to be looked at" and "Yeah, uh, bring- bring ten just in case we wanna jump on it, and I'mma just give you the— I'mma give you my half another time- another time." DANIELS replied, "Oh, okay. Oh-oh, I don't have that with me right now." DANIELS talks more about how he does not have the "10" but he really would like to go see "it." Based on their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. was in prior

contact with a prospective controlled substance supplier. That supplier had a controlled substance for BRADLEY SR. and DANIELS to inspect before they purchased it. I believe BRADLEY SR. told DANIELS to bring $10,000 ("bring 10") in the event that they wanted to purchase the controlled substance during the meeting. Case agents know traffickers will commonly meet with new suppliers and observe their product to check the purity before they invest a large amount of U.S. currency into the product. Furthermore, at the time of this call, location information for DANIELS' vehicle and Target Telephone 2 reflected that DANIELS was in Chicago, Illinois, staying at Chicago Marriot Midway hotel at this time. Thus, case agents believe that during the call, DANIELS informed BRADLEY SR. he did not have $10,000 at that time, but that he still wanted to go and visually inspect the controlled substances.

383.     On August 30, 2022, at 8:55 p.m., BRADLEY SR., using (815) 701-███, called DANIELS at Target Telephone 2. BRADLEY SR. stated, "How you like the look of that bitch, that girl?" DANIELS replied, "Beauiful, A-1." At the time of this call, location information reflected that DANIELS was at BRADLEY SR.'s Illinois residence. Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, DANIELS was looking at a quantity of cocaine at BRADLEY SR.'s apartment. Case agents know that cocaine is commonly referred to as "girl." Case agents further believe BRADLEY SR. inquired whether DANIELS liked the quality of the cocaine, and DANIELS replied that he liked the quality. Based on their training and experience, case agents know that traffickers and users will commonly refer to a high-quality controlled substance as "A-1."

384. On September 21, 2022, at 3:32 p.m., DANIELS, using Target Telephone 2, received a call from BRADLEY SR. at Target Telephone 3. During this call, BRADLEY SR. stated, "Yeah I'm [U/I] waiting on you bro…Vino got that…yeah, Vino got that and old boy is like…" DANIELS responded, "Okay, Let me go…let me go, put the… me go put the…" BRADLEY SR. then asked, "So you want me just . . . get [U/I] off of Vino? . . . And you at the house?" DANIELS stated, "No hell no!" BRADLEY SR. stated, "Cause he's blowing me up bro." DANIELS stated, "Oh my goodness. I got, he blowing you up, but I mean... No. He can't do that. He can't do that, I mean, is nice to what's-the-name, but somebody going-- he going immediately know that, what they come back for is not what we going—that's not going be the same, see? Can't do that." BRADLEY SR. stated, "Mm-hum." DANIELS then said, "And then decide there no money in there for us. And, no money, I ain't with that, I ain't with that. I definitely had that ready in a second and I wasn't coming down to-- I wasn't going come down there until about an hour from now. But, I'mma try to get—I'm finna go get that together and get on the road."

385. Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, BRADLEY SR. was trying to facilitate the distribution of a large amount of controlled substances to "Vino," and that "Vino" was calling BRADLEY SR.'s phone multiple times ("he's blowing me up bro"). Agents further believe that DANIELS believed "Vino" could not rush them, as they had to add cutting agents to the controlled substances otherwise DANIELS and BRADLEY SR. would not make any money from the transaction. ("He can't do that, I mean, is nice to what's-the-name, but somebody going-- he going immediately know that, what they come back for

181

is not what we going—that's not going be the same.") Agents also believe that DANIELS told BRADLEY SR. that he would prepare the drugs for distribution and deliver them in about an hour. ("I'm finna go get that together and get on the road.")

386.    During the call, BRADLEY SR. asked, "Yeah so, . . .  you goin put that-- of that five, gonna turn into two or somethin'?" DANIELS responded, "Um, no-no-no, you can't do that. Can't do that, you can get two out. Can't get no—can't get no what's-the-name without..." BRADLEY SR. replied, "No, I'm talkin' about that five that turned into a whole, I mean; My bad." DANIELS stated, "We can, me and you could-- I mean, but not... Right, that's what I'm saying, no-no-no, that's why I said, "You can get-- you can an extra two out. You can't get no-- a whole what's-the-name and it be the same. When you want to stay the same, you can only get two out. . . . Follow me?" BRADLEY SR. acknowledged, and DANIELS stated, "Like, Old Boy over there, you can. You get--you listenin' to what I'm saying? What we doin' for Old Boy, we could do that. . . . We could turn six fifty to one." BRADLEY SR. stated, "And he still-- and he could do the same thing too, huh?" DANIELS stated, "Mm-hum, turn six --yep we turn six, fifty, to one. Anytime. Six, fifty to one, and ain't no-- they don't know the difference." BRADLEY SR. said, "Yeah." DANIELS then said, "'Cause two-- is too powerful. You hear what I'm sayin'? But never uh, I never do half and half. I always do like six fifty, seven hundred, I'll just have a hundred to a one. If I get three out of 'em, I'd be good. I don't wanna hurt it. I don't want-- listen, I want you where you can't even-- you didn't even know it did anything."

182

387.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, DANIELS and BRADLEY SR. discussed mixing cutting agents into controlled substances. Specifically, agents believe that DANIELS advised BRADLEY SR. regarding the correct formulas to use, in that DANIELS told BRADLEY SR. that he usually mixes 650 grams or 700 grams of controlled substances with enough cutting agents to make one kilogram of controlled substances. ("I always do like six fifty, seven hundred, I'll just have a hundred to a one.")  Moreover, DANIELS stated that he does not want to dilute the controlled substances too much, as his goal is to mix just enough cutting agents so that his customers do not even know that any adulterants were added. ("I don't wanna hurt it" and "I want you where you can't even-- you didn't even know it did anything.")

388.    Also on September 21, at 7:23 p.m., BRADLEY SR, using Target Telephone 3, called DANIELS on Target Telephone 2. BRADLEY asked, "You enroute?" DANIELS affirmed, "Yeah."

389.    Case agents were monitoring GPS data of DANIELS black GMC Yukon and Target Telephone 2, which showed DANIELS left Milwaukee and arrived at a White Castle restaurant in Gurnee, Illinois at approximately 8:54 p.m. The GPS data showed the vehicle and Target Telephone 2 at this location for approximately one hour and five minutes. GPS data then showed DANIELS traveling back to Wisconsin. At 11:56 p.m., GPS data showed DANIELS in the area of SUBJECT PREMISES 2. DANIELS left shortly after and traveled to SUBJECT PREMISES 1.

390.    Case agents obtained surveillance video from the White Castle in Gurnee, Illinois, of the parking lot. The surveillance video is motion activated and not constantly recording. However, depicted in the video, at 8:54 p.m., is DANIELS' black GMC Yukon entering the parking lot. The Yukon backed into a parking spot on the West side of the parking lot. At 9:15 p.m., BRADLEY SR.'s silver Ford Explorer entered the parking lot and backed in next to DANIELS' black Yukon. At 9:16 p.m., BRADLEY SR. exited the driver seat of the Explorer and immediately reached into DANIELS' vehicle through the open front passenger window with a white object in his hand and gave it to the front passenger (presumably BRADLEY JR.). At 9:26 p.m., BRADLEY SR., DANIELS, and BRADLEY JR. can be seen talking at the rear of their vehicles. From approximately 9:29 p.m. to 9:58 p.m., it appears DANIELS entered BRADLEY SR.'s vehicle in the front driver side. DANIELS is observed in the vehicle with an unknown male in the front passenger seat. While DANIELS is inside of the Explorer, BRADLEY SR. can be seen outside of the vehicle talking with an unknown individual. At approximately 9:28 p.m., DANIELS exited BRADLEY SR.'s vehicle and re-entered the black GMC Yukon. BRADLEY JR. also re-entered the black GMC Yukon, and they exited the parking lot. BRADLEY SR. entered the silver Explorer with an unknown male, and they later left the parking lot.

391.    Based on the previous intercepted phone calls between DANIELS and BRADLEY SR., and the surveillance video footage, case agents believe that DANIELS met with "Vino" to complete the transaction.

392.    On October 1, 2022, at 6:10 p.m., BRADLEY SR., using Target Telephone 3, called DANIELS on Target Telephone 4. During the call, BRADLEY SR. stated, "I just—I

184

just got to talk to Boo." DANIELS questioned, "What he say?" BRADLEY replied, "I just talked to him, he said he just got up here." DANIELS affirmed, "Okay." BRADLEY SR. stated, "I put a order in for two." DANIELS said, "Got'cha. Okay." BRADLEY SR. replied, "So, I'm waiting on him now."

393.    Based on their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. told DANIELS that he found a new supplier named "Boo" and that he ordered two kilograms of a controlled substance that would later be sold by the DTO. ("I put a order in for two.")

394.    Also on October 1, 2022, at 6:57 p.m., BRADLEY SR., using Target Telephone 3, called an unidentified male at (773) 554-[redacted], UM[redacted] During the call, BRADLEY SR. stated, "Tell me something." UM[redacted] replied, "He talkin' about in the morning." BRADLEY SR. questioned, "In the morning?" UM[redacted] affirmed, "Yeah." BRADLEY SR. asked, "What time in the morning?" UM[redacted] replied, "I'd say about 10."

395.    Approximately one minute later, on October 1, 2022, at 6:58 p.m., BRADLEY SR. called DANIELS and said, "Uh, I just talked to—I talked to him, he said tomorrow morning, 10 o'clock. Around 10:00, 11:00." DANIELS replied, "Okay, cool. Sounds great." BRADLEY SR. asked, "So would you be ready? Still be stayin' up here?" DANIELS replied, "Yeah. Alright—it look like I have to now. I didn't want to but…"

396.    Based on their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. discussed with UM[redacted] meeting at 10:00 the next morning (October 2). BRADLEY SR. then immediately called DANIELS and told DANIELS about the meeting the following morning at 10:00 or 11:00. BRADLEY SR.

asked DANIELS if he was still in Chicago and would be ready for the meeting. ("So would you be ready? Still be stayin' up here?") DANIELS stated that he did not want to stay in Chicago that long, but that he would have to now. Based upon case agents' knowledge of the investigation, and the sequence of the above-intercepted calls, case agents believe that BRADLEY SR. and DANIELS planned to meet with a controlled substance supplier, possibly "Boo" the following morning.

397.    Location information on the their phones and DANIELS' GMC Yukon, reflected that DANIELS and BRADLEY SR. were in Chicago, Illinois during the calls outlined in the above paragraphs. On October 2, 2022, call data reflected that BRADLEY SR. attempted to call UM████, the suspected supplier, but UM4083 never answered.

398.    On October 2, 2022, at 2:18 p.m., BRADLEY SR, using Target Telephone 3, called DANIELS on Target Telephone 4. During the conversation, BRADLEY SR. stated, "Yeah 'cause he said—it was him, we 'posed to got up early and did that. And he fucking—yeap, he fucking…overslept." DANIELS replied, "Got you." BRADLEY SR stated, "He was out partying, I guess. I'm like man, bro. I was on point anyway when you call—you hit me this morning, I was already up. And I'm—I been blowing him up."

399.    Based on their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. informed DANIELS that he (BRADLEY SR.) called the supplier that they were supposed to meet, and the supplier told BRADLEY SR. that he (supplier) overslept and missed the planned meeting on the morning of October 2.

400.    On October 12, 2022, at 4:58 p.m., DANIELS, using Target Telephone 4, received a call from BRADLEY SR. at Target Telephone 5. During this call, BRADLEY SR.

stated, "I got ol' boy, he's finna go get a hotel room real quick." DANIELS stated, "Okay." BRADLEY SR. replied, "So we can, you know, fool around." Later in the conversation, DANIELS asked, "Cool, cool, cool, so what do you want me to do? Do you want me to take it out? Do you want me to leave it until we get there? What you wanna do?" BRADLEY SR. replied, "Let's leave it 'till we get there." DANIELS affirmed, "Just leave it 'till we get there." Later in the conversation, DANIELS stated, "Alright. I'm gonna leave everything the way it is then. I'll leave everything like it is." BRADLEY SR. stated, "Um-hum…we'll do one thing at a time. We'll make our way 'round." DANIELS replied, "We'll make our rounds, okay, got you. That sounds good."

401.    At the time of this intercepted call, case agents observed DANIELS' black GMC Yukon parked in the parking lot for BRADLEY SR.'s residence. Case agents know that BRADLEY SR. resides in apartment #308 at ███ Des Plaines Avenue. At this time, case agents observed DANIELS exit the Yukon, walk to the trunk of the vehicle and open the hatch while on the phone with BRADLEY SR. Case agents also observed BRADLEY JR. exit the Yukon. At 5:15 p.m., case agents observed BRADLEY SR.'s silver Ford Explorer arrive at the location. DANIELS, BRADLEY SR., and BRADLEY JR. all went into the apartment building. At 6:00 p.m., case agents observed DANIELS, BRADLEY SR., BRADLEY JR., and an unknown male exit the apartment building. All four subjects entered the black Yukon and drove away from the location. The Yukon was then followed to Miami Inn Motel and Suites located at 9041 South Cicero Avenue, Oak Lawn, Illinois. All four subjects exited the Yukon and went into motel room #37. Based on positioning of the Yukon and the case agents' vantage point, case agents observed the four

187

individuals go into the motel room, but could not see if they took anything inside. The Yukon stayed at the motel for approximately one hour and forty-five minutes. Case agents then began to monitor vehicle GPS data on the Yukon. The Yukon made numerous stops throughout Chicago, only remaining at these locations for a short duration of time before going to the next location. In total, the Yukon made approximately eight stops, each stop lasting approximately nine minutes to one hour and forty-one minutes. After the last stop, the Yukon returned to Wisconsin.

402. Based on their knowledge of this investigation, case agents believe that DANIELS brought controlled substances and/or money with him to Illinois, from either Minnesota and/or Milwaukee. ("Do you want me to take it out? Do you want me to leave it until we get there?") Case agents further believe that after the meeting at the hotel, DANIELS and BRADLEY SR. intended to sell the controlled substances and/or intended to make money pickups at different locations throughout Chicago. ("We'll make our rounds, okay, got you. That sounds good.") Based upon the GPS data for the Yukon after it left the hotel, case agents believe that DANIELS and BRADLEY SR. made their "rounds" to drug customers throughout the Chicago area.

403. On November 9, 2022, BRADLEY SR. was intercepted over Target Telephone 5 asking about being able to purchase firearms. In one call at approximately 12:37 p.m. with a UM, BRADLEY SR. stated, "I need some guns too, you got some guns?" The UM said, "Yeah, I got a lot, I got a lot of that shit. You hear?" Approximately one minute later, BRADLEY SR. called another UM, during which call BRADLEY SR. stated, "Pipes, pipes." The UM questioned, "Pipes?" BRADLEY SR. responded, "Guns bro." The

UM later stated "Alright, I'm gonna call my n**** in a few seconds and see if he got it but uh…another white dude can get it but he [U/I] on the phone." BRADLEY SR. then pressured the UM to call his firearm connection. Later in the conversation, BRADLEY SR. exclaimed, "I need a mothefuc—I need a Glock thirty!" BRADLEY SR. also stated, "I want a big ass gun though."

### 2. Itzel CRUZ-GONZALEZ procures and packages controlled substances, and accounts for drug proceeds.

404. The investigation to date has revealed that DANIELS, BRADLEY SR., and CRUZ-GONZALEZ work together to procure controlled substances for distribution. Intercepted communications, some of which are detailed below, demonstrate that CRUZ-GONZALEZ obtains for distribution methamphetamine from MACIAS, packages cocaine, and accounts for drug proceeds.

405. During the course of this investigation, case agents determined that CRUZ-GONZALEZ has used phone number (323) 604-■■■ to further DTO activities. Between August 24, 2022 and November 12, 2022, approximately 21 intercepted calls and/or text messages between CRUZ-GONZALEZ and BRADLEY SR. were deemed criminal and pertinent in nature.

### 2.1 Intercepted calls reflect CRUZ-GONZALEZ's involvement in the DTO.

406. On September 30, 2022, at 4:21 p.m., BRADLEY SR. called CRUZ-GONZALEZ at (323) 604-■■■. BRADLEY SR. said, "You can go pick yo shoes up, he waitin' on you." CRUZ-GONZALEZ said, "Send over the address." BRADLEY SR. said, "I just.. I already did, look at your phone." CRUZ-GONZALEZ said, "Umm... Yea.. that,

that's the, uhh, number you can send it to." BRADLEY SR. said, "What is the number

again?" CRUZ-GONZALEZ gave BRADLEY SR. the following phone number "562-392-

████." CRUZ-GONZALEZ said, "Yea it was Angel Tapia house." BRADLEY SR. said,

"Angel Tapia, Yepp. Los Angeles, right?" CRUZ-GONZALEZ said, "Yea, what else was

I gunna tell you? Uh, let me, let me call you back cause I'm about to call Gucci had just

called me right now Imma talk to him about that other stuff." BRADLEY SR. said,

"Okay." CRUZ-GONZALEZ said, "I'll call you back right now let me see [U/I] 'cause he

told me that they got a thousand." BRADLEY SR. said, "A thousand? What?" CRUZ-

GONZALEZ said, "Yepp." BRADLEY SR. said, "Hell yea! Get that! That's what we want!

Call me back!" CRUZ-GONZALEZ said, "Yea, but it's more expensive." BRADLEY SR.

said, "I don't give a fuck! See what he wants for the thousand!" CRUZ-GONZALEZ said,

"Yea, yea, that's what I just said baby." BRADLEY SR. replied, "Call me back."

407.    Based on their training, experience, and knowledge of this investigation,

case agents believe that BRADLEY SR. was working with CRUZ-GONZALEZ, who was

setting up a drug transaction with "Gucci." When BRADLEY SR. said, "See what he

wants for the thousand," case agents believe that BRADLEY SR. asked for a quote for

1,000 grams of a controlled substance. Case agents knows from training and experience

that drug traffickers will sell controlled substances in kilogram-quantities, which is 1,000

grams.

408.    As detailed in Paragraphs 237-243 of this Affidavit, on October 7 and

November 7, 2022, CRUZ-GONZALEZ and BRADLEY SR. discussed what case agents

believe to be five pounds of methamphetamine received by MACIAS,. Case agents know

that CRUZ-GONZALEZ is from California. Based on these calls, CRUZ-GONAZLEZ's and BRADLEY SR.'s contacts with MACIAS, and DANIELS' subsequent meeting with MACIAS in California, case agents believe that they are working together to procure controlled substances for distribution.

409.    On November 8, 2022, at 1:08 p.m., BRADLEY SR., using Target Telephone 5, called CRUZ-GONZALEZ at (323) 604-[redacted]. BRADLEY SR. said, "It's four thousand, like..." CRUZ-GONZALEZ said, "The big stack is five thousand." BRADLEY SR. questioned, "All together? And the other one together is five thousand?" CRUZ-GONZALEZ responded, "And then the other one is gonna add up five thousand, yeah." BRADLEY SR. affirmed, "Okay." CRUZ-GONZALEZ stated, "I put it back, I just put it back to how they were." BRADLEY SR. confirmed, "A'ight." CRUZ-GONZALEZ confirmed, "Yeah, but it's there. It's five and five." BRADLEY SR. responded, "[U/I] , as far as they're correct [U/I]." CRUZ-GONZALEZ stated, "Yeah, I just put it... yeah, I just put it pack how it was. I know, the stacks are weird."

410.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call CRUZ-GONZALEZ is counting and banding together U.S. currency that was made from illegal controlled substance trafficking. Based on their knowledge of this investigation, case agents know that CRUZ-GONZALEZ assists BRADLEY SR. and the DTO by facilitating the purchase, sale, and packaging of controlled substances. Case agents know that large scale traffickers procure large amounts of U.S. currency from their illegal sales. Due to it being an illegal enterprise,

traffickers are not able to place these proceeds into banks and therefore commonly keep their drug proceeds in cash form at their residence.

411.    On November 8, 2022, at 4:52 p.m., BRADLEY SR., using Target Telephone 5, called CRUZ-GONZALEZ at (323) 604-███. BRADLEY SR. asked CRUZ-GONZALEZ, "Hey, can you assemble that C, the powder? A lil' bag, the sample I had? I think it's in the [U/I] I be keeping it at." After a long pause, CRUZ-GONZALEZ questioned, "The one where your drawers are at? Or where you put…" BRADLEY SR. responded, "Yeah, the top one, the top drawer. It's inside the hat. See you—where the grey... It's like a bag with a grey, taped up with some shit? There's a lil' sample bag in the side of it too." After another long pause, CRUZ-GONZALEZ confirmed, "Oh, yeah, it's right here."

412.    Based on their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. told CRUZ-GONZALEZ to obtain the cocaine ("C") and bag it for sale. Case agents know that traffickers commonly refer to cocaine as "C" and "powder." Based on interceptions and location data, case agents also believe that BRADLEY SR. and CRUZ-GONZALEZ reside together, which is why BRADLEY SR. instructed her to look in the "drawer."

**J.    DANIELS, B. DANIELS, HENTON, MASSEY, and MONROE are engaged in a healthcare fraud scheme, and they use their residences and businesses to facilitate their fraud.**

413.    According to State of Wisconsin Medicaid records, financial records, the lawfully obtained forensic extraction of MASSEY's phone, and information obtained from CS 1, CS 3, and other witnesses who have made complaints to the Wisconsin Department of Health Services, DANIELS, B. DANIELS, HENTON, and MONROE

purport to operate what are known as supportive home care agencies, First Response Supportive Care (FRSC) and A Touch of Love Supportive Care Agency (ATOL), and a personal care agency, Wellness Personal Care Service (WPCS). Based on their training, experience, and knowledge of this investigation, State of Wisconsin healthcare fraud investigators believe that these agencies are billing Wisconsin Medicaid for services not rendered.

### 1. The Wisconsin Medicaid Program

414. The Medicaid program is a government assistance program that is jointly funded by the states and the federal government. It provides health care coverage to millions of Americans, particularly eligible low-income adults, children, pregnant women, elderly adults, and persons with disabilities. The Wisconsin Department of Health Services (DHS) administers the Wisconsin Medicaid program on behalf of the state and federal government. It is headquartered in Madison, Wisconsin.

415. State of Wisconsin healthcare fraud investigators know that the IRIS program (**I**nclude, **R**espect, **I S**elf-Direct) is a Medicaid Home and Community-Based Services (HCBS) waiver program authorized under § 1915(c) of the Social Security Act and approved by the Centers for Medicare and Medicaid Services (CMS). IRIS is a self-directed program for adults with disabilities and elderly people in Wisconsin. To be eligible for the IRIS program, one must be eligible for Medicaid, need the same level of care as someone in a nursing home, and live in a home, apartment, adult family home, or residential care apartment complex. IRIS participants receive a budget for a range of goods, support, and services, including supportive home care (SHC).

193

416.    SHC includes both direct and indirect assistance with daily functions and individualized needs, designed to promote improved functioning and safety in a participant's home and community. SHC services are comprised of supports or tasks such as:

a.      Companion or attendant supports, which may include observation or indirect assistance with self-administration of medications, meal preparation, bill payment, schedule and/or attend appointments, arrangement and/or usage of transportation, and personal assistance in community activities;

b.      Chore services; and

c.      Routine care, which is the performance of personal services. When routine care is provided, personal care activities may not comprise the entirety of the service. When personal care is available to the participant through the Medicaid State Plan, this option must be used prior to the use of any routine care under SHC.[15]

417.    A SHC agency must have a valid Medicaid provider's agreement to provide SHC services under the umbrella of the IRIS program and employ direct-care workers. An IRIS participant may purchase services from a SHC agency, and in those instances, the agency is the sole employer of the direct-care workers, not the IRIS participant.

418.    A SHC agency submits SHC claims directly to the participant's Fiscal Employer Agency (FEA) monthly using an IRIS provider invoice, which includes the

---

[15] This definition of "routine care" is taken from the IRIS manual. To explain further, SHC is only available through a waiver program such as IRIS. If a participant qualifies for personal care services from Medicaid, the participant must use those services first.

194

SHC agency information, the participant's information, dates of service, service codes, units, unit rate, unit type, and the total dollar amount. The FEA adjudicates claims based on the participant's approved authorization. If the claims are authorized, the FEA will submit the claims to DHS for funding. DHS will then fund a zero-balance state-held bank account. The SHC agency then receives reimbursement for the claim through an electronic funds transfer.

419.    State of Wisconsin healthcare fraud investigators further know that DHS operates a Personal Care Agency (PCA) program through Medicaid. A PCA is a home health agency, county department, independent living center, American Indian tribe or band, or a freestanding PCA that provides services that are:

       a.    Medically-oriented activities related to assisting an individual with activities of daily living necessary to maintain the individual in his or her place of residence in the community;

       b.    Provided upon written orders of a physician by a certified personal care provider; and

       c.    Provided by a personal care worker employed by the provider or under contract to the provider who is supervised by a registered nurse according to a written plan of care.

420.    Wisconsin Medicaid will reimburse a Medicaid-enrolled personal care provider for the following medically necessary services when performed under the supervision of a registered nurse (RN) by a personal care worker (PCW):

d.      Assistance with activities of daily living (ADL) such as bathing, dressing, ambulating, toileting, or eating;

e.      Accompanying the member to a medical appointment;

f.      Light cleaning in essential areas of the home used during personal care service activities; and

g.      Assistance with medically oriented tasks documented in the physician orders.

421.    Medicaid also reimburses for PCWs' travel time to and from a member's home.

422.    Before personal care services can be provided, a personal care screening tool (PCST) must be completed for the member by an RN. The PCST assists providers in determining the number of units to request for prior authorization (PA) of medically necessary personal care services. Then, the PCA's supervising RN must obtain signed and dated physician's orders, conduct an assessment at the member's place of residence, and develop the plan of care based on the PCST. DHS will review the PA request and approve, approve with modifications, or deny.

423.    If the PA is approved, the PCW will be assigned by the supervising RN to the member to do specific tasks according to the written plan of care. The PCW's training for these specific tasks will be assured by the supervising RN. PCWs are required to complete records of care, which include the actual start and end time of personal care each day and the tasks provided to the member for each date of service. For each task, the PCW must record the required information using one of the following methods:

196

placing a checkmark next to each task completed, entering each task into an electronic visit verification system, recording the number of minutes spent on each task, or recording the time each task was started and ended. The member and the PCW must sign and date all records of care. It is imperative that the member's medical records accurately reflect the correlation among physician orders, plan of care, PCST, and the daily documentation for PCW services.

424. One way a PCA can submit claims to Wisconsin Medicaid for payment is via the ForwardHealth Portal ("the portal") using direct data entry (DDE). The PCA requests secure access to the portal and, using that login associated with their provider IDs, complete required fields in the portal, including member ID, date of service, procedure code, number of units, charge amount, and place of service. The PCA may only submit claims after the services have been provided, and the PCA is responsible for the accuracy of the claims submitted via the portal. Medicaid remits payments to the PCA based on the approved claims.

425. Medicaid recipients can be approved to receive both personal care and supportive home care services. Both PCA and SHC agency provider types are regarded by CMS as "high risk" because CMS has found that the PCA and SHC programs are susceptible to fraud. This is because services under both programs are provided in the home by workers with minimal to no training and minimal oversight. SHC agencies in particular pose a fraud risk to the Medicaid program because becoming a SHC provider with IRIS requires significantly fewer steps, and IRIS exercises less oversight over SHC services, as these services do not require the supervision of an RN, physician orders, a

197

PA, and electronic visit verification, and claims are submitted only monthly via a vendor form.

## 2. Overview of Personal Care Agencies Involved in Fraud

426. B. DANIELS is listed as the Registered Agent for FRSC on State of Wisconsin Department of Financial Institution documents. A State of Wisconsin Medicaid 2021 "IRIS Provider Application" for FRSC lists B. DANIELS as the owner of FRSC. FRSC is a SHC agency.

427. The provided business address for FRSC on State of Wisconsin Department of Financial Institutions documents is ██0 Linden Court, Apt. A, Lomira, Wisconsin (SUBJECT PREMISES 7), which is B. DANIELS' residence. According to a WE Energies representative, First Response SCA LLC is listed as the subscriber of utilities for SUBJECT PREMISES 7 since March 1, 2017. DANIELS' was last at SUBJECT PREMISES 7 on approximately November 17, 2022, as reflected by location information.

428. In February 2020, B. DANIELS submitted a "Vender Status Change Form" to Wisconsin IRIS listing the new business address for FRSC as ████ W. Capitol Drive, Suite #119, Milwaukee, Wisconsin, SUBJECT PREMISES 5. On April 4, 2020, B. DANIELS submitted another "Vender Status Change Form" listing the business address for FRSC as P.O. Box 080086, Milwaukee, Wisconsin. On September 10, 2021, B. DANIELS signed her "IRIS Provider Application" form and listed P.O. Box 080086 in Milwaukee as the primary office, mailing and billing address for FRSCA. However, also part of this application, B. DANIELS listed the address for FRSC as ████" W. Capitol Drive, Suite

119, Milwaukee, Wisconsin[16] on an IRS Form W-9, Request for Taxpayer Identification Number and Certification.

429. On July 21, 2022, law enforcement agents entered the 2 story office building located at ██ W. Capitol Drive and located Suite 119 on the first floor. Outside the door of Suite 119 was a sign for "First Response S.C.A." There was also a sign for a business called "A Wing & A Care LLC" outside of #119. On November 8, 2022, law enforcement officers again observed these signs outside of Suite 119. Additionally, law enforcement officers spoke with the property manager for ██ W. Capitol Drive and the property manager confirmed that "Betty" and First Response S.C.A. was still located in Suite 119, SUBJECT PREMISES 5. Agents believe based on intercepted phone calls and other evidence that B. DANIELS uses both SUBJECT PREMISES 5 and 7 to facilitate the business activities for FRSC.

430. On September 30, 2021, B. DANIELS completed an IRIS Provider Application, which included a "Background Disclosure" form. Question 2 on the form asked, "Were you ever convicted of a crime anywhere, including federal, state, local, military, or tribal courts?" The response box "no" was checked. Although this answer is true of B. DANIELS, DANIELS has multiple felony narcotics convictions. Based on evidence collected thus far, DANIELS appears to be the one actually controlling the

---

[16] Law enforcement believes that B. DANIELS made a transcription error or intentionally misrepresented the correct address of FRSC when noting the address was ██ rather than ██.

business operations of FRSC, however disclosing his actual ownership and control of FRSC would likely have impacted the business's ability to obtain Medicaid funds.

431. On or about September 10, 2021, B. DANIELS signed the two-page "Wisconsin Medicaid Program Provider Agreement and Acknowledgement of Terms of Participation for Waiver Service Provider Agencies or Individuals," which is required by CMS and DHS. This agreement included an attestation that B. DANIELS agreed to comply with all applicable federal and state laws, regulations, and policies relating to providing home and community-based waiver services and maintain and provide records of services provided.

432. From approximately January 2019 through August 2021, FRSC bank accounts electronically received approximately $250,000 from Wisconsin Medicaid. Additionally, from March 2019 to May 2020, a bank account controlled solely by B. DANIELS received approximately $10,000 from Wisconsin Medicaid. FRSC bank accounts have also received significant amounts of unexplained cash.

433. HENTON is the owner/operator of ATOL, listing a business address of ████ N. Sherman Boulevard, Suite 305, Milwaukee, Wisconsin (SUBJECT PREMISES 6). ATOL is a SHC agency.

434. On or about October 29, 2018, HENTON signed the two-page "Wisconsin Medicaid Program Provider Agreement and Acknowledgement of Terms of Participation for Waiver Service Provider Agencies or Individuals," which is required by CMS and DHS. This agreement included an attestation that HENTON agreed to comply with all applicable federal and state laws, regulations, and policies relating to providing home

and community-based waiver services and maintain and provide records of services provided.

435.    From January 2019 through October 2021, bank accounts controlled by HENTON in the name of ATOL received approximately $959,000 from the State of Wisconsin Medicaid. ATOL bank accounts have also received unexplained cash deposits.

436.    MONROE is listed as the Registered Agent of WPCS (according to a 2022 application) and provided to the State of Wisconsin Department of Financial Institutions, the business address of ███ W. Townsend Street, Suite 104, Milwaukee, Wisconsin, SUBJECT PREMISES 8. WPCS is a PCA.

437.    On November 8, 2022, law enforcement officers observed a vehicle registered to MONROE parked in front of SUBJECT PREMISES 8. Law enforcement officers also observed MONROE through a window near the entrance, in Suite 104.

438.    WPCS had to complete two separate application processes to become a Medicaid-certified PCA. First was the state certification application process, which has a two-step review process. The first part of the review determines whether an applicant is fit and qualified and includes an analysis of a variety of factors, including financial solvency, personnel qualifications, and criminal background clearance. The second review is completed by an RN who reviews the applicant's policies and procedures to determine whether they meet DHS code requirements. An on-site survey is conducted after this part of the application is approved and the PCA has cared for at least five clients. The second application process is Medicaid certification. Once WPCS received an on-site survey and recommendation for Medicaid certification, it had to apply separately for

certification through the ForwardHealth portal. A PCA cannot not submit claims to Medicaid until it is approved and issued a Medicaid certification number.

439. On or about February 24, 2022, MONROE completed the Wisconsin Medicaid Provider Enrollment Report and listed himself as administrator, managing employee, and contact person throughout. MONROE also listed himself as 50% owner and an individual named Tamisha Williams as the other 50% owner. Further, MONROE listed approximately 90 PCWs and three RNs as employees of WPCS and included their names, dates of birth, and social security numbers.[17]

440. Additionally, MONROE signed the six-page Wisconsin Medicaid Provider Agreement and Acknowledgement of Terms of Participation form, which is the standard provider agreement used by Wisconsin Medicaid, and in which MONROE agreed to the terms of Federal compliance and Wisconsin Medicaid including to abide by all federal, state, and local laws, rules, and regulations. By signature, MONROE swore or affirmed under penalty of perjury that the information given in the Agreement was true and accurate. By signature, MONROE certified that he read the Online Handbook and all regulations.

441. According to State of Wisconsin Medicaid records, WPCS (MONROE) received at least $6,000,000 from approximately February 6, 2018 (the date of the first eligible to bill) to mid-November 2022.

---

[17] SHC agencies do not have to provide a list of workers when they apply to IRIS to become SHC providers, so not all identities of workers for FRSC or ATOL are known.

### 3. Overview of the Medicaid Fraud Scheme

442.    As detailed below, DANIELS, B. DANIELS, HENTON, MONROE, and other DTO members have received significant deposits from State of Wisconsin Medicaid and electronic deposits from the State of Wisconsin IRIS program, which is part of the Wisconsin Medicaid program. Many of these accounts also received significant cash deposits during the same time period as the Medicaid deposits.

443.    This investigation has led case agents to believe that DANIELS, B. DANIELS, HENTON, MASSEY, and MONROE have committed Medicaid fraud by billing the State of Wisconsin Medicaid program for personal and/or supportive care services that are not actually rendered. The investigation to date has revealed that HENTON and DANIELS first offer and provide housing to individuals. After housing is secured, ATOL and FRSC sign individuals up for supportive care services, and at least in some cases, offer discounted rent to individuals who are signed up for supportive cares. Evidence also reveals that ATOL and FRSC are subsequently billing for services that are not rendered. In some instances, evidence reflects that DANIELS and HENTON coach members to feign limitations in activities of daily living to increase the hours that can be billed to Medicaid.

444.    It is further believed that B. DANIELS, who is the Registered Agent for FRSC, is responsible for submitting bills to Wisconsin Medicaid, and that MASSEY and others assists the various supportive care agencies in signing people up for services. MASSEY also purports to be a Personal Care Worker for the various agencies.

445.    Case agents believe MONROE has worked in tandem with DANIELS, HENTON, and MASSEY. Although he operates and submits bills to Wisconsin Medicaid through WPCS, it is believed that he relied upon DANIELS and HENTON, and others, to recruit prospective clients so that collectively they could continue to submit claims to the Wisconsin Medicaid Program for services never rendered. Through the investigation, case agents have learned that DANIELS and HENTON collectively control various rental units through Berrada Property Management using FRSC and/or ATOL. As detailed within this Affidavit, MONROE has paid FRSC approximately $782,000 for what agents perceive to be assistance in securing clients.

446.    During the course of this investigation, case agents learned that DANIELS refers to himself, and others refer to him, as "Dr. Phil." However, investigators searched the public records database for the Wisconsin Department of Safety and Professional Services and were unable to locate any credentials and/or licensing for DANIELS, indicating that DANIELS is not in fact licensed to practice medicine.

### 4.    Interviews demonstrate that DANIELS, B. DANIELS, MASSEY, and MONROE bill Wisconsin Medicaid for services not actually rendered.

447.    Multiple individuals for whom ATOL, WPCS, and FRSC have billed Medicaid for services allegedly rendered have said that ATOL, WPCS, and FRSC in fact provided no services to them.

448.    One such client was CS 3. CS 3 told case agents that CS 3 met DANIELS and HENTON and after responding to an advertisement for housing assistance in a "blue book" magazine. According to CS 3, the advertisement offered assistance for those on

204

Medicaid. CS 3 suffers from diabetes, seizures, high blood pressure, and broken vertebrae in their back. According to CS 3, MASSEY brought a nurse over to CS 3's apartment for an initial assessment. CS 3 stated, "WPCS and ATOL haven't done anything for me." CS 3 never signed any care worker time sheets (which are required to be completed by the personal or supportive care worker and signed by the client). Based on their training, experience, and knowledge of this investigation, healthcare fraud investigations believe that any signature on timesheets for CS 3 from these businesses that were submitted to Medicaid would contain a forged signature and falsified information alleging services rendered. According to Medicaid records from the State of Wisconsin, since January of 2020, ATOL and WPCS both billed for services allegedly rendered to CS 3 and received payments of approximately $24,580 and $44,700 respectively from the State of Wisconsin Medicaid for those purported services.

449.    On June 21, 2022, law enforcement agents spoke with E.J. regarding ATOL and WPSC. E.J., an elderly female, provided a voluntary statement. E.J. stated she met HENTON and DANIELS in approximately February 2020 and they told her they could assist her by providing her with housing. E.J. stated everything DANIELS and HENTON told her turned out to be "a big lie." MASSEY was set to be E.J.'s personal care worker, but never provided any services. HENTON told E.J. she had to sign timesheets attesting that MASSEY had been providing her with services to stay in the apartment, and E.J. had to pay HENTON $550 per month for rent. Additionally, E.J. did not know her Medicaid benefits were going directly to HENTON and DANIELS. E.J. was then moved to a different apartment. E.J. learned HENTON took her out of the IRIS program and moved

205

her to WPCS. E.J. said WPCS did not provide any services for her either. According to

E.J., MASSEY brought over a stack of photocopied timesheets that E.J. had to sign. E.J.

felt obligated to sign the timesheets even though MASSEY did not perform any services.

E.J. left WPCS and ATOL around September 2020. From approximately February 2020 to

August 2020, WPCS received a total of $23,195 from Medicaid for services never provided

to E.J and ATOL received a total of $15,865 from Medicaid for services never provided to

E.J.

450.    On June 21, 2022, law enforcement agents interviewed O.H. regarding

ATOL. O.H. provided a voluntary statement. O.H. met HENTON and DANIELS after

responding to an advertisement for housing assistance in a "blue book" magazine.

HENTON and DANIELS informed O.H. that ATOL provided low-income services, such

as rental assistance. ATOL had office space near Sherman Boulevard and Fond du Lac

Avenue in Milwaukee, Wisconsin (SUBJECT PREMISES 6). DANIELS told O.H. to act

like she could not walk and just lay on the couch during the nurse's assessment.

According to O.H., an "older black lady" who claimed to be a Registered Nurse came

with MASSEY to O.H's residence for an evaluation. The personal care service paperwork

was for WPCS and not ATOL, even though O.H. thought she was dealing with ATOL.

O.H. did not sign paperwork for ATOL. In April or May 2020, O.H. noticed her hours

were "messed up" and nobody was coming to care for her. O.H. did not know her

personal care budget. She believed she was approved for personal care and supportive

care. O.H. suffers from asthma, obesity, heart failure, lung/kidney disease and severe

depression. O.H. said no care workers came out after the RN's assessment, and she never

206

signed any timesheets. From approximately November 2019 to February 2020, WPCS received $2,884.59 from Wisconsin Medicaid for services never rendered to O.H.

451. On June 21, 2022, J.P. gave law enforcement a voluntary statement regarding WPCS and ATOL. J.P. said that in 2019, he was receiving services from WPCS and identified MONROE as the owner. After J.P. was released from custody in April 2020, MONROE introduced J.P. to DANIELS and said that DANIELS could help J.P. with housing through ATOL. Around April 2020, J.P. moved to a different apartment. J. P.'s rent to ATOL was $400 per month, which was picked up by a female named "Nakia." MONROE told J.P. that DANIELS could also help with personal care services as well. J.P suffers from epilepsy and needs help with activities of daily living. J.P. said after the meeting with DANIELS, HENTON and Leroy HENTON took over services. Occasionally, MASSEY would pick up J.P.'s laundry to wash. J.P's mother helped him the most with cooking, cleaning, and washing clothes. Leroy HENTON had J.P. call IRIS to set up more services, and J.P. was approved to receive thirty-six hours of personal and supportive care per week. His budget for services was $2,000 per month, however his budget was deposited into the WPCS bank account controlled by MONROE. According to J.P., he never signed paperwork or timesheets for ATOL or WPCS. He did not have an assessment with a Registered Nurse, and no services were provided other than sporadic help with laundry. J.P. stated HENTON, Leroy HENTON, and DANIELS were associated with ATOL, and MONROE was associated with WPCS. When issues came up, MONROE told J.P to call DANIELS. From approximately June 2019 to March 2022, WPCS received $74,589.82 from Medicaid for services never provided to J.P.

207

452.     On July 14, 2022, law enforcement officers interviewed A.F. regarding FRSCA. A.F. gave the following voluntary statements. A.F. stated he did not know the name of his current primary care worker, did not know the location of his current supportive care agency, and did not have any contact information for his current supportive care agency. A.F. was asked if he used FRSC before his current supportive care agency, and A.F. stated he had never heard of it. From approximately January 2018 to May 2022, FRSC received approximately $88,000 from Medicaid for services A.F. claims were not provided because he had never heard of the company before the interview.

453.     Additionally, DANIELS has used the address of individuals for whom the DTO has received Medicaid funds to receive parcels containing suspected controlled substances. More specifically, clients D.B. and K.B. have received packages containing suspected controlled substances for DANIELS. According to Medicaid records from the State of Wisconsin, WPCS and ATOL billed for services rendered to D.B. and K.B. and received payments of approximately $120,000 and $135,000, respectively, for those purported services.

454.     Furthermore, CS 1 told case agents that HENTON had advised CS 1 that HENTON "rounded up" "crackheads" and kept them "in line" by the group. According to CS 1, HENTON's and DANIELS' clients were, in some cases, provided narcotics and were also sometimes forced to log hours to make the healthcare businesses appear legitimate to the government. CS 1 believed the healthcare businesses were a scheme to fraudulently collect money from government and government programs. Additionally,

contained within CS 1's telephone was an employment letter DANIELS sent to CS 1 via text. The letter indicates that CS 1 had been accepted for full-time employment with ATOL. In the letter, DANIELS stated that he was the "Chief operating officer" of ATOL. CS 1 indicated that DANIELS wrote this letter so that CS 1's court-ordered travel restrictions would be lifted so that CS 1 could travel to other areas of the United States to sell narcotics for him.

### 5.     Interceptions Relating to the Scheme

455.    Court-authorized wiretap interceptions, as described below, have provided further insight into the above-described Medicaid fraud.

456.    On September 4, 2022, HENTON, using Target Telephone 1, called a female believed to be a woman named "Delores," using (414) 446-███. During this call, HENTON asked Delores, "Did she give any information out? About her?" Delores responded, "No, she's gonna send it; remember I told you she's not gonna send it 'til she see you." HENTON then stated, "I know; and then you said she used to have seizures, or what? What supposed [U/I] the case [U/I]?" Delores responded, "Yeah, she has high blood pressure, um . . . and she had a seizure a long time ago; but she said she has to go to the hospital 'cause she's on . . . well, I didn't ask her what was for." In response, HENTON stated, "Okay. I'm gonna have her act on that seizure thing." HENTON then told Delores to send him some paperwork so that he could "write it in this paper and say…," at which point Delores said "Okay."

457.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, HENTON and Delores discussed a potential new

209

client for ATOL, and HENTON asked Delores whether the prospective client provided any information about her. Case agents further believe that Delores informed HENTON of some conditions the prospective client indicated she had suffered or was currently suffering, including high blood pressure and one seizure a long time ago. Case agents believe that HENTON told Delores that he was going to counsel the prospective client to use the previous seizure incident to establish the need for personal and/or supportive care services and to substantiate the corresponding Medicaid billing. ("I'm gonna have her act on that seizure thing.")

458.    On September 5, 2022, at approximately 7:00 p.m., HENTON, using Target Telephone 1, called an unknown female at (414) 501-[redacted], UF[redacted]. During the intercepted call, HENTON told UF[redacted] that he wanted to sign more people up for services every week (up to 20 people), and that wanted to have a "system." HENTON further stated, "Anybody got services already, we want to get them right away. Anybody that have personal care or supportive care services, we want to snatch them right away."

459.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, HENTON discussed a plan for acquiring new clients for their business. Case agents further believe HENTON instructed UF6250 to target people who were already receiving personal/supportive care services because if a member is already receiving personal cares, he could then bill for supportive cares in a way that makes it harder to detect that services are not being rendered.

460.    On September 7, 2022, at approximately 11:17 a.m., an unidentified female using (414) 892-[redacted] ("UF[redacted]") called Target Telephone 1.  During the intercepted call,

210

UF[redacted] asked HENTON, "It's Delores that does my personal and supportive cares, right?" HENTON replied, "No, your supportive care with—with A Touch of Love, not with our company, with A Touch of Love." HENTON stated, "And then I'm gonna come by there so you can sign all these timesheets. So, I'm gonna come by there, okay?"

461. Based on their training, experience, and knowledge of this investigation, case agents believe that UF[redacted] is not receiving legitimate personal and supportive cares from ATOL because UF[redacted] appears to not know who is supposed to be performing services for her. Furthermore, agents believe that HENTON is compiling records required by the Medicaid program to make the health care businesses appear legitimate to the government. HENTON's reference to needing UF[redacted] to sign "all these timesheets" corroborates what some patients have told investigators, that they were instructed to sign approvals for numerous blank or prefilled timesheets at once.

462. On September 12, 2022, at approximately 9:28 a.m., HENTON, using Target Telephone 1, received a call from UF[redacted]. During the intercepted call, UF[redacted] stated, "Hey, I have a question: The nurse was just here the other day for the evaluation, and now the other one is coming in because she wants me to... Well, she's doing all my check-ins now, but she wants me to tell her what... whoever comes over, you know, to the house... what they do for me every day. I don't know what to say because I don't know how many hours you supposed to be here." HENTON then asked, "Who wants to know that?" UF[redacted] responded, "IRIS." HENTON asked whether it was "for [her] consultant," and UF[redacted] acknowledged it was. DANIELS got on HENTON's line and stated, "Okay, so, um, you have Delores...You tell her that A Touch of Love does services. You have

211

multiple people who come, and two of the people is Delores Giller and Joelle Massey. Two of the workers that work for A Touch of Love is Joelle and Delores... and Joelle Massey, right? And your daily activity consists of... one is arranging your clothes…" DANIELS continued, "Helping you pick out and sort your clothes. Two is helping you plan out your day. . . Three is store runs; they make store runs for you. . . Number four, number four is—is meal prep… Uh... uh... number five is to help you to sort out all your bills so you can make bill payments. . . And then they also do take care of your medical and doctor runs, picking up your medications." UF▮▮ then asked, "And this is what IRIS will be doing for me?" DANIELS stated, "No, this is what A Touch of Love—this is what A Touch of Love…" HENTON added, "IRIS don't do anything; they just come out." HENTON further stated that they (IRIS) are "supposed to report the case, what A Touch of Love do with the services they give, the services that happen with you every day."

463.    Based on their training, experience, and knowledge of this investigation, case agents believe that during this portion of call, DANIELS instructed UF▮▮ how to act and what to say to the IRIS consultant (who was visiting shortly) regarding who performs her care services and what kind of services they perform. Case agents further believe DANIELS instructed UF▮▮ to present false information to the consultant to maximize the amount of personal and/or supportive cares. Case agents further believe HENTON told UF▮▮ that IRIS does not perform the services that DANIELS told her to describe to the consultant, and that IRIS merely collects information regarding the types of services ATOL performs for UF▮▮.

464.     As the call continued, DANIELS stated, "Right, I just told you, you gotta write that down. Write that down; say, 'They take care of my baths.' That's another one; write down—say, 'Bathroom. They help me get in and out of the shower,' right? . . . 'They help me get in and out of the shower as well.' You know what I'm saying? "I can't get up and move around; they help me with these needs.'" HENTON added, "You gotta always say that we… 'cause you got very low hours." UF[redacted] replied, "And that's why they doing this, because they were only were giving you whatever, seven hour a week, and I told her I needed 15, so then I can get you the damn money. But I gotta tell her… she needs to know exactly what they are doing every day, so it's going to be more than pick up my clothes. She's gonna have to help me get in the shower, then help me get all dress, you know, that kind of. . . ."

465.     Case agents believe that during this portion of the call, DANIELS instructed UF[redacted] to write down what DANIELS told her so she could repeat it to the consultant. He emphasized that she should indicate that she cannot move around and therefore needs more assistance than she was receiving at that time. UF[redacted] acknowledged that to qualify for more hours of service, and therefore receive a greater allowance, it would need to appear that she has greater limitations. UF[redacted] also indicated that she needed to be approved for 15 hours of service to be able to get HENTON and DANIELS their "damn money," a likely reference to paying rent to HENTON and DANIELS out of the proceeds of their fraud.

466.     As the call continued, DANIELS then stated, ". . . And here's the thing, too, Denise. Let me share this with you. Are you listening to me? . . . I'm gonna share this with

213

you, right? You can... remember me, and you talk about this before. With these services you can't... you have to let your pride go." UF[redacted] replied, "I know... and I did when the nurse was here." DANIELS continued, "But if the nurse asks, you say, 'Listen, I have a cognitive... I am cognitively delayed, and I know how to count and read and write. I need someone to help me with my bills and to read my mail and different things like that.' Say, 'I'm part of the older generation who didn't know how read and write.' Now, when you give them things like that, they also gives them the ability to write that down and say, 'Well, hey, we never had this; have you talked to your doctors?' 'Yeah, my memory is not good.' 'Have you had a memory test?' Like, 'No.' So now they schedule you for these things, and these are just simple things that are very easy for us to pass. You follow me? . . . They ask you five or six questions, da-da-da-da. You answer some of them wrong; you got bad memory. Uh... the doctor overlooks it; 'She says she don't know how to read.' He won't even ask you to read nothing; he just really writes it down and says that you are cognitively delayed concerning your reading and your ability and things like that. Those give you hours; they give you—that tells them that the people who are servicing you have—they have to do more for you. Plus, the State requires that anybody who has not—who's cognitively delayed, cannot read, cannot write—are people who are qualified for SSI, qualified for more assistance. So these are—this is just something some of the things we have been able to use over the [U/I]." During this portion of the call, case agents believe that DANIELS told UF[redacted] to fake a cognitive delay because it generally goes unquestioned by doctors and triggers a need for more services. Additionally, DANIELS indicates that he and HENTON have had clients pretend to suffer from

cognitive delay in their years of past business, and that has worked to secure Medicaid funding ("These are just simple things that are very easy for us to pass," and, "This is just something some of the things we have been able to use over the [U/I]").

467. UF[redacted] replied, "There are never going to... I mean, I have a college education. So, I mean, they are never going to look into this, right?" DANIELS stated, "No, they are not going to look." UF[redacted] responded, "Okay, 'cause, clearly, I am bullshitting." DANIELS acknowledged, and HENTON stated, "They are plenty of people that have a college education that [U/I]." UF[redacted] asked, "When they are on their forties and fifties?" HENTON replied, "Yeah," and UF[redacted] then stated, "Well, I guess I can be one of them." During this portion of the call, case agents believe that UF[redacted] acknowledged she does not have a cognitive delay and that she does not suffer from the limited functioning that she will represent to the consultant. UF[redacted] asked DANIELS and HENTON whether anyone would later investigate her dishonesty, and they reassured it would not happen.

468. During this same call, DANIELS told UF[redacted]5 that "all [the doctors] care about is this: If you tell your doctor something and he puts it in his notes, that's all they care about." DANIELS then stated, "That's why when I go to the doctor with people. I'll go in and list some of the major things that I . . . I list… But I haven't been able to do that with you, per se, so that we can do it with your doctor, because you was at the—that clinic, and we wasn't able to get there. . . You got a real doctor. Once you have a real doctor... you did the... like, I can take you back in there, and I can say, 'Hey, how are you doing? This is my mother-in-law. She is going through this, this, and that. These are some

215

thing that she has never reported...' And then, once you put all that on there, now they will begin to look at your medical. So that's what they was just telling the--over at the other company, they just like, 'Denise having Medicaid. She has very few illnesses. She just has illnesses. She wants disability.' And, like, boom, boom, and I just like, 'Well, there's still proof of the services, because you gotten the services before so...' A lot of companies worry, but your doctor has... a medical condition that allows you to have services, but at the same time, people like IRIS and them, they are not looking in depth. That's why they gave you most services, 'cause they don't really see a big, big medical file; no long medications and all those things like that, 'cause you don't take them. So that's why with me, before I was telling you, it would have been really good for me and you to had you a regular doctor. We could have you some medications, even though you never took 'em; they just sat in there. They prescribe them to you, sell them to you, and you leave then on the shelf, you know? Different creams, different pills and things like that, so that whenever we want to tell them and say, 'Oh, well, the medication is giving her side effects; this is happening,' they give you hours for that because the [U/I].'" UF▮ stated, "Okay, well, she's gonna be here in a few minutes, so I'm gonna go [U/I] and get my walker [U/I], okay?"

469.    During this portion of the call, agents believe that DANIELS counseled UF▮ on how to interact with her doctor so that her medical records would support additional claims for services. DANIELS further told UF▮ that he goes to the see the doctor with other clients to recite purported symptoms or illnesses for their medical records, and that he could go with UF▮ to do the same with her. DANIELS even

216

suggested that he could pretend to be her son in law. Furthermore, DANIELS indicated that they could also obtain medications that are not really necessary so that they could report problems with side effects in the future and seek approval for even more hours.

470.    Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS, HENTON, and their healthcare companies do not actually provide the services that DANIELS listed, and that UF█████ was among the clients who do not need the services for which they bill the State of Wisconsin Medicaid. Based on their training, experience, and knowledge of this investigation, case agents know that DANIELS and HENTON are coaching clients to maximize funding they receive from Medicaid.

471.    On September 18, 2022, at 6:52 p.m., HENTON received a call on Target Telephone 1 from "Ashley," who was using (414) 975-████. Ashley said, "Hey, Pops. Uh, question: How much is my rent gonna be this month?" DANIELS joined the call and replied, "It's 350 each month; that's what it is." Ashley responded, "Oh, so you're not gonna give me a discount?" DANIELS replied, "There's not gonna be a discount. Why — why would you have… Oh, oh, oh, 'cause you — right; I apologize. You on services with us now. I- This is Doctor Phil. Let me, let me go over your file and everything and make sure everything is going well, and I'll call you back with it, okay?" Minutes later, at approximately 6:58 p.m., DANIELS, using Target Telephone 1, called Ashley at (414) 975-████. DANIELS stated, "Hey, Ashley. One 175, okay? . . . That's the rent now."

472.    Based on their training, experience, and knowledge of this investigation, case agents believe that HENTON and DANIELS provide housing for Ashley and that

during this call, Ashley wanted to inquire about a discount she believed she was entitled to in the rent she owed them. At first, DANIELS (using HENTON's phone) told "Ashley" that her rent would be $350 and that she was not going to get a "discount." DANIELS then remembered that he and HENTON had begun receiving money from Medicaid for purported services performed for "Ashley," so her rent would be reduced to $175. Based upon this investigation, case agents believe that HENTON and DANIELS were/are providing Ashley with reduced rent in exchange for allowing HENTON and DANIELS to use her name, personal identifying information (PII), and Medicaid numbers to bill Medicaid for services not actually rendered. Furthermore, on September 12, 2022, a representative at Community Family Care called HENTON inquiring about a certain member that was potentially switching services to HENTON's agency. During this call, HENTON said that they sign people  up for supportive cares, "give out monthly stipends," and "help people with" housing. Case agents believe that this is further evidence of the "rent reduction" scheme.

473.    On September 21, 2022, at 10:26 a.m., HENTON, using Target Telephone 1, received a call from an unidentified male at (414) 275-███3 ("UM███"). During the intercepted call UM███ stated, "Okay, I've been calling you for about five or seven days or something, and I ain't been getting no response, but then I see you had just got back from out of town." UM███ then stated, "Okay, so when you need me, you got my phone number. Let me know something." HENTON replied, "Oh, I definitely gonna be needing you. Uh... if don't get to you today, we definitely gonna get started getting' together tomorrow, okay?" HENTON stated, "And then if you run across somebody, who need

218

service, you know, let me know so we can set them up for a place. I'mma try to make sure that that place be yours and that you have that person living in your house. If she on SSI—Just find you somebody who gonna be on SSI so you can put 'em in the place." HENTON and UM[redacted] continued to talk about UM[redacted]3 getting a person lined up so HENTON could set up an appointment. HENTON said, "Okay? Then I'll give you the application on her and everything, okay? Then we can start her billing."

474.    Based on their training, experience, and knowledge of this investigation, case agents believe that HENTON and UM[redacted] discussed recruiting more individuals who could be signed up for personal/supportive cares through ATOL to maximize the funding that they could receive from the State of Wisconsin Medicaid. Agents further believe that HENTON instructed UM7073 to find someone receiving Supplemental Security Income (SSI) because those individuals are presumed to have health issues/disabilities, allowing ATOL to claim the maximum level of services and therefore maximize their Medicaid payments. HENTON did not indicate that any services would actually be rendered.

475.    On October 10, 2022, at 9:56 a.m., HENTON, using Target Telephone 1, called an unidentified female at phone number (414) 803-[redacted] (UF[redacted]). During the intercepted call, UF[redacted] asked HENTON why nobody came to pick up the application for services because she has had it ready for a month. UF[redacted] informed HENTON she needed to be moved out of her place. HENTON stated he does not put people in homes unless they are in his programs. Based on their training, experience, and knowledge of this investigation, health care investigators believe HENTON told UF[redacted] he would not

219

find UF[redacted] a new place to live or give her rental assistance unless she enrolled in personal or supportive cares through one of HENTON's agencies for which HENTON could bill the Wisconsin Medicaid program. Based on their training, experience, and knowledge of this investigation, investigators know that HENTON and DANIELS are using the client's personal information to bill the Wisconsin Medicaid program even though the personal/supportive cares were never rendered.

476.    On October 17, 2022, at 6:58 p.m., HENTON, using Target Telephone 1, received a call from an unidentified female at phone number (414) 797-[redacted], (UF[redacted]). During the intercepted call, HENTON told UF[redacted] that she and her daughter "Amanda" should call their respective IRIS consultants and inform them that UF[redacted]'s daughter "Michelle" was now living with them as their personal care worker. HENTON informed UF[redacted] that telling IRIS that "Michelle" lives with them would take away the "EVV." HENTON further instructed UF[redacted] to inform UF[redacted]'s IRIS consultant that Michelle is on ATOL's payroll. Based on their training and experience, healthcare fraud investigators know that an "EVV" (Electronic Visit Verification) is the process by which a participant's worker electronically verifies that services were rendered and to verify the location at which services were rendered. Investigators also know that participants whose workers live with them are exempted from EVV. Based on their training and experience, case agents believe that a supportive care agency that is not rendering services has an incentive to not use EVV.

477.    On October 27, 2022, at 11:32 p.m., DANIELS, using Target Telephone 2, called MASSEY and spoke to MASSEY and BRADLEY JR. regarding their roles in the

220

process of onboarding new clients, including the paperwork that must be completed. They discussed what was being sent to B. DANIELS, when, and how. DANIELS asked MASSEY, "Is she gettin' what she needs for the… Is she gettin' what she need to send all for the medical records and their physician?" MASSEY replied, "No, she just getting the, uh…" DANIELS interrupted, "But then that's no good. She needs to be able to know. Now you and Jay gonna take over doing that." He continued, "So here's how the processing works: The processing works—The minute that you get that document signed, that needs to get at the doctor's office the same day, because that's what's holding us from doing the amount of clients that we need to do, okay?" MASSEY told DANIELS, "No, no, no; we don't have the doctor's signature that you're talking about." DANIELS told her, "No, no, no, no. The one client signs for the release of medical records and for the provisional letter. They need to [U/I] the same day. So, what I'm sayin' is, Betty needs that so they can fax it over. But, what will take for Betty to fax it over back [PH]  It be better if you guys are going to the doctor's office whatever that [U/I] and submitting that information than having that [U/I] or request for pick up, and then come pick up the medical records and assign position on them. . . . The key focal point is; getting the medical records and getting the signed physician order from we can't send the nurse 'til that's done."

478.    DANIELS then proceeded to explain how he does things. He explained, "This is what I do when I get the paperwork, okay? Every time—So, I treat it like it's gold. BRADLEY JR. clarified, "All I'm doing is sending my documents, ID, health care, social over to Betty through email the signed document I'm taking over to each individuals

221

specified doctor assigned doctor and that's it." DANIELS affirmed, "That's basically it. Then you going—you going to get that same paperwork over so when you give it to them doctors and them, you gotta get that paper back. That's how—sometimes the doctors will take them, okay? But you gotta get the original back, so you gotta let them make a copy. So, they make a copy and put it in their computer. Then you gotta ask them, 'Can I get it signed? Can I get it picked up?'"

479.    DANIELS continued to stress that they need to provide the original with the doctor's signature to B. DANIELS, stating "that original always has to go to Betty and them. Betty and them always have to have the original uhh signature" of the "phyisian order" and the "medical order release of medical records." DANIELS also urged them to get back-up contact information for anyone they signed up in case their phone services were cut off. DANIELS further stated, "You win a prize when it's, like, it's almost like I'm willing to give you an extra 20 dollars if you could take that medical record and that physician over to they doctor get it signed pick up the medical record back from the medical office and bring all that back with you and pass it and slap it on Betty's desk. You get what I'm saying? That's, like, that's like a gold mine; that's like a trophy. Like, dang, I didn't just go out and get a client, I ain't just make 'em sign, but I went down to they doctor's office, got the medical records, the medication list, the last three doctors' notes—last three doctor visits, and signed physician order. Boo yeah! Here ya go. That client now can have a nurse come out and see them. You get what I'm trying to tell you."

480.    DANIELS then explained, "That's the process we was looking with Lenard. That's how come we didn't get so many done. Now, if you guys hada—hada knew that's

222

what it would take for Lenard, you get what I'm saying? We would have been on a different page, because we would have probably did 200 clients with Lenard. We wouldn't have missed all of those people with Lenard. You get what I'm saying? Okay? And I still left, what, 30 clients? Thirty clients with Lenard that I never, that I can never get paid for that's still sitting at his office right now. You hear what I'm saying? That all because we didn't have files and records and we don't know who these people is. And that's one of these things that we want to do now as we keep going forward, is that we want to build a case file of every individual that's in, uh, that's in the company cause, God forbid something happens and I have to switch all those clients again."

481.  Based on their training, experience, and knowledge of this investigation, healthcare investigators believe that during this call, DANIELS instructed MASSEY and BRADLEY JR. to obtain complete member files as soon as possible and deliver the files to B. DANIELS so the approval process can be expedited. This process will ensure their business can bill for supportive cares and recruit more individuals who could be signed up for supportive cares to maximize the funding the business could receive from the State of Wisconsin Medicaid.

482.  On November 15, 2022, at 3:59 p.m., DANIELS, using Target Telephone 2, called B. DANIELS at 414-628-█████. B. DANIELS informed DANIELS that a client with a first initial of "J" was asking to be released from her service agreement. DANIELS said he would talk to the client and get her back on board. He also instructed B. DANIELS not to release any clients without giving him an opportunity to talk to them first. Immediately thereafter, at 4:02 p.m., DANIELS called HENTON at (262) 599-█████. He told HENTON

223

to find J and get her on the phone so that they could find out whether she had switched services. HENTON called DANIELS back with J on the line at 5:28 p.m. DANIELS asked J why she had switched providers, and J replied that it was because she had not been receiving the PCW services she needed. DANIELS told J she was supposed to call him, and he got J to agree to transfer back. DANIELS informed B. DANIELS of this in a call between them that occurred at 5:50 p.m. This call also provides yet another example of a client who enrolled in supportive care services yet did not actually receive any services.

### 6. Text messages reflect "template billing."

483. When the contents of MASSEY's cell phone were extracted pursuant to a federal search warrant in January 2022, case agents identified numerous text messages between MASSEY, MONROE, DANIELS, and HENTON that indicated that MONROE, DANIELS, and HENTON are using MASSEY to perform tasks relating to billing Medicaid. Based on their training, experience, and knowledge of this investigation, case agents believe that the text messages reflect that the parties are engaging in Medicaid billing based on a template, not billing in accordance with actual work performed. The text messages do not discuss topics relating to patient care. Some examples are noted below:

>    a. On April 21, 2020, MONROE texted MASSEY, "I have nothing for A.B. No timesheets."[18] MASSEY responded, "Ok how far should be [sic] go back?" MONROE replied, "Just the last two weeks." MASSEY then wrote, "If possible, can you leave a blank timesheet in the mailbox when you are available to, Thanks!" Based on their training, experience, and knowledge of this investigation, case

---

[18] Where appropriate, initials are being used in place of the actual names given in the text messages described here.

agents believe MASSEY sought MONROE's guidance regarding the time period that services would be billed for A.B. Case agents further believe MASSEY would not have asked this question if services had actually been rendered and noted in conjunction at the time the work was performed. Further, there were no instructions to MASSEY from MONROE on hours of care, who performed the care, and what care was performed by WPCS, suggesting that MASSEY simply "populated" the timesheet.

b.      On December 2, 2021, MASSEY texted MONROE a photograph of a pre-filled WPCS timesheet for a client named J.A. The timesheet was undated, but multiple assistance categories were already marked with an "X," indicating work was performed. The timesheet was undated and unsigned by any provider or client, but it stated the total hours of care provided for J.A. was "35" and included total mileage of "44.8." A similar text was located on December 2, 2021, wherein MASSEY texted MONROE a photograph of a pre-filled timesheet for a client named U.B. The timesheet was undated, but multiple assistance categories were already marked with an "X," indicating work was performed. The undated timesheet was unsigned by any provider or client, but it stated the total hours of care provided for U.B. was "3.25" and included total mileage of "17.5." Based on their training, experience, and knowledge of this investigation, healthcare investigators believe that the pre-filled timesheets suggest that the hours and mileage claimed therein is not reflective of services that were actually rendered.

c.      On January 1, 2022, MASSEY texted MONROE, "Hi Lenard, I need sample sheets for these clients please M.R., W.R, M.B., L.M., L.C., M.J."  MONROE replied, "I can," "I also gave those timesheets to Pops [HENTON] and Leroy," and "They also need caregivers especially L.C. because she is new." Based on their training, experience, and knowledge of this investigation, healthcare investigators believe that the sample time sheets are pre-filled, which suggests MASSEY, MONROE, and HENTON were not memorializing actual work hours, but rather were simply compiling required records to legitimize the health care businesses.

484.    Case agents believe that contained within SUBJECT PREMISES 1, 3, 5, 6, 7, and 8 will be evidence of health care fraud, in violation of Title 18 U.S.C. § 1347, and false statements regarding health care offenses, in violation of 18 U.S.C. § 1035.

225

### K. Financial Analysis – Money Laundering, Healthcare Fraud, Loan Fraud

485.    To date, the investigation has revealed that HENTON, DANIELS, B. DANIELS, MONROE, and other DTO members are laundering the proceeds of the DTO and Medicaid fraud through bank accounts at BMO Harris (BMO 1, 2, 3 & 4), Wells Fargo (WF 1), Chase Bank (Chase 1 & 2), and Educators Credit Union (ECU 1, 2, 3 & 4). Review of bank records reflects that DANIELS, B. DANIELS, HENTON, and others have funneled well over $2 million dollars in suspected drug proceeds through accounts that are held in the name of various supportive care agencies, which are also receiving Medicaid payments from the State of Wisconsin. Additionally, MONROE has fraudulently obtained COVID-19-related loans, the proceeds of which were deposited into his business bank account.

#### 1. DANIELS and B. DANIELS use BMO 1, 2, 3, & 4 to receive and conceal their criminal proceeds.

486.    An analysis of DANIELS' and B. DANIELS' bank records reflects that Medicaid payments and significant amounts of unexplained cash is initially deposited into BMO Business Account redacted 4242 (BMO 1). After the money is deposited, B. DANIELS and DANIELS transferred the money to three other BMO bank accounts or withdrew significant amounts of cash.

487.    Records from BMO Harris show that DANIELS and B. DANIELS control the following accounts at BMO Harris Bank:

| Acct Number | Name of Account | Signers | Date Opened |
|---|---|---|---|
|  |  |  |  |

| | | | |
|---|---|---|---|
| redacted4242 BMO 1 | First Response Supportive Care Agency | DANIELS & B. DANIELS | 3/11/2021 |
| redacted6721 BMO 2 | First Response Supportive Care Agency | B. DANIELS & DANIELS | 2/11/2021 |
| redacted1119 BMO 3 | Phillip & Betty Daniels | DANIELS & B. DANIELS | 1/30/2020 |
| redacted4277 BMO 4 | Betty J. Daniels | B. DANIELS | 1/2/2021 |

488. From January 2021 to May 2022, BMO 1 received approximately $171,000 from Wisconsin Medicaid and approximately $70,000 in cash deposits. BMO 1 also had $241,000 in cash withdrawals during the same period. Notably, despite BMO 1 purporting to be a business account for FRSC, bank records do not reflect the payment of common business expenses, including payroll, payments to nurses, clients, or other healthcare expenses.

489. Additionally, from December 2020 to December 2021, DANIELS and B. DANIELS received and deposited into BMO 1 approximately 69 checks from WPCS (MONROE) totaling approximately $782,000. Based on their training and experience, State of Wisconsin Medicaid fraud investigators believe, based upon preliminary evidence, the payments from WPCS to FRSC are for assistance in securing clients.

490. Records further reflect that U.S. currency from BMO 1 was subsequently transferred to BMO 2, 3, and 4, as reflected below.

     a.    From February 2021 to May 2022, BMO 2 received approximately $288,000,00 in transfers from BMO 1, accounting for well over 95% of the incoming U.S. currency into BMO 2.

b.   From January 2021 to May 2022, BMO 3 received approximately $58,000 in transfers from BMO 1.

c.   From January 2021 to May 2022, BMO 4 received approximately $10,409 in transfers from BMO 1, BMO 2, and B. DANIELS' Zelle (a third-party payment processor).

491.   On or about October 21, 2021, $50,000 in funds from BMO 1 was used to obtain a cashier's check made out to "Joathan Colula." This check was deposited into COLULA's Bail Bonds account ending in x0363. The memo line on the check stated, "For Services Rendered." The remitter was listed as "First Response Sup." Based on their training and experience, case agents believe that DANIELS used BMO 1 to transfer drug proceeds to COLULA.

492.   Additionally, on October 17, 2022, at 4:49 p.m., DANIELS, using Target Telephone 2, called B. DANIELS at (414) 628████. While they talked, DANIELS arrived at a bank and could be heard asking for a cashier's check in the amount of $10,361 to be made out to "Tier One Records."

493.   Then, on November 10, 2022, at 11:58 a.m., B. DANIELS called DANIELS and asked what he was doing. He told her, "Nothing, with the guys here in California, working."

494.   Based upon their training, experience, and knowledge of this investigation, case agents believe that the cash deposits into BMO 1, which are subsequently funneled to BMO 2, 3 & 4, constitute drug proceeds. By depositing the proceeds into the FRSC business bank account, and subsequently funneling much of it to other individual bank accounts, DANIELS and B. DANIELS are concealing and disguising the nature, source,

228

and movement of the criminally derived profits. Additionally, based upon the evidence of Medicaid fraud, agents further believe the Medicaid payments into BMO 1, which are subsequently funneled to BMO 2, 3 & 4, are proceeds of the fraud.

495. Finally, as discussed below, DANIELS' and B. DANIELS' use of their previous FRSC bank account—a Chase Bank account that is now closed—further illustrates their scheme:

  a. On August 11, 2015, B. DANIELS opened up a bank account at Chase Bank ending in x7680. On or about October 21, 2015, DANIELS was added as a signer on the account. Records for January 2018 to December 2020 reflect that the account received approximately $194,000 from Wisconsin Medicaid and approximately $1,186,768 in cash deposits. Cash deposits did not begin until January 2020 and during a twelve-month period over $1,000,000 in unexplained cash was deposited into the account. From January 2018 to December 2020, approximately $1,677,633 in cash was withdrawn from this account. DANIELS withdrew over $1,000,000 in cash from this account in 2020 while he was in California, which is a known source state for narcotics.

  b. According to CS 1, at the direction of DANIELS, CS 1 deposited the proceeds from narcotics sales conducted by CS 1 (which were also directed by DANIELS) into a Chase bank account controlled by DANIELS. Bank records reflect that CS 1 deposited drug proceeds into the Chase account on at least three occasions in September and October 2021, and the deposits totaled approximately $102,335.

  c. Additionally, on August 4, 2020, A.C. made a $50,000 cash deposit into the Chase account in Chicago, Illinois. In February 2022, A.C. accepted a package at his residence in Chicago, Illinois, which contained approximately 4 pounds of crystal methamphetamine and 5 automatic rifles. Law enforcement conducted a search warrant on A.C.'s residence and found additional firearms, money, and narcotics. Based on their training and experience, and the investigation to date, case agents believe that A.C.'s deposit into the Chase account was narcotics related.

229

     d.      On June 25, 2020, MASSEY made a cash deposit into the Chase account for $65,090. On July 2, 2020, HENTON conducted a $75,000 cash deposit into the Chase account. Based on their training and experience, and the investigation to date, case agents believe that HENTON's and MASSEY's deposits into the Chase account was narcotics related.

     e.      During this same time frame B. DANIELS transferred approximately $149,000 into a Chase account ending in 0005 (also now closed as of November 2020), in which she was the sole signer.

     f.      The Chase account, like BMO 1, 2, 3, and 4, did not have any traditional payroll activities or outgoing checks to nurses, clients, or other healthcare related expenses. Cash deposits accounted for 70% of all the credits into the account and cash withdrawals accounted for 77% of the debits. The Chase account appears to have been closed as of December 31, 2020, shortly before BMO 2 was opened. Based on their training and experience, and the investigation to date, case agents believe that the DANIELS' Chase account, like BMO 1, 2, 3, and 4 were used to hold drug trafficking proceeds and to conceal the source and nature of these proceeds.

    **2.     DANIELS DTO transferred payments to COLULA using WF 1.**

496.    On or about December 2021, DANIELS opened Wells Fargo Bank account 8255, **WF 1,** in the name of Phillip DANIELS. The source of funds into this account were as follows: one check from DANIELS' son in the amount of $14,000, approximately $10,100 in cash, and one $14,500 check, dated December 21, 2021 from an account controlled by HENTON that received Medicaid funds (ECU 1). However, DANIELS withdrew $7,850 on December 23, 2021, and $15,310 on December 15, 2021. These two withdrawals resulted in 2 cashier's checks in those amounts made payable to COLULA. These checks were deposited into COLULA's Bail Bonds account ending in x0363. Based

on these transactions, case agents believe that DANIELS used WF 1 to transfer drug proceeds to COLULA.

497.    As discussed above in Paragraph 180, COLULA received approximately $203,000 in payments from DANIELS' DTO associates, through cashier's checks and U.S. currency.

498.    Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS' and COLULA's transactions, through the use of cashier's checks and COLULA's business account, were designed to conceal the nature, source, location, ownership, or control of the drug proceeds. Agents further believe that DANIELS' significant unexplained cash deposits were proceeds from drug trafficking activities.

### 3.    DANIELS and EDWARDS use their Chase Bank Accounts (Chase 1 and 2) to launder DTO proceeds.

499.    On March 31, 2022, DANIELS and HENTON opened a Chase Bank account ending in 8205, or **Chase 1**, in the name of Intelligent Investments. The signature card lists both individuals, with HENTON listed as the President and DANIELS as Acting Secretary. The Wisconsin Department of Financial Institutions lists HENTON as the Registered Agent at the address of ATOL, ███ N. Sherman Blvd, Milwaukee, Wisconsin (SUBJECT PREMISES 6). An analysis of this account, and previous accounts associated

with Intelligent Investments, reflect that the accounts did not appear to operate as any type of legitimate business.[19]

500.    On or about August 18, 2022, EDWARDS opened a Chase Bank account ending in x9319, or Chase 2, in the name of Tier One Records.

501.    While agents are still waiting for complete financial records, at least 3 cashier's checks issued from Chase 1 to Chase 2, totaling $50,000.

502.    The day following EDWARDS' opening of Chase 2, or about August 19, 2022, EDWARDS deposited a cashier's check from Intelligent Investments in the amount of $15,000 into Chase 2. The cashier's check listed "payroll check" in the memo line. EDWARDS also deposited 2 additional cashier's checks, both in the amount of $17,750 from Intelligent Investments that listed "payroll check" in the memo line into Chase 2 on August 27, 2022, and September 8, 2022.  Notably, despite Chase 2 purporting to be a business account for Intelligent Investments, bank records do not reflect the payment of

---

[19] HENTON and DANIELS opened bank accounts ending in x1789 and x3484 at Associated Bank under the name Intelligent Investments. These two accounts were opened in January and February 2019 and were closed in August and September 2020, respectively. During this time period, the account ending in x1789 received $135,749.59 in cash deposits (accounting for 67% of incoming funds), and the account ending in x3484 received approximately $95,892.01 in cash deposits (accounting for 86% of incoming funds).

On or about October 16, 2020, DANIELS and HENTON opened Chase Bank account ending in 2062 in the name of Intelligent Investments. From approximately December 2020 – December 2021, account ending in 2062 received approximately $99,000 in cash deposits. During this time, approximately $35,000 in payments to American Airlines were made, $30,000 in cash withdrawals were made, and approximately $17,000 in payments to hotels were paid from this account.

232

common business expenses, including payroll, payments to nurses, clients, or other healthcare expenses.

503.    Further, in October 2022, DANIELS conducted at least 3 unexplained cash deposit transactions totaling approximately $94,000 into Chase 1, and EDWARDS conducted 3 separate cash withdrawals from Chase 2, totaling approximately $86,000. Based on their training, experience, and knowledge of this investigation, case agents believe that DTO proceeds are being deposited into Chase 1, which are they withdrawn in the form of cashier's checks and electronically deposited into Chase 2, at which point EDWARDS withdraws the funds from Chase 2 to pay the California-based DTO suppliers.

504.    Additionally, as discussed above in Paragraphs 230-232, DANIELS and EDWARDS have used additional bank accounts (which are now either closed or not being used) to funnel cash and cashier's checks from DANIELS to EDWARDS.

505.    Between April 2022 and September 30, 2022, in total EDWARDS has received $70,500 in cashier's checks from FRSC or Intelligent Investments and at least $129,319 in cash deposits from DANIELS and FRYER.

506.    Based on their training, experience, and knowledge of this investigation, including intercepted communications and financial records, case agents believe that DANIELS and EDWARDS are using Chase 1 and 2 as funnel accounts, i.e. to transfer drug proceeds from DANIELS to California-based sources of supply, and to therefore conceal the nature, source, location, ownership, or control of the proceeds.

507.    According to records obtained pursuant to an *ex parte* tax order, neither DANIELS nor FRSC filed tax returns for 2019, 2020, or 2021.  B. DANIELS filed a personal return in 2019 but did not claim FRSC as a Schedule C business.  Notably, according to records from the State of Wisconsin, FRSC was provided with 1099 forms that substantiate the Medicaid payments.  Therefore, case agents believe that DANIELS and FRSC intentionally failed to file tax returns for 2019, 2020, and 2021 because they would have significant tax liability based on the large Medicaid payments and relative lack of business expenses.

### 4.    HENTON and/or DANIELS' use ECU 1, 2, 3 & 4 to receive and conceal their criminal proceeds.

508.    HENTON is the owner/operator of ATOL. On or about January 1, 2018, HENTON opened Educator Credit Union (ECU) bank accounts ending in x413_08 (ECU 1) and x413_00 (ECU 2). Both accounts were opened in the name of A Touch of Love (ATOL).  HENTON was the sole signer for this account until March 18, 2021, when DANIELS was added as an additional signer.[20] In approximately December 2021, HENTON changed the name on this account from ATOL to The Perfect Choice Supportive Home Care. From approximately January 1, 2018, to May 18, 2022, ECU 1 received approximately $1,400,000 in Medicaid payments from the State of Wisconsin, consisting of approximately 600 separate payments in the form of ACH deposits.

---

[20] ECU 1 appears to be a checking account and ECU 2 appears to be a "prime share savings" account that was simultaneously opened in conjunction with ECU 1.

509. During the same time frame, HENTON and DANIELS conducted approximately $1,064,000 in cash withdrawals from ECU 1. ECU records reflect that upon receipt of a Medicaid deposit, withdrawals in the approximate amount of the deposit would occur on the same day. Examples are as follows:

| Date of Medicaid Deposit | Amount of Medicaid Deposit | Amount of Cash Withdrawal |
|---|---|---|
| 4/24/2020 | $25,182.76 | $25,000 |
| 5/15/2020 | $8,865 | $8,400 |
| 7/17/2020 | $10,930.16 | $10,600 |
| 12/4/2020 | $12,045 | $12,000 |
| 4/9/2021 | $11,609 | $10,550 |
| 7/2/2021 | $11,544.88 | $11,364 |
| 9/17/2021 | $5,119 | $4,300 |
| 9/24/2021 | $6,315 | $6,100 |
| 10/15/2021 | $10,351 | $6,000 |
| 10/22/2021 | $9,340.88 | $9,000 |

510. During the same timeframe, ECU 1 had approximately 213 cash deposits for approximately $441,000. There were several times when these deposits were in excess of $10,000 or were $10,000 exactly, as reflected below.

| Date of Deposit | Amount |
|---|---|
| 12/15/2020 | $24,530 |
| 5/18/2021 | $18,010 |

235

| | |
|---|---|
| 6/24/2021 | $10,000 |
| 10/18/2021 | $13,541 |
| 12/14/2021 | $14,500 |
| 1/28/2022 | $12,520 |
| 4/7/2022 | $30,000 |

511.   Medicaid payments from the State of Wisconsin and cash deposits were well in excess of 85% of the total sources of payment into this account.

512.   Further analysis showed that, despite ECU 1 purporting to be a business account for ATOL, bank records do not reflect the payment of common business expenses including payroll, payments to nurses, clients, or other healthcare expenses. Additionally, according to the Wisconsin Department of Workforce Development, ATOL has no reported wages. Based on their training and experience, and the investigation to date, case agents believe that the deposits into ATOL were primarily proceeds from the DTO and the healthcare fraud scheme.

513.   During the same time frame mentioned above, approximately $150,000 was transferred from ECU 1 to ECU 2. Further, ECU 2 received approximately $140,000 in cash deposits during this same time frame. Similarly, from January 1, 2018, to the present, records reflect an absence of regular payroll activity occurring in ECU 2. In other words, there was no payroll service and no consistent outgoing checks in the form of payroll.

514.   Accordingly, agents believe that ECU 1 and 2 in the name of ATOL contain proceeds of the DTO and Medicaid fraud, and have been used to launder drug proceeds.

515.   On or about April 14, 2022, HENTON opened two additional accounts at Educators Credit Union, x644171_08 (ECU 3) and x644171_00 (ECU 4), in the name of Unconditional Love Supportive Home Care. Between the date of opening and May 28,

236

2022, approximately $15,000 in cash was deposited into ECU 3, or 88% of the total funds; and approximately $1,000 in cash was deposited into ECU 4, or 100% of the total funds. Based on their training and experience, and the investigation to date, case agents believe that the cash being deposited into ECU 3 and ECU 4 constitute drug proceeds.

516.    According to records obtained pursuant to an *ex parte* tax order, neither HENTON nor ATOL filed tax returns for 2019, 2020, or 2021. Notably, according to records from the State of Wisconsin, ATOL was provided with 1099 forms that substantiate the Medicaid payments. Therefore, case agents believe that HENTON and ATOL intentionally failed to file tax returns for 2019, 2020, and 2021 because they would have significant tax liability based on the large Medicaid payments and relative lack of business expenses.

### 5.    MONROE use WF 2 and 3 and BMO 5 and 6 to receive and conceal his criminal proceeds.

517.    According to records from the State of Wisconsin MONROE is the Managing Employee and Owner of WPCS. 2018.[21] On a Medicaid application filed for WPCS in 2022, MONROE is listed as 50% owner and Tamisha WILLIAMS as 50% owner. The application lists WILLIAMS' address as ███ Settles Brook Court, Suwanee, Georgia. During the entirety of the investigation, it is believed WILLIAMS has resided in Georgia. The same application listed BRADLEY JR., C. DANIELS (DANIELS' now deceased son/nephew), Leroy HENTON, MASSEY, and others as Primary Care Workers. WILLIAMS has no criminal history and as mentioned above MONROE has a prior Illinois

---

[21] On a 2022 application, MONROE is listed as the Registered Agent of WPCS.

felony conviction for "Conspiracy to distribute 5 or more kilograms of cocaine."

518.    According to records from the State of Wisconsin, from approximately January 2019 to the present, WPCS received at least $5,000,000 in Medicaid payments. MONROE has used various accounts to receive Medicaid funds, including WF 2. A review of bank records reflects that WF 2 paid FRSC approximately $782,000 between September 2020 and December 2021. Each payment was made via check, often listing "consulting" or "payroll" in the memo line. However, according to records from the State of Wisconsin, no wages were actually paid to DANIELS/FRSC. Based on their training and experience, and the investigation to date, case agents believe that, despite purporting to be a business account, MONROE used WF 2 to hold Medicaid fraud proceeds, to conceal and disguise the nature and source of these fraud proceeds, and to attempt to legitimize his payments to DANIELS/FRSC.

519.    According to bank records, MONROE also received fraudulent loan funds in WF 2, which funds are believed to have been used for non-business reasons. MONROE subsequently transferred fraud proceeds from WF 2 to WF 3, BMO 5, and BMO 6.

**5.1    MONROE uses WF 2 to collect Medicaid payments and fraudulently obtained loan proceeds.**

520.    On September 8, 2020, MONROE opened account ending in x6511 (WF 2), in the name of WPCS at Wells Fargo Bank. According to records from the State of Wisconsin, between September 2020 and February 2022, WF 2 received approximately $2,765,084 in Wisconsin Medicaid payments. The Medicaid payments represent 82% of all deposits into WF 2 during this time.

238

521. Financial records reflect the following in withdrawal from WF 2:

    a. From October 2020 to February 2022, WILLIAMS received approximately 68 separate checks totaling $691,835. These checks were often in amounts above $10,000, and often noted "consultant fee" in the memo line.

    b. Approximately 67 checks were written from WF 2 to FRSC totaling $763,980. The FRSC payments were deposited into BMO Harris bank accounts controlled by DANIELS and B. DANIELS, including BMO 1. Based on their training, experience, and knowledge of this investigation, case agents believe these payments are for assistance in securing clients.

    c. MONROE, using WF2, also authored approximately 43 separate checks totaling $746,513 to WPCS that were deposited into BMO Harris bank accounts in the name of WPCS in which MONROE was the sole signer, to include BMO 5 and BMO 6. These checks often contained the words "consultant" or "payroll" in the memo line. BMO 5 and BMO 6 do not reflect any legitimate business expenses.

    d. MONROE also received an additional $134,000 in checks from WF 2 made out to MONROE himself or LJM Investments, which is his Wisconsin LLC and lists MONROE as the Registered Agent. WF 2 checks were also made out to HENTON, Leroy HENTON, Jameel BRADLEY JR., Jamilah MONROE (wife of MONROE).

522. According to records from the State of Wisconsin, MONROE applied for and received $295,071.54 in Direct Provider Payment Program payments from the Health Resources and Services Administration (HRSA). These funds were deposited into WF 2 on various dates: $16,984 on November 6, 2020; $3,919 on December 16, 2020; and $274,167 on January 26, 2022.

523. Below sets forth information about the HRSA:

    a. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Paycheck Protection Program and Health Care Enhancement, and the Coronavirus Response and Relief Supplemental Appropriations Act appropriated funds to reimburse eligible health care providers

239

for health care-related expenses or lost revenues attributable to coronavirus.

b. The U.S. Department of Health and Human Services' (HHS) established the Provider Relief Fund (PRF) and the HRSA administers the program on behalf of HHS.

c. The PRF provides financial support to eligible health care providers who experienced lost revenues and allowable expenses attributable to coronavirus during the COVID-19 pandemic. The PRF program was established to protect and maintain national health system capacity.

d. In total, over $178 billion has been appropriated to the PRF for direct payments to eligible health care providers to prevent, prepare for, and respond to coronavirus.

e. In addition to the PRF, Congress appropriated $8.5 billion in American Rescue Plan (ARP) Act funds for eligible rural providers and suppliers who serve Medicaid, Children's Health Insurance Program (CHIP), or Medicare patients. HRSA established the ARP Rural program in September 2021, and applications were accepted from September 29, through November 3, 2021. The ARP Rural Program was intended to help address the disproportionate impact that COVID-19 has had on rural communities and rural health care providers. Funding was available to eligible providers who serve rural patients in these communities.

524.  In his applications, MONROE attested to the following, in part:

a. "The Recipient certifies that the Payment will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus. The Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. The Recipient certifies that all information it provides as part of any application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of HHS or the HHS Inspector General, are true, accurate and complete, to the best of its knowledge. The Recipient acknowledges that any deliberate omission, misrepresentation, or falsification of any information

240

contained in this Payment application or future reports may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from Federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment."

525.    In a WPCS application signed by MONROE on October 20, 2020, he represented the 2019 fiscal year revenues for WPCS was $849,232. Banking records indicate that WF 2 received $682,801.79 from Medicaid and other small healthcare revenue sources, with Wisconsin Medicaid accounting for 87% of incoming funds.

526.    The same application also contained revenue breakdowns by fiscal quarters. WPCS represented that from January 1, 2019 – March 2019, WPCS received $121,279.22 in revenues; however, bank records reflect $107,865.29. From April 1, 2020 – June 30, 2020, WPCS represented $583,029.17 in revenues; however, records reflect $538,508.00. Based on their training, experience, and knowledge of this investigation, financial investigators believe loan applicants applying for this type of loan have an incentive to misrepresent their gross receipts to qualify for the loan.

527.    Attached to the same application was an IRS Form 1120 – U.S. Corporation Income Tax Return for WPC for the year 2019. The return is unsigned by MONROE or the return preparer. The form lists business "Paradon Accounting Service" as the preparer firm and "L. Ellis" as the preparer. L. Ellis is believed to be Lee Ellis, the Registered Agent for Paradon Accounting Services Inc. Lee Ellis has a prior misdemeanor conviction for "petty theft," and what appears to be a felony traffic conviction in Wisconsin for "fleeing an officer," and an additional felony conviction in Wisconsin of "Misappropriation of Person ID to obtain value or benefit." Notably, MONROE has

241

written Ellis or Paradon Accounting Service 3 checks totaling $31,000 since November 2020. Based on their training and experience, and the investigation to date, case agents believe these payments are for Ellis' assistance in creating the documents used to commit the loan fraud.

528.    On the IRS Form 1120 U.S. Corporation Income Tax Return, 2019 revenues for WPCS are listed as $849,232. However, banking information indicates 2019 revenues were approximately $682,801.79.  Within the application, MONROE listed compensation of officers was $227,929. However, at least $391,708.50 was withdrawn in cash from one WPCS bank account. Within the application, MONROE listed salary and wages was $72,116. However, banking statements reflect that Paychex debits for payroll and payroll taxes were $222,515. Based on their training, experience, and knowledge of this investigation, financial investigators believe loan applicants applying for this type of loan have an incentive to misrepresent their financial footprint to qualify for the loan

529.    MONROE also filled out an application for a Phase 4 HRSA payment that led to WPCS receiving $274,167.90 on January 26, 2022.  In the Phase 4 HRSA application, MONROE listed the 2020 total revenues from patient care for WPCS as $1,481,559; however, banking statements reflect it was $1,895,733.63. This is an approximate $1,200,000 increase from the 2019 billing by WPCS and MONROE. Accordingly, it appears did not suffer any negative financial effects from the COVID-19 pandemic and, therefore, WPCS was not entitled to relief. Based on their training, experience, and knowledge of this investigation, financial investigators believe MONROE had an incentive to represent that WPCS suffered a negative effect from the COIVD-19 pandemic

242

to receive loan proceeds that were at least in part converted to his immediate personal and non-business use.

530.    The same application also contained revenue breakdowns by fiscal quarters. WPCS represented that from July 1, 2019, to September 30, 2019, WPCS received $272,453; however, banking information reflects WPCS received $148,427. The application represented from July 1, 2020, to September 30, 2020, WPC received $243,909 from patient care; however, banking records reflect WPCS actually received at least $475,066.40. Lastly, on the application, MONROE alleged WPCS received $250,401 in revenue from October 1, 2020, to December 30, 2020. However, banking records reflect WPCS received at least $541,532. Based on their training, experience, and knowledge of this investigation, case agents believe MONROE deliberately made it appear as though WPCS suffered financially during the COVID-19 pandemic, when in fact WPCS' Medicaid billings increased.

531.    Attached to the same application was an IRS Form 1120 – U.S. Corporation Income Tax Return for WPC for the year 2020. The return is unsigned by MONROE or Ellis, who was again listed as the preparer, along with Paradon Accounting Service. As mentioned above, when compared to bank records, it appears the total revenues or gross receipts number was understated by over $350,000. Review of the bank records for WF2 reflects further discrepancies.  The compensation of officers is listed as $97,818, but cash withdrawn from WPCS, Zelle payments to WILLIAMS, and checks to MONROE total $1,200,000. WPC salaries are listed as $152,111, but non-Paychex checks to employees totaled $174,537, for a difference of $20,000. The debits for Paychex payroll and taxes for

243

2020 were approximately $120,742.

532.    On January 26, 2022, MONROE and WPCS received a $274,167.85 HRSA disbursement payment into WF 2. The same day a check was written from WF 2 to WPCS for $139,000 and deposited into BMO Harris bank account 4832908472, or BMO 6 on the same day. There were also additional checks to WPCS for $50,000 on January 28, 2022, and $80,500 on January 31, 2022, respectively. These checks appear to have been signed by WILLIAMS based on signature comparison. It is unknown where these checks were ultimately deposited.

533.    Medicaid payments and the fraudulent CARES Act disbursements represent 91% of all incoming funds into WF 2 from September 2020 to February 2022.

534.    From September 2020 to February 2022, the total percentage of outgoing funds for WF2 above plus cash withdrawals from the account primarily funded through Medicaid and COVID-19 Cares Act loans was approximately 73%. WF2 also reflects $369,000 paid out to the payroll service PayChex, which prepared IRS Form W-2s, printed payroll checks, and presumably paid associated state and federal withholdings. PayChex and other checks issued to individuals that could possibly be related to payroll, accounted for approximately 22% of outgoing debits from this account.  The following depicts deposits and withdrawals for WF 2:

WF 2 - $3,055,155 in Medicaid and Cares Act deposits

Overview of Withdrawals for WF 2

| Payment | Percentage of Withdrawal |
|---|---|

| | |
|---|---|
| $691,835 payments to WILLIAMS | 21% |
| $763,980 payments to FRSC | 23% |
| $746,513 payments to WPCS (BMO Harris) | 22% |
| $134,000 payments to MONROE (LJM or himself) | 4% |
| Total: $2,426,649 (plus $90,321 in cash) to above sources | 73% |

535.    Based on their training and experience, and the investigation to date, case agents believe that the majority of the deposits into WF2 were Medicaid fraud proceeds. Additionally, case agents believe that, despite purporting to be a business account, MONROE used WF 2 to hold Medicaid fraud and loan fraud proceeds, to conceal and disguise the nature and source of these fraud proceeds, and to attempt to legitimize his payments to DANIELS/FRSC.

### 5.2    MONROE transfers proceeds from WF 2 to WF 3 & BMO 5 and 6.

536.    From WF 2, WF 3 (MONROE's personal account ending in x7022) received approximately $51,000 and approximately $30,000 in cash deposits and payroll from WPCS. These funds accounted for 85% of the incoming funds into WF 3 from September 2020 – March 2022. From WF 3, MONROE paid approximately 35 different individuals approximately $30,000 over CashApp. Review of banking activity for WF 3 reflects far less banking activity than WF 2.  There was an approximate total of $95,783 in credits into WF 3 and approximately $95,608 in debits from September 2020 to March 2022 being

conducted from this account.

537.    An initial analysis of BMO Harris records reflects that MONROE deposited at least 31 checks from WF 2 into at least 3 different BMO Harris accounts, totaling approximately $524,845, as reflected below[22]:

| Account: redacted 439173 – BMO 5 | 14 checks - $154,405 |
|---|---|
| Account: redacted 908472 – BMO 6 | 17 checks - $357,540 |
| Account: redacted 243965 – now closed | 1   check - $12,900 |

538.    Review of the banking activity reflected in the above-mentioned BMO Harris bank accounts show that, despite the accounts purporting to be business accounts for WPSC, bank records do not reflect the payment of common business expenses including payroll, payments to nurses, clients, or other healthcare expenses.

539.    A review of the BMO Harris records reflects that MONROE conducted frequent transfers, moving money to various accounts, and no deposits appear to be from any other business or source besides cash. For example, MONROE conducted the following transactions using his BMO accounts:

| BMO 5 Debits/Credits | BMO 6 Debits/Credits |
|---|---|
| 9/17/2021: $2,727.00 debit – Milwaukee Bucks | 2/4/2022: $10,000 Transfer Credit |
| 9/24/2021: $50,000 Transfer Credit | 2/17/2022: $14,600 Transfer Credit |
| 2/14/2022: $2,954 debit – Nieman Marcus | 3/10/2022: $46,000.00 debit – Withdrawal |
| 5/31/2022: $1,144.67 debit – Milwaukee Bucks | 6/21/2022: $27, 300.00 – Transfer Credit |

---

[22] A complete analysis of BMO Harris records is pending.

| 6/24/2022: $12,300 credit – ATM Deposit | 6/8/2022: $129,112.49 debit - Outgoing wire to Makes and Models LLC (Car Dealership) |
|---|---|
| 6/17/2022: $1,144.66 debit – Milwaukee Bucks | |

540.    Based on their training and experience, and the investigation to date, case agents believe that BMO 5 and BMO 6 function as "slush" accounts for MONROE to use Medicaid and loan proceeds from WF 2. Case agents further believe that MONROE used WF 2 to hold Medicaid fraud proceeds and fraudulent loan proceeds, which proceeds were subsequently transferred into WF 3, BMO 5, and BMO 6 and believed to have been used for non-business reasons.

541.    MONROE's wife, Jamilah MONROE, also received money in the form of checks and cashier's checks from WPCS (WF 2 and BMO Harris), as follows: $35,000 (12/15/20); $50,000 (1/15/21); $7,000 (1/21/2022); $4,076.00 (4/15/2021); $5,100 (7/9/21, with "gift" written in the memo in the check); $11,000 (9/30/21); $10,000 (4/7/2022). These payments total approximately $122,176.

### 5.3    Jamilah MONROE uses healthcare fraud proceeds for down payment for ▮redacted▮ W. Heather Dr., Milwaukee, Wisconsin.

542.    On December 15, 2020, the $35,000 check to Jamilah MONROE was deposited into her Wells Fargo Money Market Savings account ending in x0671. The balance of her account before the deposit was $7,150.33. The $50,000 check from WPCS was deposited into Jamilah MONROE's same account on January 15, 2021. There were approximately 18 transactions in and out of this account between the deposits. The

balance on her account before the $50,000 was $49,775.56. The balance of her account after the deposit was $99,775.56. On January 22, 2021, Jamilah MONROE sent a wire to Frontier Title and Closing Services for $89,125.69.

543.     Records from Frontier Title and Johnson Bank indicate this was used as a down payment for the purchase and building of a new residence for MONROE and Jamilah located at ██████ W. Heather Drive, Milwaukee, Wisconsin. Jamilah MONROE obtained a mortgage for the property through Johnson Bank in the amount of $346,750. Included in the file from Frontier Title were 2 "gift letters" signed by MONROE that stated the following. "Wellness Personal Care do certify the following: I have made a gift of $35,00 (and $50,000.00 on the respective dates) to Jamilah MONROE, whose relationship is spouse. The gift is to be applied towards the purchase of the property located as ██████ W. Heather Drive, Milwaukee, Wisconsin. No repayment of the gift is expected or implied in the form of cash or by future services of the recipient. The funds given to the homebuyer were not made available to the donor from any person or entity with an interest in the sale of the property including the seller. Real estate agent or broker, builder, loan officer, or any entity associated with them. The source of the gift is checking account." The residence has subsequently been built and MONROE and Jamilah MONROE have been observed at the home.

544.     The deed filed with the Milwaukee County Recorder's Office and the loan application file lists Jamilah MONROE as the sole borrower and owner of the property. The Uniform Residential Loan Application submitted to Johnson Bank states that Jamilah MONROE has been employed with BMO Harris bank for approximately 5 years and her

248

job title is "VP Retail Branch Manager." Based on their training and experience, and the investigation to date, case agents believe that the $89,125.69 from WPCS represent proceeds traceable to healthcare fraud.

### 5.4 MONROE fraudulently collects PPP payment into a closed BMO Harris bank account, the balance of which was subsequently transferred to BMO 6.

545. A review of bank records reflects that on January 22, 2021, MONROE and WPCS received a Paycheck Protection Program (PPP) loan from BMO Harris Bank in the amount of $147,516.25. The application was signed by MONROE, who listed himself as a "Beneficial Owner" and President of WPCS. Banking records are still pending for that time period, but based on the PPP loan application, the sum of $147,516.25 was paid to BMO Harris bank account number ending x3965, which is now closed.

546. A review of the PPP loan application submitted to BMO Harris shows that MONROE again falsely represented WPCS suffered a financial hardship due to the COVID-19 pandemic. MONROE stated on the application that his 2020 fiscal quarter 2 gross receipts were less than his fiscal quarter 2 gross receipts for 2019. More specifically, he represented the amount of $229,100 for 2020 and the amount of $320,913 for 2019. However, banking records reflect that that the approximate number of payments WPCS received from Medicaid for fiscal quarter 2 of 2020 were approximately $538,508, and for fiscal quarter 2 of 2019 were approximately $165,392.62. Based on their training, experience, and knowledge of this investigation, financial investigators believe MONROE had an incentive to represent that WPCS suffered a negative effect from the COIVD-19 pandemic to receive loan proceeds that were at least in part converted to his

249

immediate personal and non-business use.

547.     MONROE also swore to the following in part, on the PPP loan application.

a.     "The Applicant has realized a reduction in gross receipts in excess of 25% relative to the relevant comparison time period". "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." "The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud." I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

548.     Records for BMO Harris bank account x3965 (now closed) between July 2021 and December 2021[23], reflect a continuous approximate balance of $100,000. There were approximately 35 transactions occurring in this account during this timeframe until the remaining balance of $100,000 was transferred to BMO 6 (account ending in x8472) on December 8, 2021.

549.     MONROE applied for and was granted Loan Forgiveness of $147,516.25 on

_____

[23] Records for this account for the time period January 2021, to June 2021 have been requested but not yet received.

or around December 16, 2021. Based on MONROE's numerous material misrepresentations on prior Cares Act loan applications, his payments to FRSC despite DANIELS/FRSC not being on payroll for WPSC, and the absence of legitimate business activity occurring in BMO 5, BMO 6, and account ending x3965, case agents do not believe that the PPP loan proceeds were supported by financial necessity or were used for any legitimate business purposes.

550. According to tax records obtained pursuant to an *ex parte* order, MONROE and WPSC filed payroll taxes in 2019 and 2020. MONROE and Jamilah MONROE filed jointly in 2020 and 2021 and their returns did not reflect income from WPSC, despite the large payments to their numerous bank accounts and subsequent spending. Notably, according to records from the State of Wisconsin, WPSC was provided with 1099 forms that substantiate the Medicaid payments. Therefore, case agents believe that MONROE intentionally failed to file accurate personal and business tax returns for 2019, 2020, and 2021 because he would have significant tax liability based on the large Medicaid payments and relative lack of business expenses.

### 5.5    MONROE formerly used a Chase Bank account to receive Medicaid funds and EIDL loan proceeds.

551. On March 7, 2018, WILLIAMS and MONROE opened an account at Chase Bank in the name of WPCS ending in x9697 (now closed). According to records from the State of Wisconsin, x9697 received approximately $2,000,000 in Wisconsin Medicaid payments between approximately January 1, 2019, and September 2020. The Medicaid payments accounted for approximately 87% of the funds deposited.

552.    During the same time frame, WILLIAMS and MONROE withdrew approximately $1,220,000 in cash.  These withdrawals comprise approximately 67% of the total withdrawals from x9697.  Notably, while using x9697, WPCS appeared to use PayChex payroll service.  WPCS paid PayChex $322,793, presumably for payroll expenses.  WPCS payments to PayChex comprise approximately 13% of the total debits from x9697.  While using x9697, WILLIAMS and MONROE paid $35,606 in checks to FRSC, DANIELS and B. DANIELS. Finally, WILLIAMS appeared to withdraw or receive approximately $400,000 in cash or Zelle (a third-party electronic payment processor) payments during this time.  Based on their training and experience, and the investigation to date, case agents believe that the majority of the deposits into x9697 were Medicaid fraud proceeds.

553.    Additionally, on July 27, 2020, an Economic Injury Disaster Loan (EIDL) in the amount of $149,900 was deposited into WPCS x9697.[24] The balance of the WPCS account before the EIDL loan was $6,682. The same day as receiving the EIDL funds, a $67,000 cashier's check was made out to "LJM Investments" and deposited into a BMO Harris Bank account. The following day $19,000 was sent to WILLIAMS via a Zelle payment into her Bank of America account. According to the Wisconsin Department of Financial Institutions, MONROE is the Registered Agent for LJM Investments.

554.    According to the EIDL information provided by the Small Business Administration, MONROE submitted his EIDL application on July 20, 2020. Among other

---

[24] The Medicaid payments and the EIDL loan accounted for 94% of the money entering this Wells Fargo account.

things, MONROE signed and swore to under penalty of perjury was that the "Borrower will use all proceeds of this loan solely as working capital to alleviate economic injury caused by the disaster." MONROE also claimed that the gross revenues for WPCS were $708,952. However, bank records reflect that MONROE received $801,000 in the 12-month span prior to January 31, 2020. According to Chase bank records, WPCS received approximately $674,000 in Medicaid money in 2019. In 2020, WPCS received approximately $1,384,000. Accordingly, bank records reflect WPCS did not suffer any negative financial effects from the COVID-19 pandemic. Based on their training and experience, case agents believe that MONROE underestimated WPCS gross revenues to make it appear WPCS suffered economically to obtain the loan. Based on their training and experience, and the investigation to date, case agents believe that the $149,900 that was deposited into WPCS x9697 is EIDL fraud proceeds.

555.    Account x9697 was closed by Chase Bank on or around September 2020.

556.    MONROE obtained the EIDL, PPP, and HRSA proceeds through wire fraud, in violation of 18 U.S.C. § 1343. His subsequent transfer of the funds constitutes money laundering, in violation 18 U.S.C. § 1957.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

557.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant

applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

558. *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media— in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

254

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

559.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user

255

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that

are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

560. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure

257

the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.
.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

561. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not

258

limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

562.    The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

563.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

564.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the

device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

565.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

566.    If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

567.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

260

568.    As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

569.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

570.    Due to the foregoing, with respect to any person who is located in the PREMISES during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant,  it is requested that law enforcement personnel may (1) press or swipe

261

the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## V.    CONCLUSION

571.    Based on the foregoing, I believe there is probable cause to believe that the following individuals are committing violations of federal law, including the Target Offenses: Phillip DANIELS SR., a/k/a "Dr. Phil," Roy HENTON, a/k/a Pops, Joelle MASSEY, Joathan COLULA, Julio BARRAZA, Deonte EDWARDS, Jimmy GONZALEZ MACIAS a/k/a Jimmy MACIAS, Jameel BRADLEY SR., a/k/a "Black," Michael WILLIAMS, Kevin NELSON, Ramona FRYER, Carla SMITH, Itzel CRUZ-GONZALEZ, Betty DANIELS, Dominique M. LEWIS, and Lenard MONROE. I further believe that there is probable cause to believe that located at and in the SUBJECT PREMISES described in Attachment A, there is evidence of the Target Offenses. Finally, I believe that there is probable cause to seize all funds in the Accounts identified herein.

## ATTACHMENT A

| TARGET | TARGET OFFENSE |
|---|---|
| 1. Phillip DANIELS SR., a/k/a "Dr. Phil" (DOB: XX/XX/1976)<br><br>2. Roy HENTON, a/k/a "Pops" (DOB: XX/XX/1958)<br><br>3. Joelle MASSEY (DOB: XX/XX/1992)<br><br>4. Joathan COLULA (DOB: XX/XX/1992)<br><br>5. Deonte EDWARDS (DOB: XX/XX/1995)<br><br>6. Ramona FRYER (DOB: XX/XX/1994) | 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) (Distribution of and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Unlawful use of communication facilities).<br><br>18 U.S.C. §§ 1956(h) (Money Laundering Conspiracy) and 2(a) (Aiding and Abetting the aforementioned offenses). |
| 7. Julio BARRAZA (DOB: XX/XX/1974)<br><br>8. Jimmy GONZALEZ MACIAS a/k/a Jimmy MACIAS (DOB: XX/XX/1997)<br><br>9. Jameel BRADLEY SR., a/k/a "Black" (DOB: XX/XX/1985)<br><br>10. Michael WILLIAMS (DOB: XX/XX/1981)<br><br>11. Kevin NELSON (DOB: XX/XX/1975)<br><br>12. Itzel CRUZ-GONZALEZ (DOB: XX/XX/1996)<br><br>13. Carla SMITH (DOB: XX/XX/1976) | 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) (Distribution of and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Unlawful use of communication facilities).<br><br>18 U.S.C. § 2(a) (Aiding and Abetting the aforementioned offenses). |

| | |
|---|---|
| 14. Betty DANIELS<br>(DOB: XX/XX/1976) | 18 U.S.C. §§ 1956(h) (Money Laundering Conspiracy) and 2(a) (Aiding and Abetting the aforementioned offenses). |
| 15. Dominique LEWIS<br>(DOB: XX/XX/1995) | 21 U.S.C. Section 841(a)(1) and (b)(1)(B) (Possession with Intent to Distribute Controlled Substances), and 843(b) (Unlawful use of communication facilities) |
| 16. Lenard MONROE<br>(DOB: XX/XX/1973) | 18 U.S.C §1343 (Wire Fraud) and 18 U.S.C. § 1957 (Money Laundering). |